UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

S. KENNETH LEECH II,

Defendant.

**SEALED INDICTMENT**

2̶4̶ CRIM 658

## COUNT ONE
### (Investment Adviser Fraud)

The Grand Jury charges:

Overview

1.      Between in or about 2021 and October 2023, S. KENNETH LEECH II, the defendant, committed fraud and abused the trust placed in him by clients of the investment-management company Western Asset Management ("WAMCO").  LEECH engaged in a criminal scheme commonly known as "cherry picking."  He did so to compensate for losses in his marquee investment strategy by assigning trades that performed well during their first day into client accounts associated with that strategy, and assigning trades that performed poorly over their first day into the accounts of other clients, who were not aware that LEECH was causing them losses to favor others.  Over the course of his criminal scheme, LEECH allocated trades with net first-day gains of over $600 million to his favored strategy and clients, and allocated trades with net first-day losses of over $600 million to clients to whom he owed an equal fiduciary duty.

2.      S. KENNETH LEECH II, the defendant, was able to carry out this scheme because, as WAMCO's Chief Investment Officer, LEECH was responsible for making trades on behalf of different portfolios and then assigning those trades to a particular portfolio—a process generally known as "allocation."  One set of portfolios for which LEECH traded followed what WAMCO

called the "Macro Opportunities" strategy ("Macro Opps"), which LEECH promoted as reflecting his and WAMCO's best ideas. Another set of portfolios followed what WAMCO called the "Core" and "Core Plus" strategies (together, the "Core Strategies"). LEECH owed a fiduciary duty to any client who invested in portfolios that followed either of these strategies.

3. Despite that duty, and in violation of it, S. KENNETH LEECH II, the defendant, engaged in a fraudulent scheme to bolster Macro Opps, which necessarily came at the expense of the Core Strategies, by allocating trades based on their performance between the time he placed the trades and the time he made his allocations. He carried out this scheme by placing trades, waiting to see how those trades performed throughout the day, and then using the first-day performance of his trades to determine in which portfolio to allocate those trades—assigning better-performing trades to Macro Opps and worse-performing trades to the Core Strategies. This was prohibited by WAMCO's policies, which did not allow traders to allocate trades on the basis of first-day performance to make up for losses.

4. Neither S. KENNETH LEECH II, the defendant, nor WAMCO disclosed to investors that LEECH used first-day performance to decide how to allocate trades, or that LEECH was favoring Macro Opps in his allocations. To the contrary, WAMCO represented to investors that LEECH and others knew where they planned to allocate a trade before making the trade and finalized the allocation promptly after the trade was completed. WAMCO trained LEECH and others that they should not wait hours after trading before allocating their trades, but instead should allocate promptly after the trades were completed. LEECH did not follow this process. He routinely waited hours after making his trades—often until late in the day—to make his allocations, which provided him the opportunity to observe how his trades had performed before deciding where to allocate them. Between 2021 and October 2023, LEECH used that ability to see how the

2

market moved to support Macro Opps by awarding it better performing trades, while hiding worse performing trades in the Core Strategies.

5.      By allocating trades based on first-day performance, S. KENNETH LEECH II, the defendant, improperly bolstered the overall performance of Macro Opps, at the expense of the larger Core Strategies. Each time LEECH assigned a trade with a first-day gain to Macro Opps, or assigned a trade with a first-day loss to the Core Strategies, LEECH improved or protected the daily performance of Macro Opps. LEECH took these steps to boost the daily performance of Macro Opps consistently over time, thereby significantly enhancing the overall performance of Macro Opps. From January 2021 through October 2023, the U.S. Treasury ("Treasury") futures and options trades that LEECH allocated specifically to Macro Opps had net first day *gains* of over $600 million. By contrast, during this period, the Treasury futures and options trades that LEECH allocated specifically to the Core Strategies had net first day *losses* of over $600 million.

6.      S. KENNETH LEECH II, the defendant, engaged in a similar scheme to bias allocations in favor of two other accounts ("Account-1" and "Account-2"), both of which were LEECH's longstanding clients.

