UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| - v. - | ) ) | 24 Cr. 658 (GHW) |
| S. KENNETH LEECH II, | ) ) | |
| Defendant. | ) ) ) | |

### DECLARATION OF JEREMY H. TEMKIN IN SUPPORT OF DEFENDANT S. KENNETH LEECH II'S OMNIBUS PRETRIAL MOTION

Pursuant to 28 U.S.C. § 1746, I, Jeremy H. Temkin, hereby declare as follows:

1. I am a principal of the law firm of Morvillo, Abramowitz, Grand, Iason & Anello P.C., counsel for Defendant S. Kenneth Leech II. I am an attorney licensed to practice law in the state of New York and admitted to practice before this Court.

2. I submit this declaration in support of Mr. Leech's Omnibus Pretrial Motion.

3. I am familiar with the matters discussed herein based on my representation of Mr. Leech in this case, a related case brought by the United States Securities and Exchange Commission (the "SEC"), *Securities and Exchange Commission v. Leech*, No. 24-cv-9017 (KPF) (S.D.N.Y.), and other matters.

**Background of Western Asset Management and the Relevant Investment Strategies**

4. The Western Asset Management Company ("Western") is an institutional and retail fixed-income asset manager based in Pasadena, California. Mr. Leech joined Western in or about 1990. He served as the firm's chief investment officer ("CIO") or co-CIO from 2013 through August 2024 and was instrumental to Western's growth into an industry leader with over $380 billion in assets under management ("AUM") and 600 employees, as of September 2023.

1

5.    Western offers its clients dozens of fixed-income investment strategies consistent with its long-term value investing approach.  These strategies differ in terms of their assets (*e.g.*, government bonds, corporate bonds, asset-backed securities), risk tolerances, return objectives, and other factors.

6.    The Indictment alleges that, over a 33-month period, Mr. Leech engaged in a "cherry-picking" scheme in which he sought to "bolster" Western client accounts following the Macro Opportunities ("Macro Opps") strategy at the expense of accounts following Western's flagship Core and Core Plus strategies (together, the "Core Strategies")

7.    Western's clients invested in the Core Strategies and Macro Opps through either separate accounts or co-mingled accounts.  Western offered institutional clients the ability to tailor strategies to meet their specific investment goals, risk tolerances, and preferences.  As a result, the Core Strategies included approximately 180 different client accounts and Macro Opps included approximately 18 different client accounts.  Accounts within a given strategy could (and frequently did) hold different assets, reflecting different risk profiles and requiring bespoke account management.

8.    I am informed and understand that the Core Strategies (the strategies the government alleges were disfavored) are Western's flagship strategies.  They invested primarily in U.S.-based bonds, with Core accounts seeking to limit their investments to U.S. dollar denominated securities, and Core Plus accounts generally holding no more than 25 percent of their total assets in non-U.S. dollar denominated securities.  Additionally, they (a) were measured against a benchmark; (b) drove returns "bottom-up" from the identification of under-valued securities; and (c) were expected to perform within three percent of the benchmark in ordinary years and six percent of the benchmark in extraordinary years.  The Core Strategies and

2

its many competitors at other firms are measured against the Bloomberg US Aggregate Bond Index.  As a result, the Core Strategies' performance against competitors is an apples-to-apples comparison and is closely scrutinized in the industry.  Between 2021 and 2023, AUM in the Core Strategies ranged between $100 and $165 billion and generated more than one-third of the firm's revenue.

9.      In contrast, Macro Opps (the allegedly favored strategy) was a niche strategy designed for Western's most risk-tolerant clients.  Macro Opps was a global-based strategy that could hold as much as 75 percent of an account's net assets in non-U.S. dollar denominated securities.  Additionally, Macro Opps (a) held substantial investments in emerging markets and foreign currencies; (b) was an "unconstrained" strategy, meaning that it was not measured against a benchmark and did not have direct or obvious competitors; (c) drove returns "top-down" from the identification of macroeconomic trends; and (d) was highly volatile, meaning it was expected to be up or down ten percent annually in ordinary years and up or down twenty percent annually in extraordinary years.  Between 2021 and 2023, Macro Opps' AUM ranged from approximately $3 billion to $16 billion, and it constituted between five to twelve percent of the firm's revenue.

