UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

UNITED STATES OF AMERICA,        )

)

    -v-                              )          24 Cr. 658 (GHW)

)

S. KENNETH LEECH II,           )

)

       *Defendant*.         )

------------------------------------------------------------- X

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT S. KENNETH LEECH II'S OMNIBUS MOTIONS *IN LIMINE*

Dated: December 15, 2025            MORVILLO ABRAMOWITZ
    New York, New York           GRAND IASON & ANELLO, P.C.

                                   Jonathan S. Sack
                                   Jeremy H. Temkin
                                   Samuel W. Magaram
                                   565 Fifth Avenue
                                   New York, NY 10017
                                   (212) 856-9600

                                   CLEARY GOTTLIEB STEEN &
                                   HAMILTON LLP

                                   Joon H. Kim
                                   Mitchell Kohles
                                   One Liberty Plaza
                                   New York, New York 10006
                                   (212) 225-2000

                                   *Attorneys for Defendant S. Kenneth Leech II*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT...................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

I.      The Government Should Be Precluded from Presenting Opinion Testimony from Lay
        Witnesses That Is Predicated on Specialized Knowledge About Events that the Witnesses
        Did Not Personally Perceive ........................................................................................... 3

        A.      Background ............................................................................................................ 3

        B.      Applicable Law ..................................................................................................... 4

        C.      Argument ............................................................................................................... 6

II.     The Government Should Be Precluded from Making Arguments Suggesting that
        Allocating Trades at or Near the End of the Day Is Inherently Improper or Suspect........11

        A.      Relevant Regulations ............................................................................................11

        B.      Argument ............................................................................................................... 13

III.    The Government Should Be Precluded from Referring to Alleged Aggregate Unrealized
        First-Day Gains and Losses of $600 Million or from Describing Individual Trades as
        "Winners," "Losers," "Good Trades" or "Bad Trades," or Other Similar Labels that Fail
        to Reflect the Unrealized Nature of the First-Day Performance....................................... 14

IV.     The Court Should Use a Written Juror Questionnaire to Ensure an Efficient *Voir Dire* and
        Reduce the Risk of Juror Bias........................................................................................... 17

CONCLUSION............................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Cardwell v. Davis Polk & Wardwell LLP*,
   No. 19 Cv. 10256 (GHW) (S.D.N.Y. Dec. 6, 2023), Dkt. 364 ..................................... 20

*Colon ex rel. Molina v. BIC USA, Inc.*,
   199 F. Supp. 2d 53 (S.D.N.Y. 2001) .............................................................. 10

*DVL, Inc. v. Niagara Mohawk Power Corp.*,
   490 F. App'x 378 (2d Cir. 2012) .................................................................. 5

*GFL Advantage Fund, Ltd. v. Colkitt*,
   272 F.3d 189 (3d Cir. 2001) ....................................................................... 14

*Hale Cnty. A & M Transp., LLC v. City of Kansas City, Mo.*,
   998 F. Supp. 2d 838 (W.D. Miss. 2014) ....................................................... 9

*Leon v. TransAm Trucking, Inc.*,
   2020 WL 728785 (S.D.N.Y. Feb. 13, 2020) ................................................. 4, 9

*United States v. Afriyie*,
   929 F.3d 63 (2d Cir. 2019) ....................................................................... 4

*United States v. Cioffi*,
   No. 08 Cr. 415 (FB) (E.D.N.Y. July 13, 2009), Dkt. 178 ................................. 20

*United States v. Cruz*,
   981 F.2d 659 (2d Cir. 2019) ..................................................................... 9

*United States v. Discala*,
   No. 14 Cr. 399 (EN) (E.D.N.Y. Feb. 2, 2018), Dkt. 490 ................................. 19

*United States v. Felder*,
   993 F.3d 57 (2d Cir. 2021) ....................................................................... 7, 8

*United States v. Finnerty*,
   474 F. Supp. 2d 530 (S.D.N.Y. 2007) (Chin, J.), *aff'd*, 533 F.3d 143 (2d Cir. 2008) ... 15

*United States v. Full Play*,
   No. 15 Cr. 252 (E.D.N.Y. May 6, 2022), Dkt. 1785 ....................................... 19

*United States v. Garcia*,
413 F.3d 201 (2d Cir. 2005) ............................................................................ 5, 6, 7, 8

*United States v. Glenn*,
312 F.3d 58 (2d Cir. 2002) ............................................................................... 5

*United States v. Grant*,
No. 16 Cr. 468 (GHW) (S.D.N.Y. May 5, 2018), Dkt. 286 .......................... 19, 21

*United States v. Haynes*,
729 F.3d 178 (2d Cir. 2013) ............................................................................ 5, 8

*United States v. James*,
607 F. Supp. 3d 246 (E.D.N.Y. 2022) ............................................................. 8

*United States v. Kale*,
445 F. App'x 482 (3d Cir. 2011) ...................................................................... 8

*United States v. Martoma*,
No. 12 Cr. 973 (PGG) (S.D.N.Y. Jan. 3, 2014), 2014 WL 50263 ................ 19, 21

*United States v. Melzer*,
No. 20 Cr. 00314 (GHW) (S.D.N.Y. May 19, 2022), Dkt. 111 ..................... 20, 21

*United States v. Percoco*,
No. 16 Cr. 776 (VEC) (S.D.N.Y. May 29, 2018), Dkt. 685 .......................... 19

*United States v. Silver*,
No. 15 Cr. 93 (VEC) (S.D.N.Y. April 10, 2018), Dkt. 380 ........................... 19

*United States v. Steinberg*,
No. 12 Cr. 121 (RJS) (S.D.N.Y. Nov. 7, 2013), Dkt. 311 ............................ 21

