UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

S. KENNETH LEECH, II,

Defendant.

24 Cr. 658 (GHW)

---

THE GOVERNMENT'S MOTIONS *IN LIMINE*

SEAN BUCKLEY
Deputy United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Thomas Burnett
Peter J. Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
 *Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 5

BACKGROUND ................................................................................................................... 5

DISCUSSION ..................................................................................................................... 11

I.  THE DEFENDANT'S STATEMENTS TO WAMCO AND THE SECURITIES
    EXCHANGE COMMISSION ARE ADMISSIBLE ............................................................ 11

II. STATEMENTS OF THE DEFENDANT'S AGENTS ARE ADMISSIBLE UNDER RULE
    801(D)(2)(D) ............................................................................................................ 12

    A.  APPLICABLE LAW ............................................................................................... 13
    B.  THE DEFENDANT HAD AN AGENCY RELATIONSHIP WITH CERTAIN WAMCO STAFF ........ 16

III. THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING
     IRRELEVANT AND UNFAIRLY PREJUDICIAL EVIDENCE AND ARGUMENTS.... 23

CONCLUSION................................................................................................................... 31

**TABLE OF AUTHORITIES**

Cases

*Cabrera v. Jakabovitz*,
  24 F.3d 372 (2d Cir. 1994) .................................................................................... 13

*In re Reserve Fund Secs. & Derivs. Litig.*,
  No. 09 Civ. 4346 (PGG), 2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ........................... 12, 14

*Levine v. SEC*,
  436 F.2d 88 (2d Cir. 1971) ..................................................................................... 26

*O'Neal* v. *Esty*,
  637 F.2d 846 (2d Cir. 1980) .................................................................................... 14

*Pappas v. Middle Earth Condo. Assn*,
  963 F.2d 534 (2d Cir. 1992) ............................................................................... 14, 15

*Penguin Books U.S.A.* v. *New Christian Church of Full Endeavor, LTD.*,
  262 F. Supp. 2d 251 (S.D.N.Y. 2003) ......................................................................... 14

*Rogers v. United States*,
  422 U.S. 35 (1975) ............................................................................................... 27

*Shannon v. United States*,
  512 U.S. 573 (1994) .............................................................................................. 27

*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011) .................................................................................... 24

*United States v. Aleynikov*,
  785 F. Supp. 2d 46 (S.D.N.Y. 2011) .......................................................................... 23

*United States v. Aspinall*,
  389 F.3d 332 (2d Cir. 2004) ............................................................................... 10, 11

*United States v. Bailey*,
  444 U.S. 394 (1980) .............................................................................................. 21

*United States v. Bakhtiari*,
  913 F.2d 1053 (2d Cir. 1990) .................................................................................. 21

*United States v. Battaglia*,
  No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) ................................. 27

2

*United States v. Benedetto*,
  571 F.2d 1246 (2d Cir. 1978)................................................................................................ 24

*United States v. Boykoff*,
  67 F. App'x 15 (2d Cir. 2003) .............................................................................................. 25

*United States v. Chambers*,
  800 F. App'x 43 (2d Cir. 2020) ............................................................................................ 25

*United States v. Demosthene*,
  334 F. Supp. 2d 378 (S.D.N.Y. 2004).................................................................................. 22

*United States v. Fazio*,
  No. 11 Cr. 873 (KBF), 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012) ................................ 24

*United States v. Fiumano*,
  No. 14 Cr. 518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) .................................. 26

*United States v. Goldstein*,
  No. 21 Cr. 550 (DC), 2023 WL 3662971 (E.D.N.Y. May 25, 2023) .................................... 13

*United States v. Grimm*,
  568 F.2d 1136 (5th Cir. 1978) .............................................................................................. 25

*United States v. Harris*,
  491 F.3d 440 (D.C. Cir. 2007)............................................................................................... 27

*United States v. Kwong*,
  69 F.3d 663 (2d Cir. 1995)..................................................................................................... 21

*United States v. Lauersen*,
  348 F.3d 329 (2d Cir. 2003).................................................................................................. 13

*United States v. Miller*,
  626 F.3d 682 (2d Cir. 2010)................................................................................................... 21

*United States v. Mustaga*,
  753 F. App'x 22 (2d Cir. 2018) ............................................................................................ 26

*United States v. O'Connor*,
  580 F.2d 38 (2d Cir. 1978).................................................................................................... 25

*United States v. Olivo*,
  664 F. App'x 77 (2d Cir. 2016) ............................................................................................ 10

3

*United States v. Paccione*,
   949 F.2d 1183 (2d Cir. 1991)..................................................................................................27

*United States v. Paul*,
   110 F.3d 869 (2d Cir. 1997)...................................................................................................21

*United States v. Reese*,
   933 F. Supp. 2d 579 (S.D.N.Y. 2013)...................................................................................22

*United States v. Rioux*,
   97 F.3d 648 (2d Cir. 1996)............................................................................................. 12, 13

*United States v. Rivera*,
   No. 13 Cr. 149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ..................................24

*United States v. Scarpa*,
   897 F.2d 63 (2d Cir. 1990)......................................................................................................24

*United States v. Stewart*,
   No. 03 Cr. 717 (MGC), 2004 WL 113506..............................................................................22

*United States v. Stroming*,
   838 F. App'x 624 (2d Cir. 2021) .............................................................................................26

*United States v. Thomas*,
   116 F.3d 606 (2d Cir. 1997).....................................................................................................26

*United States v. Walker*,
   191 F.3d 326 (2d Cir. 1999).....................................................................................................25