<u>WAMCO, LEECH, and the Relevant Strategies</u>

7.      WAMCO is a global fixed-income investment advisor that manages hundreds of billions of dollars on behalf of its clients. The firm has nine offices, including one in New York, New York. At all times relevant to this Indictment, S. KENNETH LEECH II, the defendant, was WAMCO's Chief Investment Officer or Co-Chief Investment Officer. As Chief Investment Officer, LEECH's responsibilities included participating in committees that helped set firm-wide investment strategies. LEECH also served as a portfolio manager for multiple WAMCO strategies and, in that role, actively made trades for clients participating in those strategies.

3

8.      One set of strategies for which S. KENNETH LEECH II, the defendant, was a portfolio manager consisted of the Core Strategies, which was comprised of Core and Core Plus. The Core Strategies were benchmarked to the Bloomberg U.S. Aggregate Index.  The goal of the Core Strategies was to generate a greater return than that benchmark index over the course of an investment cycle, while keeping benchmark-based constraints on the amount of risk that those strategies could take on.  WAMCO advertised the Core Strategies to pension funds, large institutions, and retail investors as a prudent, long-term investment strategy designed to outperform the benchmark over a market cycle.  The primary difference between Core and Core Plus was that Core Plus could use a wider range of assets to accomplish that goal.  Investors could participate in either of the Core Strategies by having a separately managed account—such as Account-1—or investing in one of the WAMCO mutual funds that followed the Core Strategies.  At all times relevant to this Indictment, WAMCO had between approximately $100 and $165 billion in assets under management across the Core Strategies.  LEECH shared portfolio management responsibilities for Core and Core Plus with many other portfolio managers.

9.      Macro Opps was another strategy for which S. KENNETH LEECH II, the defendant, was a portfolio manager.  LEECH was responsible for starting Macro Opps and promoted it to clients as reflecting what he claimed were the best ideas at the firm.  Macro Opps was an unconstrained strategy, which meant that, unlike the Core Strategies, it did not have a benchmark.  Instead, the stated objective of the Macro Opps was to maximize total return, with a relatively wide range of risk compared to the Core Strategies.  WAMCO advertised that "the firm's overall value opportunities can be assessed through [Macro Opps]," and that the strategy typically expressed the best ideas drawn from other strategies across WAMCO—including the Core Strategies—but did so in a more concentrated, aggressive manner.  At all times relevant to this

Indictment, WAMCO had between approximately $3 and $16 billion in assets under management in mutual funds and separately managed accounts following Macro Opps. LEECH shared portfolio management responsibilities for Macro Opps with one other portfolio manager.

10.     The Macro Opps strategy had an outsized effect on WAMCO's net revenue, despite its relatively small size compared to the Core Strategies. Investors following the Macro Opps strategy paid fees that were approximately four times higher than fees paid by investors in the Core Strategies. That fee structure meant that each dollar in Macro Opps was more valuable to WAMCO than a dollar in the Core Strategies. For example, in 2020, Macro Opps generated approximately $56.6 million of net revenue, from approximately $14 billion assets under management. This was considerably more revenue than Core generated from over $37 billion assets under management, and was approximately 50% as much revenue as Core Plus generated from over $100 billion assets under management.

11.     Macro Opps also had a significant effect on the net revenue WAMCO attributed to S. KENNETH LEECH II, the defendant. WAMCO produced scorecards that attributed accounts and net revenue to each portfolio manager. Those scorecards credited LEECH with all of the net revenue from Macro Opps, but divided the net revenue from accounts following the Core Strategies among different portfolio managers. For example, in 2020, WAMCO's scorecard credited LEECH with approximately $26.3 million in net revenue from Core and approximately $65 million in net revenue from Core Plus. The scorecard credited LEECH with approximately $56.6 million in net revenue from Macro Opps, despite assets under management being far smaller.

12.     Between 2021 and October 2023, S. KENNETH LEECH II, the defendant, made a series of poor investment decisions that disproportionately affected Macro Opps, causing

significant losses in the fund that led LEECH to seek to improve its performance, even at the expense of clients in the Core Strategies:

a.      Between 2021 and 2023, LEECH made a series of investment decisions that led to losses across the portfolios he managed, including a large position in Russian debt that was nearly wiped out soon after Russia invaded Ukraine in early 2022 and a significant investment in Credit Suisse debt that also lost all value when Credit Suisse collapsed in early 2023. Although those losses affected many of WAMCO's strategies, including the Core Strategies, they caused particularly acute problems for Macro Opps, in large part because Macro Opps had more exposure to some of the losing investments. Over the period described above, the assets under management for Macro Opps fell by approximately 80%, dropping to a low of under $3 billion.