10.     Consistent with their widely divergent investment approaches, the Core Strategies and Macro Opps differed with respect to their duration and convexity positions—the two primary metrics of a portfolio's sensitivity to interest rate changes.  The Core Strategies generally maintained duration within 20 percent of the benchmark's duration in the case of Core, or 30 percent of the benchmark's duration in the case of Core Plus.  Macro Opps, meanwhile, had a much broader duration band (more than three times greater than the Core Strategies).  The strategies also differed in their convexities.  Macro Opps was much more negatively convex than

the Core Strategies, rendering it far more sensitive to interest rate moves than the Core Strategies.

**Background of the Investigation**

11.     In October 2023, Western retained outside counsel to conduct an investigation into trades that Mr. Leech executed for the Core Strategies and Macro Opps (the "Outside Counsel Investigation").  After being informed about the investigation, Mr. Leech immediately retained counsel who, in turn, retained several experts to assist him in his representation of Mr. Leech with respect to matters relating to Mr. Leech's trade allocations.

12.     I understand that Mr. Leech ceased entering and allocating trades for the Core Strategies in or around late October 2023.

13.     On or about November 6, 2023, the Los Angeles Regional Office of the SEC opened a formal investigation into certain trades and allocations done at Western and issued subpoenas for documents and informal document requests for personal records connected to Mr. Leech, his family members, and entities connected to him.  On or about November 14, 2023, my firm informed the SEC that we were representing Mr. Leech in connection with its investigation. Between December 6, 2023 and April 1, 2024, we made nine separate document productions to the SEC.  These productions amounted to more than 1,000 pages of documents.

14.     On March 6, 2024, Mr. Leech appeared and gave testimony at the SEC's Los Angeles Regional Office in Los Angeles, California.  My partner Jonathan Sack and our colleague Nathaniel Sobel represented Mr. Leech during his testimony.

**Bill of Particulars**

15.     As Mr. Leech's counsel, my firm has received the government's discovery productions.  I understand that, to date, the government has produced more than 600,000

4

documents totaling approximately 4,000,000 pages.  As recently as last week, August 14, 2025, the government produced 48,823 documents consisting of 402,089 pages.

16.    Included in the government's productions are "trade blotters," which are spreadsheets reflecting trades purportedly made by Mr. Leech between 2019 and mid-2024.  I understand that the trade blotters contain approximately 62,011 unique trade identification numbers, each of which corresponds to a trade purportedly executed and allocated by Mr. Leech, and that over 33,000 of the trades identified in the blotters were purportedly placed by Mr. Leech (a) in U.S. Treasury futures and options, (b) during the 33 months covered by the Indictment, and (c) allocated to one or more accounts within the Core Strategies or Macro Opps.  These 33,000 plus trades span 595,236 rows and 48 columns of the blotter for a total of 28,571,328 cells of information.

17.    Analyzing any one of Mr. Leech's trades and the corresponding allocation requires a detailed analysis of the relevant strategies' pre-existing positions both in U.S. Treasury instruments (including cash bonds and derivatives) and non-U.S. Treasury assets, their key metrics (duration and convexity) at the start of the day in question, how market developments affected those metrics, and what trades were necessary to manage the respective strategies in light of the market changes.  In addition to these technical analyses, analysis of any given trade requires consideration of other materials such as contemporaneous email correspondence evidencing strategy-specific trading objectives.  All this work must be performed manually and requires extensive input from experts in fixed income portfolio management.  It is not possible to perform this complex and time-consuming analysis for all—or even a meaningful portion—of the more than 33,000 trades recorded in the blotters before the April 6, 2026 trial date.