*United States v. Valle*,
No. 12 Cr. 847 (PGG) (S.D.N.Y. Jan. 28, 2013), Dkt. 111 .......................... 19

## Rules and Statutes

17 C.F.R. 1.35 ........................................................................................................ 11, 12, 13

Fed. R. Civ. P. 26(a)(2) .......................................................................................... 9

Fed. R. Evid. 403 ................................................................................................... 7, 8, 10

Fed. R. Evid. 404(b)..............................................................................................    2

Fed. R. Evid. 602 ...............................................................................................    5, 6

Fed. R. Evid. 701 ............................................................................................5, 6, 7, 8

Fed. R. Evid. 702 ..........................................................................................  5, 6, 7, 9

Fed. R. Crim. P. 16 ........................................................................................3, 4, 5, 6, 9

New York Stock Exchange Rule 410(a)(3)  ........................................................    12

## Other Authorities

58 Fed. Reg. 26270 (May 3, 1993) ...............................................................11, 12, 13

63 Fed. Reg. 695 (Jan. 7, 1998) .............................................................................    12

63 Fed. Reg. 45699 (Aug. 27, 1998).......................................................................    13

Kristen A. Liska, *Experts in the Jury Room: When Personal Experience Is Extraneous Information*, 69 STAN. L. REV. 911 (2017) ............................................................    20

Shari Seidman Diamond *et al*., *Embedded Experts on Real Juries: A Delicate Balance*, 55 WM. & MARY L. REV. 885 (2014) ....................................................................    21

**PRELIMINARY STATEMENT**

The government's prosecution of Defendant S. Kenneth Leech II rests almost entirely on a statistical analysis allegedly showing Mr. Leech allocated trades in a manner that favored one set of investment strategies offered by Western Asset Management Company ("Western") over another. As alleged in the Indictment, this criminal scheme lasted almost three years from early 2021 to late 2023, a period of historic volatility in the fixed-income market, and entailed Mr. Leech allocating thousands of U.S. Treasury futures and options trades in a manner that favored Western's Macro Opportunities strategy ("Macro Opps") at the expense of Western's Core and Core Plus strategies (together, the "Core Strategies"), on which Western and Mr. Leech made their reputation. To prove this unlikely criminal scheme, the government will not present evidence from any co-conspirator—or any witness, document, or other evidence for that matter—establishing any of the actual details or specifics of the alleged criminal scheme, its purpose, its means, or its methods. As the government's recent bill of particulars makes clear, it will not be able to prove which of Mr. Leech's trades were allegedly misallocated and which were properly allocated; rather, it asserts that *all* of the thousands of "trades specifically allocated" to one strategy or the other "were *consistent* with the cherry-picking scheme." (*See* Gov't Bill of Particulars at 2 (emphasis added) (internal quotation marks omitted)). In other words, the government cannot identify and will not attempt to prove the specifics around the criminal scheme they have charged. Instead, it has manufactured this prosecution around a statistical analysis, with other "evidence" distorted to fit into its predetermined and mistaken narrative.

The law demands that the government be put to its burden at trial of establishing proof of guilt beyond a reasonable doubt, through evidence admitted through proper means and for proper purposes. That is always the case, but it is particularly so here, where the government relies so

1

heavily on a statistical analysis to prove its case.  Under these circumstances, extra vigilance is required to ensure that the government does not improperly compensate for what is lacking in its direct proof by, among other things, conflating lay and expert testimony or making prejudicial and factually unsupported arguments.  For those reasons, and for the reasons set forth in greater detail below, Mr. Leech moves *in limine* to:

- Preclude the government from presenting opinion testimony from lay witnesses that is predicated on their specialized knowledge about events that they did not personally perceive;

- Preclude the government from arguing or suggesting that allocating trades at or near the end of the day is inherently improper or suspect;

- Preclude the government from referring to the $600 million unrealized aggregate first-day results or the trades as "winners," "losers," "good trades," "bad trades," or other similarly inaccurate terminology, on the basis of unrealized first-day performance; and

- Use a written juror questionnaire in the jury selection process to ensure a fair and impartial jury free from improper biases.

We separately move with respect to issues raised by the government's proposed expert testimony and to preclude the Rule 404(b) evidence the government has proposed to introduce at trial.  Mr. Leech reserves the right to make additional motions *in limine* following disclosures that the government will make prior to trial, including its exhibit lists, and Section 3500 material, as well as in response to materials produced in discovery, which remain ongoing.

## **ARGUMENT**

### I.     The Government Should Be Precluded from Presenting Opinion Testimony from Lay Witnesses That Is Predicated on Specialized Knowledge About Events that the Witnesses Did Not Personally Perceive

The Government has made Rule 16 disclosures with respect to the expected testimony of expert witnesses Professors Lauren Cohen and Peter Kolm.  Citing their specialized knowledge, the government plans to present these experts' analyses of Mr. Leech's trading and their opinions about his allocations.[1]  For the reasons set forth below, the government should be precluded from offering similar opinion testimony about Mr. Leech's trading and allocations from lay witnesses.

### A.     Background

Based on disclosures made by the government, we expect the government may present evidence that in the fall of 2023, a junior analyst at Western (the "Analyst"), observed trading allocations that Mr. Leech made in a particular account that the Analyst did not understand.  He raised his questions internally within Western, including to a more senior portfolio manager (the "Portfolio Manager").  The Analyst and Portfolio Manager analyzed records of Mr. Leech's trades (about which they did not have specific personal knowledge) that occurred over a long period across different strategies, and they conducted analyses to reach opinions on the potential reasons for Mr. Leech's trade allocations, including, for example, whether Mr. Leech used the unrealized first-day performance of the trades in making allocation decisions.  We understand based on the government's disclosures that the analyses were escalated to Western leadership.  We further understand based on the government's disclosures that both the Analyst and the Portfolio Manager

---

[1] Mr. Leech is moving separately to preclude all or part of Professors Cohen's and Kolm's proposed testimony in a contemporaneously filed motion, to which are attached the relevant disclosures of Professors Cohen and Kolm.  (*See Memorandum of Law in Support of Defendant S. Kenneth Leech II's Motion To Exclude Proposed Expert Testimony Of Lauren Cohen And Petter Kolm*, Richards Decl., Ex. A ("Cohen Disclosure") & Ex. C ("Kolm Disclosure")).

made reports to the Securities and Exchange Commission, from which they are seeking financial rewards as whistleblowers.