*United States v. Yildiz*,
   355 F.3d 80 (2d Cir. 2004).......................................................................................................14

*Weaver v. Bloomberg L.P.*,
   No. 22 Civ. 8201 (PAE), 2024 WL 693166 (S.D.N.Y. Feb. 20, 2024)...................................14

Rules

F.R.E. 801(d)(2)(D) ............................................................................................................ 13, 20
Fed. R. Evid. 402 ...................................................................................................................... 21
Fed. R. Evid. 403 ...................................................................................................................... 21
Fed. R. Evid. 404(a)(2)(A) & 405(a) ........................................................................................ 24
Fed. R. Evid. 801(a).................................................................................................................. 10
Fed. R. Evid. 801(c)................................................................................................................... 12
Fed. R. Evid. 801(c)(2) .............................................................................................................. 12

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in support of its motions *in limine* in connection with the trial of S. Kenneth Leech, II, scheduled to begin on April 6, 2026. First, the Government moves to admit certain of the defendant's prior written statements. Second, the Government seeks a preliminary ruling on the admission of out-of-court statements of the defendant's agents. Third, the Government moves to preclude irrelevant and unfairly prejudicial evidence and argument, including evidence and argument about: (a) the purportedly complex nature of the Government's case; (b) the availability of civil remedies for the defendant's fraudulent conduct; (c) the defendant's good acts to prove his innocence; and (d) the defendant's personal circumstances, including his age, family responsibilities, and potential punishment.

**BACKGROUND**

On November 25, 2024, a Grand Jury in this District returned a five-count indictment charging the defendant with investment adviser fraud, securities fraud, commodity trading advisor fraud, commodities fraud, and making false statements in testimony before the Securities Exchange Commission ("SEC"). These charges arise out of the defendant's multiyear "cherry-picking" scheme and his subsequent misstatements to the SEC about what he had done. The defendant cherry-picked by executing Treasury futures and options trades, observing how those trades performed in the hours that followed execution, and then allocating well performing trades to client accounts that he favored and allocating poorly performing trades to others. This scheme was self-serving: the defendant favored the accounts with the highest fees and closest professional association to him personally, and he disfavored accounts with lower fees and other managers.

The defendant pursued his scheme for years while he was employed as the chief investment officer of Western Asset Management Company ("WAMCo"). At the time, the defendant managed portfolios for an array of clients, each of whom he owed a fiduciary duty to act in the utmost good

5

faith. The defendant's favored accounts generally[1] followed WAMCo's Macro Opportunities ("Macro Opps") strategy. The stated objective of Macro Opps was to maximize total return, with a relatively wide range of risk compared to other WAMCo strategies. WAMCo advertised that "the firm's overall value opportunities can be assessed through [Macro Opps]," and that the strategy typically expressed the best ideas drawn from other strategies across WAMCo—including a different set of portfolios known as WAMCo's Core Strategies—but did so in a more concentrated, aggressive manner.[2] When WAMCo pitched this strategy to clients, it was referred to as the defendant's "baby." The defendant personally developed and managed Macro Opps. These accounts paid high management fees and, in some instances, separate performance fees.

The defendant's disfavored client accounts generally followed WAMCo's Core and Core Plus strategies (the "Core Strategies"). WAMCo advertised the Core Strategies to pension funds, large institutions, and retail investors as a prudent, long-term investment strategy designed to outperform the benchmark over a market cycle. Each of these accounts had numerous portfolio managers, such that attribution for poor performance was dispersed among multiple WAMCo executives. And, while these funds had greater assets under management than Macro Opps did, investors primarily were institutional and public retirement plans paying low management fees, and no performance fees. As a result, from a fee perspective, a dollar invested in the defendant's

---

[1] Account-1 and Account-2 were a Core Plus account, and a separately managed subset of a Core account. The defendant had a long association with the client of Account-1, and Account-2 was the predecessor account to the Macro Opps strategy. Account-1 typically was allocated trades *pro rata* along with the Core Strategies, but also received special, directed allocations. Account-2 typically was allocated trades *pro rata* along with Macro Opps, but also received special, directed allocations.

[2] Ex. A: R03_22078.

disfavored client accounts was not as valuable as a dollar invested in the defendant's favored client accounts.

The defendant's scheme, which commenced in 2021, followed unusually poor performance in the defendant's favored Macro Opps strategy. The macroeconomic trends brought about by the Covid-19 pandemic, including importantly the steady rise of global interest rates, were contrary to Macro Opps-then thesis, which was fundamentally long interest rates. Over the course of the defendant's scheme, Macro Opps continued to struggle, losing assets as the defendant's bets on certain investment themes proved to be consistently and expensively wrong. Significantly, in 2022, when Russia invaded Ukraine, Macro Opps held a proportionally massive concentration in Russian bonds that became effectively illiquid. In 2023, when Credit Suisse collapsed, Macro Opps was left holding a large position in Credit Suisse Additional Tier 1 bonds that was written down to zero. [3] By email, the defendant told the other portfolio manager on Macro Opps that "we are just totally snake bit" and complained privately to friends that he had "P&L proof" of his "confusion." [4]

While the Core Strategies also performed poorly over this time-period, they were benchmarked to the Bloomberg Aggregate Index, which likewise was down. Thus, clients in the Core Strategies could observe that peer funds managed by other advisers also were performing poorly. In addition, because the Core Strategies were expected to outperform their benchmark over a market cycle, they had some latitude to improve performance following the market contraction. With respect to a Core Strategies client, the defendant testified, "in our business, the first year you're offside you get disappointment, the second year, you get a warning, and [] the third year,

---

[3] An "Additional Tier 1" bond is a high-risk bond that can be converted to equity or written down to zero in certain circumstances.