b.      This severe drop in the value of Macro Opps—which LEECH had advertised as reflecting what he claimed were WAMCO's best ideas—caused LEECH and the Macro Opps team to pay particularly close attention to improving the daily performance of that strategy. During this time of extreme drawdowns in Macro Opps, WAMCO and LEECH engaged in a Macro Opps "retention campaign" to convince clients to keep their investments in Macro Opps. WAMCO attempted to convince its clients to stay invested in Macro Opps by claiming that Macro Opps typically recovered quickly after suffering losses.

<u>LEECH 's Fraudulent Scheme to Boost Macro Opps and Other Accounts</u>

13.      Between in or about 2021 and 2023, S. KENNETH LEECH II, the defendant, engaged in a fraudulent scheme to improve the overall performance of Macro Opps, Account-1, and Account-2 by using first-day performance to decide where to allocate Treasury futures and options trades, favoring Macro Opps, Account-1, and Account-2 at the expense of the Core Strategies. In other words, without disclosure to any client, LEECH used first-day performance

of trades to decide whether a trade would be allocated to Macro Opps, Account-1, or Account-2, as opposed to the Core Strategies.

14.     S. KENNETH LEECH II, the defendant, did not disclose to investors that he was using first-day performance to determine how to allocate trades or that LEECH was causing the Core Strategies to take on first-day losses and miss out on first-day gains in order to improve the performance of Macro Opps. This failure to disclose was in violation of LEECH's obligations to WAMCO's clients. Those clients trusted LEECH to manage their money as a fiduciary and, as a fiduciary, LEECH had a duty to fully and fairly disclose all material facts as well as to employ reasonable care to avoid misleading his clients.

15.     WAMCO's statements to investors in due diligence questionnaires and U.S. Securities and Exchange Commission ("SEC") filings represented that S. KENNETH LEECH II, the defendant, and others, would not favor clients or take first-day performance into account when making allocation decisions. For example:

a.     WAMCO reported to investors that it was a fiduciary and had policies and procedures to uphold its duties, including policies and procedures to ensure that any trade allocation decisions were consistent with WAMCO's fiduciary duties and fair and equitable over time. WAMCO noted that allocations may differ between benchmarked strategies, such as the Core Strategies, and unconstrained strategies, such as Macro Opps, but never stated that first-day performance could be a basis for deciding how to allocate between strategies.

b.     WAMCO represented to investors that the firm's traders generally followed a particular trade-flow process that called for preparing an allocation before making a trade, which would not permit a trader to observe market movements before deciding the trade allocation. That trade-flow process involved identifying a particular trade or strategy and the funds to which that

trade should be allocated; running the proposed trade and allocation through a compliance process, so the compliance team could identify any potential problems; and then executing the trade after that compliance process had been completed.

        c.      WAMCO further represented to investors that LEECH and other traders would finalize allocations "as soon as possible" after the trade was executed. This representation meant, in short, that LEECH and other WAMCO traders would not have the opportunity to allocate trades based on first-day performance because they would have to allocate before observing market movements.

        16.      WAMCO also trained S. KENNETH LEECH II, the defendant, that he should not favor certain clients over others, and that he should not wait hours after trading to allocate each trade, but instead should allocate each trade promptly after trade execution to avoid even the appearance that he was making allocation decisions based on first-day performance. For example:

        a.      WAMCO's policies required LEECH to refrain from favoring certain clients over others. Those policies stated that LEECH was required to act as a fiduciary to all of the clients for which he managed money, and the policies explained that this fiduciary duty prohibited LEECH from "inappropriately favor[ing] the interests of one client over another." The policies specified that "[i]nvestment decisions must never be based upon an objective to allocate lucrative or profitable trades to particular accounts to make up for past account performance or to benefit the Firm through a higher fee structure in such accounts."

        b.      WAMCO's compliance training and materials also repeatedly emphasized to LEECH and other traders that they should not wait hours to allocate their trades, but instead should allocate each trade promptly after the trade had been executed, and in no event later than the end of the trading day. WAMCO's compliance and training materials emphasized that it would