18. By letter dated March 18, 2025, Mr. Sack requested that the government provide particulars "identify[ing] each trade [it] alleges Mr. Leech misallocated." A true and correct copy of Mr. Sack's March 18, 2025 letter is attached as **Exhibit 1**.

19. By letter dated April 11, 2025, the government rejected our request for particulars, stating that it "does not need to identify in a bill of particulars specific trades the defendant may have misallocated" because it believes it needs "to prove that the defendant engaged in this fraudulent scheme, not that he misallocated a particular trade." The government also stated that it need not identify the trades at issue because "the criminal fraud [alleged] is the defendant's failure to disclose th[e] practice" of "using first-day performance to decide how to allocate trades . . . . 'which constitutes [a] material misrepresentation[] or omission[].'" A true and correct copy of the government's April 11, 2025 letter is attached as **Exhibit 2**.

20. By letter dated July 3, 2025, Mr. Sack responded to the government's April 11, 2025 letter and asked the government to "identify any statement or statements that the government alleges 'constitutes [a] material misrepresentation[] or omission[].'" A true and correct copy of defense counsel's July 3, 2025 letter is attached as **Exhibit 3**.

21. By letter dated July 18, 2025, the government responded to Mr. Sack's July 3, 2025 letter and again refused to provide the requested particulars. A true and correct copy of the government's July 18, 2025 letter is attached as **Exhibit 4**.

**The Search Warrant Returns and the Government's Flawed Taint Team Process**

22. Based on my experience and discussions with other attorneys at my firm, I understand that the government frequently exercises search warrants to obtain the contents of personal email accounts of targets of white-collar criminal investigations. As reflected in the discovery, on or about February 28, 2024, the government obtained search warrants that required

Apple and Google to produce emails, text messages, and other materials for three accounts associated with Mr. Leech for the period from January 1, 2021 to February 28, 2024.

23.    The warrant affidavit disclosed the existence of the Outside Counsel Investigation but made no reference to Mr. Leech's cooperation with it or his representation by counsel and did not propose any protocol for preserving the attorney-client privilege, the work product doctrine, or any other relevant privilege.

24.    On or about March 7, 2024, Google produced 16,036 emails and 14,289 other records, including Google search history, to the government.  Separately, Apple produced another 999 emails, 1,311 text messages, and 2,464 other records.  (The date of that production is not readily apparent from the discovery.)  Thus, all told, in response to the search warrants, the government obtained a total of 17,035 emails, 1,311 messages, and 16,753 other records from Mr. Leech's Apple and Google accounts.

25.    On June 12 2024, an Assistant United States Attorney ("AUSA") assigned to Mr. Leech's case contacted Mr. Sack in connection with the government's investigation.  Over the ensuing five months, Mr. Sack, our colleagues, and I had numerous conversations with representatives of the government.

26.    By email dated September 9, 2024, the government informed my firm that it had "obtained materials on which [it was] conducting a privilege review" and requested "a list with the names and contact information of any people with whom you believe Mr. Leech has had privileged communications."  A true and correct copy of the government's September 9, 2024 email is attached as **Exhibit 5**.  (Exhibit 5 has been redacted to omit approximately five pages of unrelated emails preceding the September 9, 2024 email.)

27.     By letter dated September 24, 2024, Mr. Sack responded to the government's September 9, 2024 request, provided the requested information, and asked the government for details regarding "the process the Office intends to use to ensure that potentially privileged material is not reviewed or otherwise considered in connection with the government's investigation."  A true and correct copy of Mr. Sack's September 24, 2024 letter is attached as **Exhibit 6**.  (The enclosure to the September 24, 2024 letter, which includes a list of individuals with whom Mr. Leech had privileged and work product-protected email communications, is omitted from Exhibit 6, but is available at the Court's request.)