As required under Rule 16, the government has made disclosures about the qualifications and opinions of their proposed expert witnesses, Professors Cohen and Kolm. Both Professors Cohen and Kolm conducted analyses similar in methodology, purpose, and conclusions to those conducted by the Analyst and Portfolio Manager. They obtained records of Mr. Leech's trades over several years and, among other things, conducted statistical analyses of the trading to reach opinions on whether Mr. Leech's allocations were consistent with using first-day performance in allocating trades to different strategies and accounts. (*See* Cohen Disclosure ¶ 52 ("Professor Cohen will testify that the analyses . . . are consistent with Mr. Leech using information about the first-day performance of his Treasury F&O trades in making allocation decisions between Macro Opps and the Core Strategies."); Kolm Disclosure ¶ 17 ("Professor Kolm will testify that these analyses are consistent with Mr. Leech using performance information from between the time of trade and the time of allocation in making allocation decisions.")).

### B.    Applicable Law

The Federal Rules of Evidence differentiate between expert and lay witness testimony and generally do not permit non-expert "opinion" testimony about a particular occurrence that "goes beyond . . . personal perceptions to the inferences and conclusions [drawn] from . . . after-the-fact observation." *Leon v. TransAm Trucking, Inc.*, 2020 WL 728785, at *3 (S.D.N.Y. Feb. 13, 2020); *see also United States v. Afriyie*, 929 F.3d 63, 70 (2d Cir. 2019) (emphasizing lay witness's "contemporaneous involvement with the transactions at issue" in affirming its admission under Rule 701). Thus, Rule 602 provides that non-expert lay witnesses "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of

the matter," and Rule 701, entitled "Opinion Testimony by Lay Witnesses," provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." In contrast, Rule 702 governs the admissibility of testimony from witnesses "qualified as an expert by knowledge, skill, experience, training, or education" and therefore allowed to "testify in the form of an opinion." For experts offered under Rule 702, the government must comply with the disclosure requirements of Federal Rule of Criminal Procedure 16(a)(1)(G).

Courts have held that Rule 701 prohibits lay testimony that relies "in any way" on specialized knowledge that is within the scope of Rule 702; lay opinion testimony under Rule 701(c) "must be the product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215–16 (2d Cir. 2005). If the opinion of a witness "rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to [Rule 702]," and thereby satisfy the reliability requirements under Rule 702 and the pretrial disclosure obligations under Federal Rule of Criminal Procedure 16. *See United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) ("[T]he purpose of Rule 701(c) is 'to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" (quoting Fed. R. Evid. 701 advisory committee note)); *DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 F. App'x 378, 380–81 (2d Cir. 2012) ("Moreover, Rule 701(c) exists to prevent a party from conflating expert and lay opinion testimony thereby

conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pretrial disclosure requirements …" (citation omitted)).

### C.    Argument

Based on disclosures that have been made, at least two lay witnesses the government may present at trial, the Analyst and Portfolio Manager, reviewed Mr. Leech's trading records and then, using their specialized and technical knowledge, conducted after-the-fact analyses of Mr. Leech's trade allocations across different Western strategies.  From these analyses, the Analyst and Portfolio Manager appear to have formed opinions about whether Mr. Leech's allocations had been informed by the trades' unrealized first-day performance.  This is just the type of opinion testimony the Federal Rules of Evidence prohibit from a lay witness, and thus, should be precluded.

As a general matter, fact witnesses can testify only on matters about which the witness has "personal knowledge."  Fed. R. Evid. 602.  Expert witnesses, on the other hand, can provide opinion testimony on matters about which they do not have personal knowledge, but only if they (1) meet the qualification and reliability requirements of Rule 702, and (2) satisfy the disclosure obligations under Federal Rule of Criminal Procedure 16.  Consistent with this general framework, Rule 701 provides that a lay witness cannot offer opinion testimony unless it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  All three requirements must be satisfied for non-expert opinion testimony to be permitted.  *See Garcia*, 413 F.3d at 210.

Here, any lay opinion testimony from the Analyst or Portfolio Manager would not meet any of the three requirements of Rule 701, much less all of them.  First, such testimony would not be based on the witnesses' own perception.  Neither the Analyst nor the Portfolio Manager

6

personally observed the thousands of trades and allocations that form the bases of their analyses and opinions.  Rather, similar to the work conducted by Professors Cohen and Kolm, they obtained voluminous data from Western's trade blotter and purportedly conducted quantitative, technical analyses on that data.  Their opinions are based on that after-the-fact work, not their own perceptions.  Second, such lay opinion testimony would not be "helpful" in understanding the witnesses' testimony or determining a fact in question.  To the contrary, as discussed in greater detail below in the Rule 403 analysis, presenting mixed lay and opinion testimony from the Analyst or Portfolio Manager, including with the government experts' opinions, would only confuse the issues for the jury.  Third, as the government's own highly technical and complicated expert Rule 702 disclosures confirm, such analyses and opinions from the lay witnesses would be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c).