[4] Ex. B: R01_90358; R11_180215.

you get terminated."[5] By contrast, Macro Opps was an "absolute return" strategy benchmarked against its own prior performance. Clients could look only to previous years' returns for comparison, making poor performance particularly stark. Concerning Macro Opps, the defendant testified the clients were "hot money," saying, "the good news about hot money is when it comes in . . . it can come in fast…. The bad news is it goes out just as fast."[6] Thus at the time of the defendant's scheme, the need to turnaround performance in Macro Opps was acutely felt.

WAMCo kept contemporaneous records of the defendant's trades, allocations, and economic performance. Those records demonstrate that the defendant systematically allocated trades hours after he executed them and used information about how the trades performed after execution to make his allocation decisions, favoring Macro Opps and disfavoring the Core Strategies. These records also show that the defendant's trading affected client outcomes: over the course of his scheme, the defendant allocated trades with net first-day gains of over $600 million to his favored clients, and allocated trades with net first-day losses of over $600 million to disfavored clients. The disparate performance is not explained by any ordinary trading strategy, by the characteristics of the favored and disfavored accounts, or by chance.[7]

To demonstrate that the defendant's cherry-picking was intentional, deceptive, and in violation of his fiduciary duties, the Government will present the jury with the records of the defendant's trades and call an array of witnesses, including current and former WAMCo employees. These witnesses will explain how the defendant's trading reveals systematic post-

---

[5] Ex. C: Mar. 6, 2024, SEC Tr. 146:1-5.

[6] Ex. D: Mar. 6, 2024, SEC Tr. 143:14-17.

[7] The Government has noticed expert witnesses on this topic and further discusses the trading evidence in its *Daubert* motion.

execution allocation, how the defendant's systematic post-execution allocation violated WAMCo's compliance training, and how the defendant's trades benefited Marco Opps (and thus the defendant himself), and hurt the Core Strategies. Additionally, two former WAMCo employees ("Witness-1" and "Witness-3") will testify about their observations of the defendant's historical trading and allocation practices, and their contemporaneous statements to others about the defendant's historical trading and allocation practices.[8]

For example, Witness-1 is expected to testify that in approximately late 2011, Witness-1 observed suspicious trading patterns in the defendant's client portfolios. Initially, Witness-1 noticed that the defendant executed a costly early morning trade in zero coupon bonds,[9] and then waited more than eight hours before allocating the trade, which was at a loss.  Witness-1 reviewed the defendant's trade blotter and identified offsetting trades in Treasury bonds and other United States debt instruments. The trades were "offsetting" in that as one increased in value the other decreased in value and both could not be profitable at the same time. According to Witness-1, the defendant allocated his offsetting trades late in the day with winning trades allocated to a hedge fund-type vehicle (one of which was the predecessor account to Macro Opps, Account-2), and losing trades allocated to Western Asset's broad market portfolios.

---

[8] Consistent with the Court's scheduling order, on November 12, 2025, the Government provided the defendant with notice of its intent to offer certain "other act" evidence at trial (the "Government's 404(b) Notice"). The Government's 404(b) Notice included the anticipated testimony of Witness-1 and Witness-3, which the Government expects to offer as direct evidence of the charged crimes, or alternatively, pursuant to Rule 404(b), or, alternatively, to rebut certain arguments the defendant may raise at trial. At defense counsel's request, the Government agreed the defendant would first move to preclude the admission of evidence pursuant to Rule 404(b), and the Government would oppose.

[9] A "zero coupon bond" is bought at a steep discount to face value. Unlike many bonds, a zero coupon bond does not pay interest (or "coupons") during its term to maturity, but at maturity its full face value is realized.

In October 2011, after observing this pattern, Witness-1 prepared excerpts of the defendant's trade blotter and certain order allocation history and shared the information by email with another Western Asset executive ("Witness-2"). One of the defendant's emails concerned the zero-coupon trade described above, noting, "This trade was done at 5:26 a.m. and allocated at 1:36 p.m. to non-U.S. accounts (no hedge fund) with the price down 2%."[10] According to Witness-1, after sharing the defendant's suspicious trading and allocation patterns with Witness-2, he later notified Western Asset's then-general counsel. Witness-1 resigned from WAMCo in late 2013. After he left, another WAMCo portfolio manager sent Witness-1 and Witness-2 an email charting the poor performance of Witness-1's account following his departure. Witness-1 responded noting that the defendant's favored client account strategy was "killing it though," and asking if it was a "possible SKL [i.e., the defendant] ticket in a drawer situation?"[11] According to Witness-1, referring to hiding a trade ticket "in a drawer" was a colloquial reference to executing a trade and then tucking it away to observe performance before allocating it. Another communication among WAMCo portfolio managers described making "sure there are no tickets stuffed in the drawer," corroborating Witness-1's explanation of this phrase.

Witness-3 is expected to testify that commencing in approximately 2014, he was a senior employee on Western Asset's trading floor assigned to a desk several feet away from the defendant's trading assistant ("Trading Assistant-1"). According to Witness-3, the defendant generally spent approximately one hour each morning on the trading floor, then went to his office until the close of the market. At some time near or after the close of the market, the defendant returned to the trading floor and gave Trading Assistant-1 a stack of paper trading tickets. Trading

---

[10] Ex. E: R02_653521.