8

not be appropriate to allocate trades based on how the market had moved between the time of a trade and the time of allocation, and emphasized that allocating trades promptly would guard against the appearance of unfairness.

c.        WAMCO's annual compliance training for all portfolio managers, including LEECH, stated that traders should complete the allocation process promptly after each trade they made was executed.  The training presentation emphasized that it was not prompt to wait hours before allocating, giving a "[b]ad facts scenario" of a trader who executed a trade at 8 a.m., but waited until noon to complete the allocation for that trade, after the market had moved.

d.        WAMCO's compliance department reinforced this annual training through emails to all portfolio managers, including LEECH.  For example, in or about August 2021, WAMCO's compliance department sent an email to all portfolio managers, including LEECH, emphasizing that they "should be allocating reasonably promptly after [trade] execution."  The email explained that WAMCO did "not want a market movement after execution to influence the allocation," and that "[t]he [Securities and Exchange Commission] is concerned that an adviser might use knowledge of market movement to allocate winning trades to certain accounts."

17.    Notwithstanding the trainings and WAMCO's representations to investors, S. KENNETH LEECH II, the defendant, fraudulently favored Macro Opps, Account-1, Account-2 over the Core Strategies by routinely waiting for hours after trading—often until late in the day—before allocating those trades.  This practice provided LEECH the opportunity to observe how the market had moved between the time of his trades and the time of his allocation decisions.

18.    Between 2021 and October 2023, S. KENNETH LEECH II, the defendant, took advantage of his ability to see market movements before allocation to favor Macro Opps, Account-1, and Account-2 in his allocation of many Treasury futures and options trades, at the expense of

the Core Strategies.  This process of favoring Macro Opps, Account-1, and Account-2 based on first-day performance cumulatively had a significant, positive impact on their performance.

19.    By using first-day performance to decide how to allocate trades between Macro Opps and the Core Strategies, S. KENNETH LEECH II, the defendant, helped improve the overall performance of Macro Opps over time:

a.    LEECH primarily traded Treasury futures and options for both Macro Opps and the Core Strategies.  LEECH allocated the vast majority of his Treasury futures and options trades to either Macro Opps specifically, the Core Strategies specifically, or as an even split between Macro Opps and the Core Strategies.  LEECH could also allocate trades to specific portfolios within strategies, such as Account-1 and Account-2.

b.    Overall, LEECH's trading in Treasury futures and options did not generate first-day results that were disproportionately gains or losses.  Between 2021 and October 2023, approximately 55% of LEECH's Treasury futures and options trades had first day gains, and approximately 45% had first day losses.  The average first-day performance of each of those trades was a gain of approximately $6,500.  In short, LEECH's Treasury futures and options trading between 2021 and October 2023 did not consistently generate significant first-day gains or losses.[1]

c.    Similarly, as stated above, LEECH allocated many trades evenly to both Macro Opps and the Core Strategies.  He was able to do this because many trades involved purchasing numerous Treasury futures and options in a batch, and LEECH could evenly split those purchases between the two strategies.  As with LEECH's overall trading, the trades LEECH allocated as an even split between Macro Opps and the Core Strategies did not generate first-day

---

[1] The data in this Indictment reflects LEECH's Treasury futures and options trades, excluding trades that were paired with other trades in WAMCO's trading system.

10

results that were disproportionately gains or losses. Of Treasury futures and options trades that LEECH evenly split between 2021 and October 2023, approximately 55% had first day gains, and approximately 45% had first-day losses. These trades did not consistently generate pronounced first-day gains or losses, with an average first-day return at a gain of approximately $13,500.

        d.      By contrast, when LEECH allocated Treasury futures and options trades specifically to Macro Opps or the Core Strategies—that is, to one instead of the other, rather than both evenly—LEECH did so in a biased manner, favoring Macro Opps over the Core Strategies. For example:

        i.      The Treasury futures and options trades that LEECH allocated specifically to Macro Opps were biased toward positive first-day performance. Between 2021 and October 2023, approximately 80% of the Treasury futures and options trades that LEECH allocated specifically to Macro Opps had first-day gains, while only approximately 20% had first-day losses. The average first-day return for trades LEECH allocated specifically to Macro Opps was a gain of over $225,000.[2]

        ii.      By contrast, the Treasury futures and options trades that LEECH allocated specifically to the Core Strategies were biased toward negative first-day performance. Between 2021 and October 2023, approximately 25% of the Treasury futures and options trades that LEECH allocated specifically to the Core Strategies had first-day gains, while approximately 75% had first day losses. The trades LEECH allocated specifically to the Core Strategies also had had significant losses. The average first-day return for trades LEECH allocated specifically to the Core Strategies was a loss of over $300,000.