28.     By letter dated November 4, 2024, the government described its use of a "Filter Team" to review the documents received from Apple and Google pursuant to the search warrants.  A true and correct copy of the government's November 4, 2024 letter is attached as **Exhibit 7**.

29.     By letters dated November 26, 2024 and December 20, 2024, my firm asserted privilege with respect to a number of documents that had been produced by Apple and Google.

30.     By letter dated February 6, 2025, the government responded to Mr. Sack's September 24, 2024 letter, and provided sparse details regarding its privilege review protocols. A true and correct copy of the government's February 6, 2025 letter is attached as **Exhibit 8**.

31.     In a letter dated April 7, 2025, Mr. Sack requested additional information regarding the government's filter review process.  A true and correct copy of defense counsel's April 7, 2025 letter is attached as **Exhibit 9**.  (Twenty-three pages of agreements between Mr. Leech's counsel and experts retained to assist counsel that were enclosed with the April 7, 2025 letter have been omitted from Exhibit 9, but are available at the Court's request.)

32.    In a letter dated June 11, 2025, the government informed counsel that, on seven separate occasions, the Taint Team released privilege materials to the Prosecution Team, thereby necessitating that the Taint Team conduct a supplemental privilege review.  The government also disclosed that the Prosecution Team accessed 231 documents from the Google Returns over which Mr. Leech, when given an opportunity, asserted privilege.  My firm's review of these materials has revealed that, with certain documents falling into more than one category, these 231 documents include:

    a.  14 emails with the subject line "privilege";

    b.  one email with the subject line "RFH Work Product" (a reference to Ralph F. Hirschmann, Esq., who also represented Mr. Leech in connection with the Outside Counsel Investigation and the pre-charging phases of both the SEC and the DOJ investigations);

    c.  83 documents exchanged between Mr. Leech and his wife Eileen;

    d.  41 emails between Mr. Leech and experts retained by counsel; and

    e.  104 documents or draft documents that Mr. Leech prepared at the direction of counsel and sent to himself in the form of emails.

Further, while Mr. Leech has asserted privilege over 835 documents in the Apple Returns, including numerous substantive communications with counsel and experts retained by counsel, the government disclosed that it is unable to recreate which of those documents were improperly released to the Prosecution Team.  A true and correct copy of the government's June 11, 2025 letter is attached as **Exhibit 10**.

33.    In a letter dated July 2, 2025, Mr. Sack and I sought additional information regarding the nature of the Taint Team review and the improper disclosure of privileged

materials to the Prosecution Team.  A true and correct copy of defense counsel's July 2, 2025 letter is attached as **Exhibit 11**.

34.     By letter dated July 18, 2025, the government responded and generally refused to provide the information requested in our July 2, 2025 letter.  A true and correct copy of the government's July 18, 2025 letter is attached as **Exhibit 12**.

35.     In a conversation on July 22, 2025, the AUSAs responsible for this case clarified that the government "will not use any of the materials to which [the Prosecution Team] currently has access at trial for any purpose," and that if Mr. Leech "makes a motion regarding the Search Warrant Materials, the government reserves the right to (1) contest the defense's privilege designations regarding the Currently Segregated Materials, (2) affirmatively seek rulings from the Court on the defendant's privilege claims over the [currently segregated materials], and (3) use the Currently Segregated Materials at trial for any purpose."  Mr. Sack and I memorialized our July 22, 2025 conversation with the AUSAs in a letter dated July 28, 2025, and the government confirmed that our letter accurately states its position in an email dated July 29, 2025.  True and correct copies of our July 28, 2025 letter and the government's July 29, 2025 email are attached as **Exhibits 13 and 14**, respectively.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 22, 2025
          New York, New York

                                                            /s/ Jeremy H. Temkin
                                                            Jeremy H. Temkin
                                                            565 Fifth Avenue
                                                            New York, NY 10017
                                                            (212) 856-9600 (telephone)
                                                            (212) 856-9494 (facsimile)