In applying Rule 701, courts have sought to protect against the risk of expert testimony being smuggled in and presented to the jury through fact witnesses, without the requirements of Rule 702 being met.  *See Garcia*, 413 F.3d at 215 (Rule 701 "prevent[s] a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim P. 16").  Thus, the Second Circuit has repeatedly held that "an opinion 'rest[ing] in any way upon scientific, technical, or other specialized knowledge' can only be admitted as expert testimony."  *United States v. Felder*, 993 F.3d 57, 73 (2d Cir. 2021) (quoting *Garcia*, 413 F.3d at 215–16); *see also Haynes*, 729 F.3d at 195.  Courts have enforced this rule by insisting that "lay opinion must be the product of reasoning processes familiar to the average person in everyday life."  *Felder*, 993 F.3d at 73; *see also United States v.*

*Kale*, 445 F. App'x 482, 485 (3d Cir. 2011) ("If the 'rational basis' grounding a lay opinion would prove inaccessible to "a person of average intelligence," it will not qualify as lay testimony.").

The complicated analyses at issue here—involving the review of records of thousands of trades that were allocated across multiple strategies and running statistical analyses to assess whether first-day performance was used in allocating those trades—necessarily relied on "scientific, technical, or other specialized knowledge;" it is not "the product of reasoning processes familiar to the average person in everyday life." *Felder*, 993 F.3d at 73. Lay witnesses may not offer such opinion testimony, even if they had "accumulated [the specialized knowledge] throughout the course of their careers." *See United States v. James*, 607 F. Supp. 3d 246, 259 (E.D.N.Y. 2022) (precluding lay opinion testimony about billing practices from former employees that drew on their specialized experienced acquired as medical billers and coders). In short, Rule 701 precludes the introduction of what is plainly expert opinion testimony, requiring technical and specialized knowledge, through lay witnesses who, like the government's disclosed experts, have conducted retrospective analyses about Mr. Leech's trading allocations.

Even if such testimony were admissible under Rule 701, the Court should preclude it under Rule 403 because its probative value would be substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, [and] needlessly presenting cumulative evidence." Fed. R. Evid. 403.

<u>First</u>, permitting the lay witnesses to offer such opinions would cause unfair prejudice. Mr. Leech would be forced to challenge the scientific reliability of the lay witnesses' analyses and opinions, in addition to their qualifications, without the Rule 16 disclosures required of true expert witnesses. *Cf. Leon v. TransAm Trucking, Inc.*, No. 18 Cv. 9755 (LJL), 2020 WL 728785, at *2

8

(S.D.N.Y. Feb. 13, 2020) (failure to designate under Fed. R. Civ. P 26(a)(2) "would alone be sufficient ground not to permit the testimony under Rule 702").

Second, to the extent the Court does not grant Mr. Leech's motion to preclude Professors Cohen's and Kolm's testimony entirely, permitting both lay opinion and expert testimony on the subject of Mr. Leech's trade allocations would lead to unfair bolstering. The expert witnesses, whose qualifications and analyses should stand (or fall) on their own merits, will unfairly benefit from what would amount to an endorsement from lay witnesses affiliated with Western. And importantly, the lay witnesses' credibility—which should be scrutinized especially carefully in view of their financial incentives—would be unfairly bolstered and be given an aura of reliability by the expert witnesses' testimony. *See United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992) ("We reaffirm here the principle that the credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description."); *Hale Cnty. A & M Transp., LLC v. City of Kansas City, Mo.*, 998 F. Supp. 2d 838, 845 (W.D. Miss. 2014) ("As a general rule, an expert is not allowed to impugn or bolster the credibility of fact witnesses under the guise of rendering his [] expert opinion.").

Third, presenting mixed fact and opinion testimony from the lay witnesses on the same subjects as the detailed analyses conducted by the government experts (which themselves are cumulative and duplicative in many places), would serve only to confuse the jury, especially since there will likely be both similarities and differences in their respective methodologies and analyses. For example, although covering similar ground and reaching similar conclusions, we expect that Professors Cohen and Kolm conducted more detailed and wide-ranging analyses and tests,

9

reviewing a broader set of trading data that was organized differently.[2]  It would confuse the jury to hear several different ways of analyzing the data from different witnesses, some qualified as experts with others testifying as lay witnesses, yet reaching similar conclusions.

Fourth, considering the breadth and scope of Professors Cohen's and Kolm's proposed testimony (their initial and supplemental disclosures total close to 100 single-spaced pages, with dozens of separate analyses, regressions, and conclusions), to the extent the Court permits Professors Cohen's and Kolm's testimony, the analyses that the Analyst and Portfolio Manager conducted in the fall of 2023 would have minimal probative value and would instead be entirely subsumed under and cumulative of the expert testimony.  *Cf. Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 96–97 (S.D.N.Y. 2001) (applying Rule 403 to preclude expert from testifying that product met minimum safety standards as cumulative of same testimony proposed by two other experts).

These harms vastly outweigh the extremely limited probative value offered by the cumulative lay opinions about Mr. Leech's trade allocations, and therefore should be precluded under Rule 403.

* * *

For the reasons set forth above, the government should be precluded from presenting opinion testimony from lay witnesses at trial, including from the Analyst and the Portfolio Manager.

---

[2]   Among other things, before conducting their analyses, Professors Cohen and Kolm each performed various tasks to "clean" the data they analyzed, including, among other tasks, merging data from Western's trade blotter with records from trade brokers, the latter of which "often contained data that the Western Asset trade blotters were missing."  Cohen Disclosure ¶¶ 1-3; *see also* Kolm Disclosure ¶¶ 3-5.  We do not expect that the Analyst and Portfolio Manager conducted the same "cleaning" procedures in the same manner, and thus were likely working from a different data set.