[11] Ex. F: R02_653820.

Assistant-1 then would enter the defendant's trades and allocation instructions into Western Asset's electronic trade allocation system. Witness-3 stated it was a "parlor game" among WAMCo staff on the trading floor to attempt to reconstruct the defendant's trading rationale by reviewing his trade log after Trading Assistant-1 went through the late afternoon routine of entering the defendant's allocations. According to Witness-3, the defendant's practice of late-afternoon allocations was inconsistent with WAMCo's compliance training, the practice of other traders and portfolio managers at WAMCo, and WAMCo's fiduciary duty to its clients.

## DISCUSSION

### I.    The Defendant's Statements to WAMCo and the Securities Exchange Commission Are Admissible

Pursuant to Rule 801(d)(2)(A), "A statement is not hearsay when it is made by the defendant himself." *United States v. Olivo*, 664 F. App'x 77, 80 (2d Cir. 2016); Fed. R. Evid. 801(a) ("'statement' means a person's oral assertion, written assertion, or non-verbal conduct"). The Government moves to permit admission of certain of the defendant's written statements to WAMCo and the SEC.

First, in connection with WAMCo's internal investigation of the defendant's fraudulent conduct, the defendant prepared multiple memoranda concerning his trading and allocation practices, and the trades and allocations he executed on four dates: June 16, 2021, November 4, 2021, April 21, 2022, and July 13, 2022 (the "Trade Memos"). In fact, metadata for two of these Trade Memos reflects "Stephen Leech" as the "author." Because the defendant authored the Trade Memos, they are admissible against the defendant as the defendant's own statements. *See, e.g.*, *United States v. Aspinall*, 389 F.3d 332, 341 (2d Cir. 2004) (instructions written on documents "would not be hearsay even if offered by the government for their truth, because a 'party's own statement,' offered against that party, is defined as 'not hearsay'").

11

Second, in connection with the SEC's investigation of the defendant's fraudulent conduct, the defendant's counsel provided the SEC a memorandum setting forth the defendant's hypothetical rationale for trades and allocations executed on two dates, November 4, 2021, and August 2, 2022 (the "October 8 Memo").  Among other things, the October 8 Memo states that the defendant "does not have a specific recollection of individual trades that were executed between January 2021 and October 2023." However, the October 8 Memo describes hypothetical trading and allocation explanations, which are characterized in a cover letter as the defendant's "best reconstruction" of his rationale for trading decisions on those two dates. While the October 8 Memo was conveyed to the SEC by counsel, it documents the defendant's own statements. Accordingly, the October 8 Memo is admissible against the defendant as the defendant's own statements.

## II. Statements of the Defendant's Agents Are Admissible Under Rule 801(d)(2)(D)

The Government expects the evidence at trial will show the defendant was WAMCo's Chief Investment Officer, and that WAMCo's investment staff, as well as numerous client service executives and support staff reported directly or indirectly to the defendant. The evidence also will show the defendant specifically authorized certain WAMCo employees to assist him in executing and allocating his Treasury futures and options trades, and to communicate on his behalf. The Government will seek to introduce for their truth certain out-of-court emails and text messages prepared by these WAMCo employees in furtherance of those authorized tasks. These statements are admissible for their truth under Federal Rule of Evidence 801(d)(2)(D), because (1) there was an agency relationship between the defendant and certain WAMCo investment staff, (2) the

statements were made during the course of those individuals' employment relationship, and (3) the statements relate to a matter within the scope of that agency relationship.

At this time the Government seeks a preliminary pretrial ruling pursuant to Rule 104(a) that the first requirement of Rule 801(d)(2)(D)—that there was an agency relationship between the defendant and three particular members of WAMCo's support staff—is met. Such a preliminary ruling will provide the parties clarity on the likely scope of certain witnesses' testimony, and it will obviate the need for the Court to resolve questions of agency during trial, narrowing the issue to whether specific statements were made during the course of the agency relationship and within its scope.[12]

### A.    Applicable Law

As a general matter, any out-of-court statement offered for the truth of the matter asserted constitutes hearsay, and is inadmissible unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise. Fed. R. Evid. 801(c), 802.

Rule 801(d)(2)(D) provides in relevant part that "[a] statement is not hearsay if . . . [t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  "To show that the statement is not hearsay, the government must show: (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996).

---

[12] At trial, the Government also expects to offer various statements that do *not* constitute hearsay because they are not offered for their truth. *See* Fed. R. Evid. 801(c)(2). Some statements will also be admissible under Rule 801(d)(1)(B) if the defendant implies through attorney argument or cross-examination that the witness is not telling the truth, is acting based on an improper motive, or previously said something inconsistent.

An agency relationship may exist with employees of entities controlled by a defendant. *See In re Reserve Fund Secs. & Derivs. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7 (S.D.N.Y. Oct. 3, 2012) ("Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of F.R.E. 801(d)(2)(D), and his statements are admissible against that individual defendant."). Formal employment is not a prerequisite, however, as an agency relationship also can exist when an agent is directly responsible to the defendant. Under those circumstances, an agency relationship is established by: (1) "the manifestation by the principal that the agent shall act for him," (2) "the agent's acceptance of the undertaking," and (3) "the understanding of the parties that the principal is to be in control of the undertaking." *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994), *superseded by statute on other grounds*.