_____

[2] Unless otherwise noted, data in this Indictment describing trades LEECH allocated specifically to Macro Opps excludes trades LEECH made through Broker-1, described below, because LEECH did not exercise discretion over those allocations as a matter of course.

e.    The bias in favor of Macro Opps persisted regardless of whether LEECH was trading Treasury futures or Treasury options:

i.    Between 2021 and October 2023, when LEECH allocated Treasury futures trades specifically to Macro Opps, approximately 80% had first-day gains, compared to approximately 20% with first-day losses. When LEECH allocated Treasury futures trades specifically to the Core Strategies, however, only approximately 15% had first-day gains, whereas approximately 85% had first-day losses.

ii.    That same bias applied to Treasury option allocations. When LEECH allocated Treasury options trades specifically to Macro Opps, approximately 80% had first-day gains, compared to approximately 20% with first-day losses. By contrast, when LEECH allocated Treasury options trades specifically to the Core Strategies, only approximately 35% had first-day gains, whereas approximately 65% had first-day losses.

f.    LEECH's bias in favor of Macro Opps was more pronounced the larger the first-day gain or first-day loss. For example:

i.    Between 2021 and October 2023, there were over 500 Treasury futures or options trades that LEECH chose to allocate specifically to either Macro Opps or the Core Strategies and that had first-day gains over $500,000. LEECH allocated over 90% of those winning trades to Macro Opps and less than 10% to the Core Strategies.

ii.    Conversely, over that same time period, there were over 500 Treasury futures or options trades that LEECH chose to allocate specifically to either Macro Opps or the Core Strategies and that had first-day losses over $500,000. LEECH allocated less than 10% of those losing trades to Macro Opps, while allocating over 90% of them to the Core Strategies.

12

iii.     Similarly, between 2021 and October 2023, there were over 150 Treasury futures or options trades that LEECH chose to allocate specifically to either Macro Opps or the Core Strategies and that had first-day gains over $1,000,000. LEECH allocated over 90% of those winning trades to Macro Opps and less than 10% to the Core Strategies.

iv.     Over that same time period, there were over 200 Treasury futures or options trades that LEECH chose to allocate specifically to either Macro Opps or the Core Strategies and that had first-day losses over $1,000,000. LEECH allocated less than 5% of those losing trades to Macro Opps, while allocating over 95% to the Core Strategies.

g.     LEECH also allocated trades in the same instrument on the same day in a biased manner. Between 2021 and October 2023, LEECH routinely made multiple trades going in the same direction (buy or sell), for the same instrument (e.g., five-year Treasury futures), on the same day. Those trades often had different first-day performance because LEECH executed the trades at different prices throughout the day. When LEECH allocated those trades, he routinely allocated the better-performing trades to Macro Opps, and the worse-performing trades to the Core Strategies.

h.     LEECH's pattern of biased allocation was steady over the period relevant to this Indictment. In each of the 34 months between the beginning of 2021 and October 2023, the Treasury futures and options trades allocated specifically to Macro Opps had a net first-day gain. By contrast, over that same period, the Treasury futures and options trades that LEECH allocated specifically to the Core Strategies had net first-day losses in all months except two.

i.     The bias in favor of Macro Opps was not caused by LEECH pursuing a particular trading strategy for Macro Opps. Notably, when LEECH did not exercise discretion to

allocate trades between Macro Opps and the Core Strategies, the trades that went to Macro Opps were not characterized by disproportionate first-day gains.  For example:

        i.        Between 2021 and October 2023, LEECH had a standing instruction that trades he made through a certain broker ("Broker-1") should, by default, be allocated to Macro Opps.  As a result, LEECH generally did not exercise discretion to allocate trades through Broker-1 at the end of the day because his trading assistant automatically allocated them to Macro Opps.