II.    **The Government Should Be Precluded from Making Arguments Suggesting that Allocating Trades at or Near the End of the Day Is Inherently Improper or Suspect**

In the Indictment, the government focuses intently on the timing of Mr. Leech's trade allocations, particularly those allocations that occurred late in the trading day.  (*See* Indictment ¶ 4 ("He routinely waited hours after making his trades—often until late in the day—to make his allocations"); *id.* ¶ 17 (Mr. Leech "routinely waiting for hours after trading—often until late in the day—before allocating those trades"); *id.* ¶ 25 (Mr. Leech "routinely did not decide where to allocate trades until hours after trading—typically late in the day—after he had a chance to observe how his trades had performed during the day. . . .")).  Although it is fair for the government to elicit facts about the timing of Mr. Leech's allocations—and it can argue what that might have meant in terms of access to information at the time of allocations—because the relevant rules, particularly Rule 1.35 promulgated by the Commodities Futures Trading Commission ("CFTC"), explicitly permit delayed allocations at the end of the day, the government should be precluded from arguing that allocating trades later or near the end of a trading day is inherently improper or suspect.

A.    **Relevant Regulations**

For many decades, in the U.S. securities markets, "allocations of trades have been permitted to occur at the end of the day."  *See* 58 Fed. Reg. 26270, 26277, 1993 WL 137827 (May 3, 1993) ("Finally, as noted earlier, end-of day or post-trade allocation of bunched or block orders is permissible on foreign futures exchanges and in the cash and securities markets.").  The New York Stock Exchange, for example, has permitted end-of day allocation of securities block orders since October 1983.  *Id.* at 26274, 26277 (citing to New York Stock Exchange Rule 410(a)(3)).

For U.S. Treasury futures and options, the CFTC serves as the primary regulator.  *See* U.S. Department of the Treasury, *Joint Staff Report: The U.S. Treasury Market on October 15, 2014*, 10 (July 13, 2015) ("Treasury . . . futures (and options on these futures) are regulated by the

11

CFTC . . . .").  And CFTC Rule 1.35 provides that asset managers should allocate trades on a post-trade basis, "as soon as practicable after the entire transaction is executed . . . [but no later than] the end of the day."  17 C.F.R. § 1.35(b)(5)(iv)(A) (2024).  Prior to 1993, the relevant CFTC rule had required that allocations be made "at the time of entry and time of report of execution."  58 Fed. Reg. at 26270.  In 1993, the CFTC proposed a rule change to make Rule 1.35 more consistent with the rules in the securities markets in allowing portfolio managers to "allocate the fills at the end of the day after reviewing the result of trading activity in all markets."  *Id.* at 26273; *see also id.* ("[T]he [lookback] procedure could be used to maintain positions of a specified duration under circumstances when this result cannot be achieved through the use of a predetermined allocation formula.").  In proposing this rule change, the CFTC specifically noted the intended purpose of permitting "duration management," including "where futures transactions are executed on the basis of a change in interest rate that affects the price of the bonds in an underlying portfolio."  *Id.* at 26273-74.  The proposed rule, after a full comment period, remained pending, without being adopted.

In 1998, the CFTC re-proposed the 1993 post-execution allocation rule, in a revised form, limiting the permitted post-trade allocations to management of portfolios that also contained securities, or other CFTC-exempt instruments (like the Western Asset Management portfolios at issue in this case).  *See* 63 Fed. Reg. 695, 1998 WL 2247 (Jan. 7, 1998).  This proposal in 1998 repeated the original rationale for allowing post-trade allocations, including that it would allow account managers to engage in "duration management" based on interest rate changes during the day.  *Id.* at 697.  Based on comments received on the re-proposed rule, noting the benefits of post-trade allocations in situations that did not involve security-related portfolios, the CFTC expanded the proposed rule to allow post-trade allocation even where orders were not tied to security-related

portfolios.  *See* 63 Fed. Reg. 45699, 45701, 1998 WL 539305 (Aug. 27, 1998).  The CFTC adopted

the expanded Rule 1.35 on August 27, 1998, and the relevant substance of the rule remains in effect

today.  *Id.* at 45699.

In short, since 1998, the relevant regulations have expressly permitted end-of-day trade

allocations, as well as consideration of intra-day movements in interest rates in allocations for the

purpose of duration management.

**B.      Argument**

The government clearly intends at trial to emphasize the timing of Mr. Leech's allocations

and, in particular, those trades that were allocated toward the end of the trading day.   The

government may seek to argue or suggest at trial that allocating trades later in the trading day is

somehow inherently improper or suspect.  But since CFTC Rule 1.35 expressly permits allocations

of trades made "at the end of the day after reviewing the result of trading activity in all the markets,"

58 Fed. Reg. 26270, 26273, 1993 WL 137827 (May 3, 1993), it would be incorrect and improper

for the government to do so.[3]  While the government could argue that allocations made later in the

day would have given Mr. Leech more of an opportunity to allocate the trades on the basis of first-

day performance, the government should not be permitted to suggest or argue that end-of-day

allocation is inherently improper or suspect.  *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d

189, 207 (3d Cir. 2001) ("[I]t is unreasonable to infer unlawful intent from lawful activity alone."

(internal quotation marks omitted)).

---

[3] Similarly, Western's policies themselves only required that traders "must complete the allocation of securities among participating clients *no later than the end of the day* on which the transaction is completed." SDNY_LEECH_R01_00225878 (Western Compliance Manual 2022) (emphasis added).

III.    **The Government Should Be Precluded from Referring to Alleged Aggregate Unrealized First-Day Gains and Losses of $600 Million or from Describing Individual Trades as "Winners," "Losers," "Good Trades" or "Bad Trades," or Other Similar Labels that Fail to Reflect the Unrealized Nature of the First-Day Performance**

Based on the Indictment and its pretrial disclosures, the government appears poised to try to sway the jury by referencing the sizeable (and hypothetical) dollar figures tied to the allegedly misallocated trades and potentially by describing trades as "winners" or "losers" or "good" or "bad" trades on the basis of their unrealized first-day performance.  However, describing the magnitude and quality of the allegedly misallocated trades in such a manner would be inaccurate, misleading, and unfairly prejudicial, and therefore, should be precluded.