In the context of Rule 801(d)(2)(D) analysis, courts have found an agency relationship when the facts and circumstances show the declarant depended on the defendant for instructions. *See United States v. Rioux*, 97 F.3d at 660-61 (finding the fact that "these supervisors were answerable and directly responsible to [the defendant] . . . is enough to satisfy the first element of the test under 801(d)(2)(D)"); *United States v. Goldstein*, No. 21 Cr. 550 (DC), 2023 WL 3662971, at *7 (E.D.N.Y. May 25, 2023) (noting that an agency relationship may be satisfied "by facts demonstrating the declarant depended on the defendant for her position and job instructions").

That some of an agent's statements may be damaging for the defendant is irrelevant. For the statements to fall within the scope of the agency relationship, they need only "relate[] to a matter within the scope of the agency." *Pappas v. Middle Earth Condo. Assn*, 963 F.2d 534, 537 (2d Cir. 1992). "The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements

14

relate." *Rioux*, 97 F.3d at 537. Thus, the Circuit has explained that a nurse's statement to a patient about purging files in a doctor's office was admissible against the doctor both because helping to maintain files was within the scope of the nurse's work and because discussing such matters with patients was within scope of her work, even if "file purging" was not. *United States v. Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003).

The Second Circuit has encouraged "[l]iberal admissibility of this sort of proof" both because "an employee is usually the person best informed about certain acts committed in the course of his employment," and because "while still employed an employee is unlikely to make damaging statements about his employer, unless those statements are true." *Pappas v. Middle Earth Condo. Assn*, 963 F.2d at 537; *see also, e.g.*, *United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004) ("[F]ew principals employ agents for the purpose of making damaging statements."); *Weaver v. Bloomberg L.P.*, No. 22 Civ. 8201 (PAE), 2024 WL 693166, at *11 (S.D.N.Y. Feb. 20, 2024) ("That the statements are detrimental, not helpful, to [the employer's] interests does not impede their admission under Rule 801(d)(2)(D)."). The Second Circuit has emphasized that because:

> Admissions against a party's interest are received into evidence without many of the technical prerequisites of other evidentiary rules—such as, for example, trustworthiness and personal knowledge—admissibility under this rule should be granted freely.

*Pappas*, 963 F.2d at 537. Thus, even statements that could be characterized as an employee's "private musings" have been admitted when the employee is "speaking as to a matter that matches

15

the subject matter of her job description." *In re Reserve Fund Secs. & Derivs. Litig.*, 2012 WL 12354233, at *7.[13]

### B.    The Defendant Had an Agency Relationship with Certain WAMCo Staff

An agency relationship existed between the defendant and (i) Trading Assistant-1, (ii) a WAMCo operations manager ("Operations Manager-1"), and (iii) his executive assistant ("Executive Assistant-1"). This is true for several reasons: from an organizational standpoint, the defendant was responsible for the actions of these staff; their job responsibilities explicitly included supporting the defendant; and he relied on Trading Assistant-1 and Operations Manager-1 to enter his trades and trade allocations. In addition, the defendant specifically authorized Trading Assistant-1 and Operations Manager-1 to determine trade allocations on his behalf when he did not provide them.

First, as WAMCo's chief investment officer, the defendant was responsible for supervising all of WAMCo's investment staff and activities. Indeed, in SEC filings WAMCO represented the defendant was a "[c]ontrol person," that is, a person who "directly or indirectly[] controls [Western Asset Management's] management or policies."[14] Additionally, at his March 6, 2024, testimony before the SEC, the defendant testified that "everyone in the [i]nvestment [d]epartment . . . rolls up through the organizational chart and reports to me."[15]

---

[13] "Whether a statement concerns a matter within the scope of employment/agency under . . . [Rule 801(d)(2)(D)] is [a] preliminary matter to be determined by the trial court." *Penguin Books U.S.A.* v. *New Christian Church of Full Endeavor, LTD.*, 262 F. Supp. 2d 251, 261 (S.D.N.Y. 2003). The question for the court is "whether or not a juror could reasonably find that the admission was made within the scope of employment/agency or within the speaking authority." *Id.* (citing *O'Neal* v. *Esty*, 637 F.2d 846, 851 (2d Cir. 1980)).

[14] Ex. G: R01_3399393 (Dec. 21, 2021, Form ADV Excerpt).

[15] Ex. H: Mar. 6, 2024, SEC Tr. 24:7-10.

Second, these staff members' job responsibilities included supporting the defendant. Since at least 2015, annual performance reviews for Trading Assistant-1 stated that her primary responsibility was supporting the defendant, including with respect to entering his trades and allocations into WAMCo's proprietary trade management system, "ATP." For example, the "overall performance" section of her 2015 performance review stated, "support of SKL [*i.e.*, the defendant] . . . is her primary focus," noting while "it is not always easy to get what you need from him to allocate and post his trades…. [Trading Assistant-1] is able to responsibly handle whatever comes her way from [the defendant]."[16] Subsequent performance reviews consistently identified Trading Assistant-1's "main priority" as supporting the defendant's trading and allocations.[17] In this role, Trading Assistant-1 was responsible for obtaining the defendant's trade allocations from the defendant and entering those allocations into ATP. Similarly, performance reviews for Operations Manager-1 identify her as the "business owner for ATP" and describe her role supervising Trading Assistant-1 and supporting the defendant's trade allocations.[18]

Third, the defendant specifically authorized Trading Assistant-1 and Operations Manager-1 to assist in executing and allocating his Treasury futures and options trades by obtaining and entering his allocations into WAMCo's systems and determining his trade allocations when he did not do so himself. To this end, the defendant authorized Trading Assistant-1 and Operations Manager-1 to assist the defendant in allocating and processing his trades.