        ii.        When Treasury futures and options trades were allocated to Macro Opps without LEECH first observing performance in the market, the bias in favor of Macro Opps disappeared.  Over the relevant time period, approximately 55% of the trades LEECH placed through Broker-1 trades had first-day gains, while approximately 45% had first-day losses.  These trades produced modest first-day losses, generating an average first-day return of a loss of over $5,000.  This is dramatically different from the first-day performance of trades LEECH allocated to Macro Opps when he had the opportunity to first observe market movements, which had an average first-day return of a gain of over $225,000.

        iii.        After October 2023, WAMCO removed LEECH from the Core Strategies, so he no longer had the authority to allocate trades to those strategies.  As with the Broker-1 trades, when LEECH no longer had discretion to allocate trades to the Core Strategies, the trades LEECH allocated to Macro Opps stopped having a consistent, pronounced bias toward first-day gain.  Between in or about November 2023 and July 2024, approximately 60% of the Treasury futures and options trades LEECH allocated to Macro Opps had first-day gains, while approximately 40% had first-day losses.  Unlike when LEECH could choose to allocate between Macro Opps and the Core Strategies, the average first-day return on the trades allocated to Macro Opps after October 2023 was a first day loss of approximately $1,500.

j.        In all, between 2021 and October 2023, the Treasury futures and options trades LEECH allocated specifically to Macro Opps had net first-day gains of over $600 million. By contrast, the Treasury futures and options trades LEECH allocated specifically to the Core Strategies had net first-day losses of over $600 million.

k.        LEECH's fraudulent scheme to allocate trades based on first-day performance affected the overall performance of Macro Opps and the Core Strategies. Even if LEECH held onto Treasury futures and options beyond the first day he purchased them, his biased allocation strategy ensured that Macro Opps had a stream of first-day gains over time, which boosted the strategy's performance when it was otherwise performing well, and cushioned its losses when the strategy was otherwise performing poorly. These gains were particularly important for Macro Opps because that strategy had far fewer assets under management than the Core Strategies, so LEECH's fraudulent scheme to allocate based on performance had a more pronounced positive impact on Macro Opps than it had a negative impact on the Core Strategies.

20.    S. KENNETH LEECH II, the defendant, did not limit his biased allocations exclusively to bias as between Macro Opps and the Core Strategies, but also used first-day performance to decide to allocate trades to Account-1 and Account-2:

i.        In or about 2023, WAMCO discussed and ultimately implemented a reorganization plan that reduced LEECH's responsibilities at the firm, including his responsibilities over the Core Strategies. LEECH retained leadership responsibilities over Macro Opps and certain accounts, including Acccount-1 and Account-2.

ii.        Account-1 and Account-2 were separately managed accounts, with which LEECH had longstanding relationships. Account-1 was part of the Core Strategies, but LEECH had an arrangement with the owner of Account-1 that allowed him to take certain, more

15

aggressive positions in the account. Account-2 was the account that WAMCO and LEECH used as an example of LEECH's track record when they first created Macro Opps and subsequently received allocations as part of Macro Opps.

iii.      Between 2021 and 2023, LEECH made specific allocations to Account-1 that he did not make to the rest of the Core Strategies. Those allocations were biased toward assigning Account-1 trades that had positive first-day performance. The bias was large enough that—even though Account-1 typically also received allocations whenever LEECH allocated to the Core Strategies, which were losses—the net first-day performance of trades that LEECH allocated to Account-1 were positive, making a meaningful contribution to Account-1's overall performance.

iv.      Similarly, between 2021 and 2023, LEECH also allocated trades specifically to Account-2 that had positive first-day performance. Because of Account-2's relatively small size, these allocations had a substantial, positive impact on Account-2's overall performance, even beyond the benefit it received from the trades allocated to it through LEECH's Macro Opps allocations.

### LEECH's False and Misleading Testimony to the SEC

21.    On March 6, 2024, S. KENNETH LEECH II, the defendant, provided sworn testimony to the SEC, in connection with an SEC investigation into LEECH's allocations between 2021 and 2023.

22.    As explained above, S. KENNETH LEECH II, the defendant, had previously received training at WAMCO directing him to allocate trades promptly and warning him that the SEC viewed a failure to allocate trades promptly as a potential warning sign for cherry picking.