First, the government alleges in the Indictment that "LEECH allocated trades with net first-day gains of over $600 million to his favored strategy and clients," and allocated trades with the same amount in net first-day losses to disfavored clients.  (Indictment ¶ 1; *see also id.* ¶¶ 5, 19(j)).  However, as we noted in Mr. Leech's pretrial motion to strike references to this $600 million figure and the supposed $1.2 billion differential, these allegations are inaccurate and misleading.  The government does not claim—nor could they—that *every* trade allocated during the relevant period was misallocated.  (*See* Defs.' Mem. of Law in Support of Omnibus Pretrial Mot. at 22).  Indeed, the Court-ordered bill of particulars recently filed by the government confirms that it is not alleging that all of the trades that comprise the $1.2 billion differential were misallocated.  Rather, the differential is simply the aggregate first-day performance of the "pool" of trades from which the government alleges an unidentified subset were misallocated.  (*See* Gov't Bill of Particulars at 2 ("The pool [of trades consistent with the cherry-picking scheme] consists of trades specifically allocated to Macro Opportunities, the Core/Core Plus Strategies, Account 1074, or Account 1651, between approximately January 1, 2021 and October 19, 2023, excluding certain categories of trades identified in the Government's Expert Notices, such as Broker-1 trades and roll trades.")).

14

In addition, because the positions were mostly held for longer periods of time, these aggregate figures represent *unrealized* first-day performance. Thus, even under the government's own theory, the allegedly misallocated trades did not result in $600 million in—as they try to suggest in the Indictment—first day "gains" for Macro Opps and $600 million in first day "losses" for the Core Strategies.

In addition to being inaccurate and misleading, references to the purported $600 million gains and losses and a $1.2 billion differential would be unfairly prejudicial. *See United States v. Finnerty*, 474 F. Supp. 2d 530, 546 (S.D.N.Y. 2007) (Chin, J.) (holding that the government's "repeated reference to the 26,300 instances of" alleged market manipulation, which "formed the cornerstone of the Government's argument that [the defendant] engaged in securities fraud[,] . . . was severely prejudicial" in light of the government's failure to prove that all 23,600 instances were indeed fraudulent and evidence that the defendant was not responsible for several of the trades included in the 26,300 figure), *aff'd*, 533 F.3d 143 (2d Cir. 2008). In connection with Mr. Leech's pretrial motions, the Court has ruled that it will reserve judgment on whether to strike the references to $600 million from the Indictment until the Court has seen the evidence at trial. (*See* Nov. 7, 2025 Hearing Tr. at 84 ("I cannot conclude at this point" that the aggregate net gains and losses are "not relevant to whether Mr. Leech engaged in the scheme the government alleges.")). We respectfully submit that on the same basis, the Court should preclude the government from arguing or referring to the $600 million figure at trial until or unless it can establish through evidence that doing so would be accurate and relevant.

Second, we expect that, at trial, the government may seek to use shorthand to describe specific trades as either "winners," "losers," "good trades," or "bad trades" based on their unrealized first-day performance. Such descriptions would be misleading and not supported by

15

the evidence.  Mr. Leech and Western did not measure or focus in any way on the hypothetical gains and losses of particular trades on the first day.  Indeed, the government's experts make clear that the positions at issue were not systematically sold at the end of the day to lock in these purported "gains" or "losses," conceding that most of the trades were held for longer than one day and that their value moved up and down—in what they claim are random ways—following the end of the day.  (*See* Cohen Disclosure ¶¶ 53-55, 65; Kolm Disclosure ¶¶ 17, 26, 31, 36(d)-(f), 39, 41(j)-(k)).  Thus, to describe these trades using loaded terms such as "winners," "losers," "good trades" or "bad trades," based on the unrealized first-day performance, would be inaccurate and would mislead the jury.

In addition, using such inaccurate terminology would obscure the important fact that, at the time he placed the trades, Mr. Leech undoubtedly believed they would be "good" for the portfolios he managed, including by hedging other positions.  Mr. Leech placed trades that he believed would serve the needs of the portfolios over an extended holding period.  Regardless of which funds they were allocated to and their first-day performance, they were all "good" trades in the sense that they were trades Mr. Leech placed because he believed they would be beneficial to the portfolios.  Therefore, it would be inaccurate and misleading to suggest, through loaded terminology or argument, that any of the trades were "bad" or "unwanted."

* * *

References to the $600 million in net first-day gains and $1.2 billion differential, as well as use of terms such as "winners" or "losers" based on unrealized first-day performance, would be inaccurate, misleading, confusing, and unfairly prejudicial.  Accordingly, the Court should preclude such references, at least until the government has established through evidence that the descriptions would be accurate and fair.

16

**IV.    The Court Should Use a Written Juror Questionnaire to Ensure an Efficient *Voir Dire* and Reduce the Risk of Juror Bias**

Mr. Leech respectfully requests that the Court use a written juror questionnaire in advance of the in-person *voir dire*.  A juror questionnaire would be helpful and assist the Court and the parties in selecting a fair and impartial jury in this case in view of (1) the extensive publicity surrounding Mr. Leech's indictment and the ongoing pretrial proceedings, (2) the length of trial that could raise issues for certain prospective jurors, (3) the complexity of the subject matter of the trial, including the government's expected reliance on highly technical statistical analyses, and (4) the potentially polarizing and inflammatory issues related to alleged financial crimes.