In connection with this responsibility, Trading Assistant-1 regularly communicated with

---

[16] Ex. I: R01_225342.

[17] Ex. J: R01-225464.

[18] Ex. K: R01_225598.

the defendant, and was authorized by the defendant to communicate with WAMCo's employees and trading counterparties on his behalf, including as a recipient of the defendant's trade confirmations from brokers. For example, when an analyst on the defendant's team attempted to obtain the defendant's allocations from Trading Assistant-1 before 2:00 p.m. Pacific Time several days in a row, Trading Assistant-1 advised her, "I wouldn't bother asking me until 2:30 [PT] on a consistent basis."[19] Similarly, when a Wells Fargo broker sent multiple consecutive confirmations for the defendant's trades, Trading Assistant-1 responded by Bloomberg message, calling the confirms "rapid fire."[20] The broker advised Trading Assistant-1, "I am assuming [the defendant is] checking his positions equally as fast…. I want his data to be current." Trading Assistant-1 replied, "I think it would improve things if you did slow it down." After seeing the exchange, Operations Manager-1 emailed Trading Assistant-1, "If [the broker] only knew [the defendant] did not give allocations until late in the day. He needs to not worry about up-do-date positions. You are correct." *Id*. Trading Assistant-1 replied to Operations Manager-1, "[the defendant] is not reading those [trade confirms] buddy hate to tell you." *Id*.

In addition, Trading Assistant-1 prepared trade ledgers on a near daily basis by collecting the defendant's trade confirmations and copying the information from the trade confirmations into a notebook. The ledgers are organized by date and broker, and identify a contract amount, instrument, and execution price for each of the defendant's trades. After copying the trade confirmations, Trading Assistant-1 attempted to contact the defendant to obtain allocations, then entered each trade and allocation into ATP. After posting a trade to ATP, Trading Assistant-1 also noted in her ledger the ATP number assigned to each trade. On some occasions these ledgers reflect

---

[19] Ex. L: R07_171991.

[20] Ex. M: R01_1149058.

the defendant's instruction that Trading Assistant-1 should "come back" to a particular trade, because the defendant was not prepared to provide an allocation at the time they spoke.[21]

Trading Assistant-1 also prepared instructions for other WAMCo employees to follow when Trading Assistant-1 was unavailable to obtain and enter the defendant's trade allocations. These instructions often include information about the defendant's allocation shorthand (for example, which accounts were included in the allocation directive "Ops" or "SKL1"), his default allocation for Broker-1, special guidance for Account-2, and how late the defendant might be expected to call and provide allocations.

Operations Manager-1 directly supervised WAMCo's trade operations staff, including Trading Assistant-1. Importantly, when Trading Assisant-1 was not available to obtain the defendant's trade allocations from the defendant or to enter the defendant's trade allocations into ATP, Operations Manager-1 often did so herself. In this capacity, Operations Manager-1 regularly communicated with the defendant, and was authorized by the defendant to communicate with WAMCo's employees and trading counterparties on his behalf, including as a recipient of the defendant's trade confirmations from brokers. For example, when the defendant failed to provide allocations for his trades on a Friday afternoon, Operations Manager-1 emailed the defendant's investment team on Sunday stating, "Friday [the defendant] did quite a few trades. [The defendant] only gave us allocations for about half of them. We'll have to get the allocations from him early in the a.m. tomorrow. Just want you to know his numbers may not be where he thinks given the

---

[21] The defendant's statements reflected in Trading Assistant-1's notes, including his allocation instructions and directives to "come back," are separately admissible against him pursuant to Rule 801(d)(2)(A).

missing trades."[22]

On another occasion when Trading Assistant-1 was absent and Operations Manager-1 obtained the defendant's trade allocations from the defendant, Operations Manager-1 wrote Trading Assistant-1, "[the defendant] back to his old tricks yesterday. Allocations at 1:45pm. I had meetings between 2pm and 4pm with small breaks in the middle. Market all over the place with heavy trading. The perfect storm. Very late EOD [end of day]. Hopefully today should be better."[23]

Beyond their responsibility for obtaining and entering the defendant's trade allocations, the defendant also specifically authorized Trading Assistant-1 and Operations Manager-1 to determine trade allocations on his behalf when he was unavailable to do so himself.  In other words, if the defendant did not provide his desired trade allocations to Trading Assistant-1 or Operations Manager-1, the defendant authorized these employees to determine which clients would participate in his trades.[24]

For example, the defendant authorized these employees to allocate his trades 50/50 (that is, evenly split between Macro Opps and the Core Strategies) if the defendant was unable to

---

[22] Ex. N: R01_1153146.

[23] Ex. O: R01_1148929.

[24] The Government will introduce evidence at trial that the defendant's practice of delegating his allocation authority to his trading staff was inconsistent with WAMCo's compliance instructions, which emphasized that "[t]he headline is that you need to <u>own</u> your trades as an investment professional.  <u>The Firm provides a material amount of supporting infrastructure, but ultimately your name is on the ticket, our clients and internal colleagues deserve a high standard of quality from you, and you have your own professional reasons to do the job right.</u>" Ex. P: R10_704389 (emphasis in original).

provide an allocation by the end of the trading day.[25] The defendant referred to this 50/50 allocation as his "standard allocation." On one occasion when the defendant failed to provide allocations for two trades, Trading Assistant-1 informed the defendant, "I allocated 50/50 on both of these below, fyi." The defendant responded, "sorry – missed this – but as usual – your [*i.e.*, Trading Assistant-1's] use of our standard allocation is correct!"[26] On another occasion, Trading Assistant-1 informed the defendant, "[s]ince I couldn't get you on the phone I used our standard allocation."[27] On a date when the defendant failed to provide allocations to Operations Manager-1, he wrote her, "I totally airballed this."[28] Operations Manager-1 replied, "No problem. . . I made a few 'executive decisions' on your behalf." Operations Manager-1 then identified trades for which she herself made allocation decisions.