16

23.    S. KENNETH LEECH II, the defendant, knew he that did not allocate trades promptly after trade execution, and in fact waited to allocate trades so that he could do so knowing the first-day performance of the trades.  As a result, and in order to avoid scrutiny of his fraudulent allocation practices, in his sworn testimony before the SEC, LEECH lied about his process for allocating trades, falsely claiming, in substance, that he already decided to which strategy trades would be allocated at the time he placed the trade orders.

24.    An attorney for the SEC asked S. KENNETH LEECH II, the defendant, if at the time he placed an order with a broker, LEECH "typically ha[d] an allocation in mind, and LEECH responded, "Yes."  LEECH further asserted that "occasionally" if he had the ability to communicate with his trading assistant, he would tell her just after placing the trade order what his allocation would be.  But he asserted that he typically did not convey his allocation decision until the end of the day because his trading assistant did not "sit in close proximity" to him.  When the attorney followed up, asking LEECH again if he had "an allocation instruction in mind at the time you place the trade order with the broker," LEECH again responded, "Yes."

25.    These responses were false and misleading.  S. KENNETH LEECH II, the defendant, routinely did not decide where to allocate trades until hours after trading—typically late in the day—after he had a chance to observe how his trades had performed during the day, at which point he conveyed his allocation decisions to his trading assistant over the phone.

## STATUTORY ALLEGATIONS

26.    From at least in or about 2021, up through and including at least in or about October 2023, in the Southern District of New York and elsewhere, S. KENNETH LEECH II, the defendant, as an investment adviser, willfully and knowingly, directly and indirectly, used the mails and a means and instrumentality of interstate commerce to (a) employ a device, scheme, and

17

artifice to defraud a client and prospective client; (b) engage in a transaction, practice, and course of business which operates as a fraud and deceit upon a client and prospective client; and (c) engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, LEECH engaged in a fraudulent scheme to favor certain portfolios over others by using first-day performance to decide how to allocate Treasury futures and options trades.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
Title 18, United States Code, Section 2.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

27.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

28.     From at least in or about 2021, up through and including at least in or about October 2023, in the Southern District of New York and elsewhere, S. KENNETH LEECH II, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, LEECH engaged in a fraudulent scheme to favor certain portfolios over others by using first-day performance to decide how to allocate Treasury futures and options trades.

18

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT THREE
### (Commodity Trading Advisor Fraud)

The Grand Jury further charges:

29.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

30.     From at least in or about 2021, up through and including at least in or about October 2023, in the Southern District of New York and elsewhere, S. KENNETH LEECH II, the defendant, as a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, and associated person of a commodity pool operator, by use of the mails and any means and instrumentality of interstate commerce, directly and indirectly (a) employed a device, scheme, or artifice to defraud a client and participant and prospective client and participant; and (b) engaged in a transaction, practice, or course of business which operated as a fraud and deceit upon a client and participant and prospective client and participant, to wit, LEECH engaged in a fraudulent scheme to favor certain portfolios over others by using first-day performance to decide how to allocate Treasury futures and options trades.

(Title 7, United States Code, Sections 6o and 13(a)(5); Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Commodities Fraud)

The Grand Jury further charges:

31.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

32.     From at least in or about 2021, up through and including at least in or about October 2023, in the Southern District of New York and elsewhere, S. KENNETH LEECH II, the

19

defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (a) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (b) making, and attempting to make, an untrue and misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (c) engaging, and attempting to engage in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, LEECH engaged in a fraudulent scheme to favor certain portfolios over others by using first-day performance to decide how to allocate Treasury futures and options trades.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## COUNT FIVE
### (False Statements)

The Grand Jury further charges:

33.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

34.     On or about March 6, 2024, in the Southern District of New York and elsewhere, S. KENNETH LEECH II, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, and made a materially false, fictitious, and fraudulent statement and representation, to wit, during testimony before the SEC, LEECH made

20

false representations that he knew his trade allocation at the time he placed his trade orders with the brokers.

(Title 18, United States Code, Sections 1001(a)(1)-(2).)

## FORFEITURE ALLEGATION

35.     As a result of committing the offenses alleged in Counts One and Two of this Indictment, S. KENNETH LEECH II, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

36.     If any of the above-described forfeitable property, as a result of any act or omission of S. KENNETH LEECH II, the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third person;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney

22