First, the extensive publicity surrounding this case weighs in favor of a written juror questionnaire.  This case has generated substantial media attention both at the time of indictment and throughout the pretrial phases.  Major financial publications and other news outlets have extensively covered the case, which is both novel and against a prominent portfolio manager. When the Indictment was returned in November 2024, multiple national outlets reported on the charges, including the Wall Street Journal, CNBC, Reuters, Financial Times, Axios, Investment

17

News, and others.[4]  Major media interest has continued to follow pretrial proceedings—including

by Bloomberg, the Wall Street Journal, and others[5]—and attention will no doubt grow leading up

to and during the trial.  Extensive publicity (pretrial and during jury selection) can make it more

difficult to find and select a fair and impartial jury, as prospective jurors may be influenced by the

media attention, including by potentially being less candid in oral *voir dire* because of

embarrassment or unwillingness to acknowledge potential biases in open court or fear that their

---

[4]  *See, e.g.*, Jack Pitcher, *Federal Prosecutors Charge Star Bond Investor Ken Leech With Fraud,* WSJ (Nov. 26, 2024), https://www.wsj.com/finance/regulation/federal-prosecutors-charge-star-bond-investor-ken-leech-with-fraud-23298e66; Jonathan Stempel, *US charges top bond manager, former Wamco co-CIO Kenneth Leech, with fraud,* REUTERS (Nov. 25, 2024), https://www.reuters.com/business/finance/us-charges-former-wamco-co-cio-kenneth-leech-with-fraud-2024-11-25/; Emile Hallez, *Ken Leech formally charged by SEC, US Attorney's Office,* INVESTMENT NEWS (Nov. 25, 2024), https://www.investmentnews.com/mutual-funds/ken-leech-formally-charged-by-sec-us-attorneys-office/258360; Eric Jacobson & Alec Lucas, *Former Western Asset Bond Manager Ken Leech Hit with Criminal Charges,* MORNINGSTAR (Nov. 26, 2024), https://www.morningstar.com/bonds/former-western-asset-bond-manager-ken-leech-hit-with-criminal-charges; Ben Berkowitz, *Bond manager Ken Leech charged with $600 million fraud,* AXIOS (Nov. 25, 2024), https://www.axios.com/2024/11/25/ken-leech-bond-fraud; Lucy Carter, *SEC: Leech charged with cherry picking trades for WAMCO funds,* THE DESK (Nov. 26, 2024), https://www.fi-desk.com/sec-leech-charged-with-cherry-picking-trades-for-wamco-funds/; *U.S. charges top portfolio manager, former Wamco co-CIO Kenneth Leech, with fraud,* CNBC (Updated Nov. 25, 2024), https://www.cnbc.com/2024/11/25/us-charges-top-portfolio-manager-former-wamco-co-cio-kenneth-leech-with-fraud.html; Brooke Masters & Will Schmitt, *Investor Ken Leech charged over alleged $600mn 'cherry-picking' scheme,* FINANCIAL TIMES (Updated Nov. 25, 2024), https://www.fi-desk.com/sec-leech-charged-with-cherry-picking-trades-for-wamco-funds/.

[5]  Jack Pitcher, *Former Wamco Executive Said Star Investor's Suspicious Trades Go Back a Decade,* WSJ (Jan. 14, 2025), https://www.wsj.com/finance/regulation/former-wamco-executive-said-star-investors-suspicious-trades-go-back-a-decade-6bfbf185; William Johnson, *Former WAM exec claims to have raised concerns about trades in 2012: report,* CITYWIRE (Jan. 15, 2025), https://citywire.com/pro-buyer/news/former-wam-exec-claims-to-have-raised-concerns-about-trades-in-2012-report/a2457845; Douglas Appell, *Trial for WAMCO's Ken Leech set for April 2026,* PENSIONS & INVESTMENTS (May 20, 2025), https://www.morningstar.com/bonds/former-western-asset-bond-manager-ken-leech-hit-with-criminal-charges; Silla Brush & Loukia Gyftopoulou, *Wamco's Ken Leech Retires as CFTC Closes Investigation of Firm,* BLOOMBERG (Aug. 1, 2025), https://www.bloomberg.com/news/articles/2025-08-01/western-asset-s-leech-retires-cftc-closes-investigation-of-firm.

answers will be reported by the press.  There is also risk that potential jurors will taint the *venire* with statements about the press reports that they have seen, but others had not.  *See, e.g.*, Tr. at 83, *United States v. Grant*, No. 16 Cr. 468 (GHW) (S.D.N.Y. May 5, 2018), Dkt. 286 (noting benefit of "jurors individually . . . questioned regarding those individual questions . . . while the other jurors were in a different room"); Tr. at 4, *United States v. Valle*, No. 12 Cr. 847 (PGG) (S.D.N.Y. Jan. 28, 2013), Dkt. 111 ("Another purpose [of a questionnaire] is to avoid polluting the [*venire*] by statements made by certain members of the [*venire*] about what they've read, seen or heard, and the impact of all of that on them when many members of the [*venire*] may not have had the same experience.").

The level of pretrial publicity in this case is similar to a number of other cases in the Southern and Eastern Districts of New York in which written juror questionnaires were used effectively.  *See*, *e.g.*, Jury Questionnaire, *United States v. Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y. Jan. 7, 2014), 2014 WL 50263 (juror questionnaire used in insider trading trial following publicity and public comment by prosecutors); Juror Questionnaire, *United States v. Percoco*, No. 16 Cr. 776 (VEC) (S.D.N.Y. May 29, 2018), Dkt. 685 (juror questionnaire in multi-defendant trial following publicity); Juror Questionnaire, *United States v. Silver*, No. 15 Cr. 93 (VEC) (S.D.N.Y. April 10, 2018), Dkt. 380 (juror questionnaire in public corruption trial of key leader in state assembly following media coverage); Mem. & Order, *United States v. Discala*, No. 14 Cr. 399 (EN) (E.D.N.Y. Feb. 2, 2018), Dkt. 490 (juror questionnaire in a two-defendant securities fraud trial that received publicity); Juror Questionnaire, *United States v. Full Play*, No. 15 Cr. 252 (PKC) (E.D.N.Y. May 6, 2022), Dkt. 1785 (juror questionnaire used in FIFA corruption case); Tr. at 4–7, *United States v. Cioffi*, No. 08 Cr. 415 (FB) (E.D.N.Y. July 13, 2009), Dkt. 178 (using questionnaire in multi-defendant "Bear Sterns" trial that received media attention).