In connection with this task, Trading Assistant-1 and Operations Manager-1 discussed how they should allocate the defendant's unallocated trades, including whether they should apply the defendant's standard allocation instruction (or some other allocation), or wait to try to obtain the defendant's allocations despite the late hour. On a date when the defendant failed to provide trade allocations before traveling, Trading Assistant-1 asked other members of the investment team, "I feel confident enough that I can figure out most of [the defendant's] trades but if you know

---

[25] As to trades executed with a particular broker, Broker-1, the defendant had a separate standing instruction to Trading Assistant-1 and Operations Manager-1 that those trades were allocated to Macro Opps.

[26] Ex. Q: R11_302919.

[27] Ex. R: R11_660628.

[28] Ex. S: R04_159084.

anything he needed to do specifically today—then let me know."[29] When the defendant's investment team provided no input, Trading Assistant-1 asked Operations Manager-1 whether she should formally post the defendant's trades after allocating them herself. Trading Assistant-1 noted, "I took the conservative route on everything. He had been allocating some options trades recently to SKL1+F only but I did not do any like that because I could not see any pattern of which trades he allocates this way." *Id*. Operations Manager-1 advised Trading Assistant-1, "run with it." Subsequently, Trading Assistant-1 spoke to the defendant who provided a "few adjustments" to her allocations.

As the defendant authorized Trading Assistant-1 and Operations Manager-1 to act on his behalf regarding his trades and allocations, an agency relationship existed between the defendant and Trading Assistant-1 and Operations Manager-1. The types of statements the Government intends to introduce at trial will fall comfortably within the scope of their agency relationships with the defendant. Fed. R. Evid. 801(d)(2)(D).

The defendant also had an agency relationship with Executive Assistant-1, his assistant at WAMCo. Executive Assistant-1 sat at a desk outside the defendant's office, and managed the defendant's communications and his calendar, as well as various aspects of his personal life (for example, related to his family's travel and taxes). In that capacity, Executive Assistant-1 regularly communicated with the defendant, and was authorized to communicate with WAMCo's employees, clients, and counterparties, and the defendant's friends and family members on the defendant's behalf.

For example, in connection with the preparation of client-facing performance materials,

---

[29] Ex. T: R01_1148966.

Executive Assistant-1 advised a trader, "I spoke to [the defendant] and he said he doesn't need attribution in the book."[30] On another occasion, Executive Assistant-1 responded to outreach from a WAMCo client stating, "I am writing you on [the defendant's behalf]. He wanted you to know that he saw your e-mail but he has been out of the country on vacation."[31] On another occasion, the defendant sent Executive Assistant-1 an email, the subject line of which was [Trading Assistant-1]. The email stated, "Please tell her I have calls until 2//I will call her then."[32] A similar email from the defendant to Executive Assistant-1, the subject line of which was [Trading Assistant-1], stated, "Please tell her bund options (short calls) to opps."[33]

Accordingly, Executive Assistant-1 had an agency relationship with the Defendant. The types of statements the Government intends to introduce at trial fall will fall comfortably within the scope of that relationship.

**III. The Court Should Preclude the Defendant from Introducing Irrelevant and Unfairly Prejudicial Evidence and Arguments**

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

---

[30] Ex. U: R11_839436.

[31] Ex. V: R11_988093.

[32] Ex. W: R11_17907

[33] Ex. X: R11_192765.

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

### A. The Court Should Exclude Evidence and Argument about the Purportedly Novel Nature of the Government's Case

The defendant's pretrial motions have sought to denigrate the Government's investigation and prosecution of the defendant, claiming that the Government has put together a novel cherry-picking case. (*See* Dkt. 35 at 6 (contrasting this case to other cherry-picking cases which "typically allege identical or nearly identical accounts"); Dkt. 38 at 1, 36 (describing this case as "the first cherry-picking prosecution that alleges dishonest allocation of trades among fixed income portfolios with demonstrably different investment strategies, based solely on unrealized first day performance of trades, in which the defendant lacked a direct financial interest in the 'favored' accounts;" and asserting "this is an extraordinarily complex case"); Nov. 7, 2025 Tr. at 24, 47 (describing the case and the facts as of "inordinate complexity" and "exceedingly complicated"). The Court should exclude such subjective and self-serving characterizations in front of the jury because they are irrelevant to the jury's consideration of the issues on trial, and amount to attempts at jury nullification. *See, e.g.*, *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the Government's investigation); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (noting that the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case"), *aff'd*, 173 F. App'x 899 (2d

24

Cir. 2006); *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *2 (S.D.N.Y. Jan. 26, 2004) ("The defense may not argue or present evidence to the jury that tends to show that this count is an unusual or unprecedented application of the securities laws.").

### B. The Court Should Exclude Evidence about the Availability of Civil Remedies for the Defendant's Fraudulent Conduct

The defendant should be precluded from introducing evidence or argument, including through cross examination, concerning the availability of civil remedies for his fraudulent conduct.