Second, the trial in this case will likely last about four weeks, which could present hardship for certain jurors, including challenges in their employment, with childcare, or with preexisting travel plans. A questionnaire distributed to prospective jurors beforehand could help more efficiently identify and handle *venire* members for whom the length of the trial will cause issues, as this Court has recognized in comparable cases. *See*, *e.g.*, Order, *Cardwell v. Davis Polk & Wardwell LLP*, No. 19 Cv. 10256 (GHW) (S.D.N.Y. Dec. 6, 2023), Dkt. 364 ("[T]he Court believes that a jury questionnaire will need to be administered" in part due to "the anticipated length of the trial"); Tr. at 8, *United States v. Melzer*, No. 20 Cr. 314 (GHW) (S.D.N.Y. May 19, 2022), Dkt. 111 (same).

Third, the trial will involve complex financial subjects, including potential expert testimony regarding complicated statistical analyses. In such circumstances, a questionnaire will also help in identifying jurors who may have difficulty with the complexity of the proof. For example, because statistical evidence may feature prominently at the trial, a questionnaire could help identify bias among potential jurors who are either inclined to overvalue or have difficulty understanding such evidence. A written questionnaire will enable the parties to more effectively and efficiently reduce the risk of, among other things, the so-called "expert juror" who may introduce extraneous facts during jury deliberations or use their own specialized knowledge in a way that improperly dominates deliberations.[6]

---

[6] While the risk of "expert jurors" may be present in many cases involving experts, the concern is amplified where, as here, the government appears intent on predicating its case against Mr. Leech on expert analysis. *See* Kristen A. Liska, *Experts in the Jury Room: When Personal Experience Is Extraneous Information*, 69 STAN. L. REV. 911, 935 (2017) ("[E]xpert jurors may pose an additional risk to constitutional guarantees given the heightened possibility of unreliability in the context of expert witnesses"); *see also* Shari Seidman Diamond *et al.*, *Embedded Experts on Real Juries: A Delicate Balance*, 55 WM. & MARY L. REV. 885, 889 (2014) (observing that "not all nonlegal expertise that enters the jury room may come from the witness stand" and exploring implications).

Fourth, Mr. Leech's profile as a leading bond fund manager accused of allegedly perpetrating a $600 million dollar fraud on investors may elicit feelings of animosity and prejudice that could undermine his right to an impartial jury.  Community bias against those perceived as belonging to "Wall Street" and other financial professionals is commonplace and has prompted specific juror questionnaires and *voir dire* inquiries in other trials in this District.  *See, e.g.*, Jury Questionnaire at 4, *Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y. Jan. 7, 2014), 2014 WL 50263 (asking whether the fact that the "case involves the buying and selling of hundreds of millions of dollars' worth of stock in two large companies, the operations of a large investment firm . . . and allegations of insider trading . . . would make it difficult for you to sit as a fair and impartial juror"); Joint Proposed Examination of Prospective Jurors at 8, *United States v. Steinberg*, No. 12 Cr. 121 (RJS) (S.D.N.Y. Nov. 7, 2013), Dkt. 311 ("Do you have any strong impressions, positive or negative, of people who work on Wall Street or in the financial industry, including at investment banks, mutual funds or hedge funds?").

Indeed, this Court has used and encouraged questionnaires in analogous cases that raised a number of different issues that could be addressed more efficiently written responses.  *See*, *e.g.*, Tr. at 80–82, *Grant*, No. 16 Cr. 468 (GHW) (S.D.N.Y. May 5, 2018), Dkt. 286 (proposing "front load[ing] a lot of the voir dire with a more substantive questionnaire" in public corruption case, in order to cover various issues, including hardship, potential biases and prejudices, even though case did not have the "same degree of prominence" as Sheldon Silver trial); Tr. at 8, *Melzer*, No. 20 Cr. 314 (GHW) (S.D.N.Y. May 19, 2022), Dkt. 111 (inviting parties to propose written juror questionnaire given the nature of the issues to be discussed at trial, including anticipated length of trial and other issues).

For these reasons, Mr. Leech respectfully requests that the Court use a written juror questionnaire in the jury selection process.

## **CONCLUSION**

For the reasons set forth above, Mr. Leech respectfully moves *in limine* to (1) preclude the government from presenting opinion testimony from lay witnesses that is predicated on their specialized knowledge about events that they did not personally perceive; (2) preclude the government from arguing or suggesting that allocating trades at or near the end of the day is inherently improper or suspect; (3) preclude the government from referring to the $600 million aggregate first-day results or the trades as "winners," "losers," "good trades" or "bad trades"—or other similarly inaccurate terms—on the basis of unrealized first-day performance; and (4) use a written juror questionnaire in the jury selection process to ensure a fair and impartial jury free from improper biases.

Dated: December 15, 2025
    New York, New York

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO, P.C.

*/s/* Jonathan S. Sack
Jonathan S. Sack
Jeremy H. Temkin
Samuel W. Magaram
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

*/s/* Joon H. Kim
Joon H. Kim
Mitchell Kohles
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Defendant S. Kenneth Leech II*

23