At least two other federal agencies have conducted civil investigations of the defendant's allocation of Treasury futures and options trades during the 2021-2023 period. The SEC investigated and filed a complaint charging the defendant with violations of the Securities Act of 1933, the Securities Exchange Act of 1933, the Investment Advisers Act of 1940, and the Investment Company Act of 1940. *Securities Exchange Commission v. Leech*, 24 Civ. 9017 (KBF) (S.D.N.Y.) (Dkt. 1). In addition, according to quarterly filings by WAMCo's parent company, Franklin Resources, Inc., the Commodity Futures Trading Commission (the "CFTC") investigated the defendant's trading activities and closed its investigation without action. *See* Franklin Resources, Inc., Aug. 1, 2025, Form 10-Q. Further, on behalf of a proposed class, the Western Pennsylvania Electrical Employees Insurance Trust Fund sued the defendant, Western Asset Management Company, and others, for securities fraud. *The W. Pa. Elec. Emps. Ins. Trust Fund v. W. Asset Mgmt. Co., et al.*, 25 Civ. 937 (KT) (W.D. PA) (Dkt. 1).

References to other avenues of relief for harmed investors invite the jury to set aside their fact-finding duties or to wrongly conclude that other legal actions may vindicate the same interests and should be precluded as attempts at jury nullification. *See United States v. Aleynikov*, 785 F. Supp. 2d 46, 75-76 (S.D.N.Y. 2011) ("Whether Goldman Sachs chose to pursue or not to pursue civil remedies against Aleynikov was irrelevant to any of the issues before the jury in this criminal

25

trial, and Aleynikov has not shown otherwise."), *rev'd on other grounds*, 476 F. App'x 473 (2d Cir. 2012). Accordingly, the defendant should be precluded from offering evidence or argument concerning the availability of civil remedies for his fraudulent conduct.

### C. The Court Should Exclude Evidence and Argument About the Defendant's Good Acts to Prove His Innocence

The defendant should be precluded from presenting evidence or argument, including in jury addresses, concerning his prior commissions of "good acts," and likewise should be precluded from offering evidence of his noncriminal activities to disprove his guilt of the crimes charged. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). While a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait" of character, or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014).

Furthermore, pursuant to Federal Rule of Evidence 403, "a district court may exclude evidence of a defendant's prior good acts if it finds that any minimal probative value of such evidence is outweighed by the likelihood of jury confusion and the risk of jury nullification." *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) ("And the trial judge was rightly concerned that, to the extent any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.")).

The defendant should accordingly be precluded from offering evidence or argument, including in his opening statement, regarding his prior good deeds, including charity and philanthropy, or his lack of commission of other bad acts. As a specific example, the defendant should be precluded from offering this type of evidence and argument insofar as it relates to philanthropic organizations or any other charitable causes he supports.

The defendant should likewise be precluded from seeking to establish his good faith by introducing evidence of trading that is not the subject of the allegations in this case. Whether analyzed under the rubric of relevance, pursuant to Rule 401, or character propensity evidence, under Rule 404(b), courts uniformly hold that evidence that a defendant engaged in legal, honest business conduct on some occasions may not be introduced to rebut allegations that the defendant engaged in illegal conduct on other occasions. *See, e.g., United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) ("Chambers's argument that his running of a legitimate law practice makes it less likely that he had corrupt intent to bribe Villanueva is precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit."); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming the district court's refusal to allow defendant accused of preparing false

27

asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (affirming district court's exclusion of testimony that witnesses did not pay defendant any bribes "because such testimony would in effect be an attempt to demonstrate appellant's good character by proof of specific good acts"); *see also United States v. Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." (quoting *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978))).

Thus, for example, in *Levine v. SEC*, 436 F.2d 88 (2d Cir. 1971), the Second Circuit rejected a broker-dealer defendant's claim that he was entitled to offer testimony by certain of his clients that they had not been lied to, as such testimony would not negate the testimony of the customers who testified that false and misleading statements had been made to them. *Id.* at 91; *see also, e.g.*, *United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) ("A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branches in Brooklyn or the Bronx on April 22 or that he did not rob the Manhattan branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22.").

So too here, evidence or argument that the defendant did not engage in fraud with respect to trades, instruments, time periods, or clients, other than those at issue in this case, is irrelevant to the question of whether the defendant committed the acts charged in the Indictment.

### D. The Court Should Exclude Evidence and Argument About the Defendant's Personal Circumstances, Including Potential Punishment

Evidence and argument that make a defendant appear sympathetic for reasons unrelated to the charges at issue should also be excluded as inviting the jury to acquit a defendant even where the evidence proves his guilt beyond a reasonable doubt. Juries are not "to act based on their . . . sympathy." *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021); *see, e.g.*, *United States v. Mustaga*, 753 F. App'x 22, 37 (2d Cir. 2018) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy."). Any attempt to encourage such sympathy is therefore an attempt at nullification, which is itself plainly improper. *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent").

The Government is not aware of any lawful basis for the defendant to offer evidence or argument concerning his family background, health, age or any other similar personal factors. The defendant should be precluded from doing so, and from mentioning such subjects in argument, absent a showing that such a factor bears on guilt. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy for whom defendant had devoted his life to care); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *see also United States v. Harris*, 491 F.3d 440, 447-48 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendant should similarly be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

CONCLUSION

For the foregoing reasons, the Court should grant the Government's motions *in limine* in their entirety.

SEAN BUCKLEY
Attorney for the Government


By:    /s/_____
       Thomas Burnett
       Peter J. Davis
       Assistant United States Attorneys

       Lindsey Keenan
       Special Assistant United States Attorney

31