UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                          :

UNITED STATES OF AMERICA        :

                          :

      - v. -              :   24 Cr. 658 (GHW)

                          :

S. KENNETH LEECH II,         :

                          :

           Defendant.     :

                          :

                          :
---------------------------------------------------- x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTION

SEAN BUCKLEY
Attorney for the United States
Southern District of New York

Thomas S. Burnett
Peter J. Davis
Lindsey Keenan
Assistant United States Attorneys

*- Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................................... 4

BACKGROUND ........................................................................................................................ 5

ARGUMENT ............................................................................................................................ 8

I.  The Defendant Has Failed to Establish Attorney Client Privilege Over Any of His Claims.... 8

    A.  The Defendant Has Not Met His Burden to Prove Each Individual
        Communication With His Son and Friend Are Privileged .......................................... 8

    B.  The Defendant Has Not Met His Burden to Establish that His Notes Are
        Privileged................................................................................................................ 16

    C.  The Defendant's Search History Is Not Privileged .................................................... 20

    D.  The Defendant's Miscellaneous Privilege Assertions Fail ......................................... 22

II. The Filter Team Process Reasonably Respected the Defendant's Privilege .......................... 23

    A.  The Filter Process ................................................................................................... 24

    B.  Applicable Law ....................................................................................................... 32

    C.  Discussion .............................................................................................................. 34

CONCLUSION........................................................................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

Page(s)

*A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, .............................. 19

*Avenatti*,
   559 F. Supp. 3d ........................................................................................................... 37

*Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*,
   143 F.R.D. 611 (E.D.N.C. 1992) ................................................................................. 22

*Cavallaro v. United States*,
   284 F.3d 236 (1st Cir. 2002) ....................................................................................... 12

*Cicel (Beijing) Sci. & Tech. Co. v. Misonix, Inc.*,
   331 F.R.D. 218 (E.D.N.Y. 2019) ................................................................................. 18

*Coplon v. United States*,
   191 F.2d 749 (D.C. Cir. 1951) ..................................................................................... 34

*Dunn as Tr. for Zohar Litig. Tr.-A v. Patriarch Partners, LLC*,
   672 B.R. 587 (Bankr. D. Del. 2025) ...................................................................... 10, 13

*Gartner*,
   518 F.2d ....................................................................................................................... 33

*In re Cnty. of Erie*,
   473 F.3d 413 (2d Cir. 2007) ......................................................................................... 23

*In re Grand Jury Subpoena Served Upon Doe*,
   781 F. 2d 238 (2d Cir. 1986) ....................................................................................... 33

*In re Grand Jury Subpoenas Dated January 20, 1998*,
   995 F. Supp. 332 (E.D.N.Y. 1998) ......................................................................... 8, 10

*In re Grand Jury Subpoenas*,
   454 F.3d 511 (6th Cir. 2006) ....................................................................................... 37

*In re Horowitz*,
   482 F.2d 72 (2d Cir. 1973) ........................................................................................... 17

*In re Search Warrants Executed on Apr. 28, 2021*,
   No. 21 Misc.  (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021) ......................... 35

*In re von Bulow*,
    828 F.2d 94 (2d Cir. 1987).................................................................................. 19

*Lively v. Wayfarer Studios LLC*,
    24 Civ. 10049 (LJL), 2025 WL 2606904 (S.D.N.Y. Sept. 9, 2025)........................................ 12

*Montejo v. Louisiana*,
    556 U.S. 778 (2009)..................................................................................... 35, 37

*Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*,
    No. M8-85 (WHP), 1999 WL 378337 (S.D.N.Y. June 10, 1999) ................................... 8, 9, 16

No. 07 Civ. 929 (WWE),
    2014 WL 657688 (D. Conn. Feb. 20, 2014) ........................................................... 19

*Regeneron Pharms., Inc. v. Merus B.V.*,
    No. 14 Civ. 1650 (KBF), 2014 WL 11344040 (S.D.N.Y. Dec. 5, 2014) ................................ 18

*Robbins & Myers, Inc. v. J.M. Huber Corp.*,
    274 F.R.D. 63 (W.D.N.Y. 2011).......................................................................... 17

*United States v. Ackert*,
    169 F.3d 136 (2d Cir. 1999)...................................................................... 9, 14, 15

*United States v. Alexander et al.*, No.,
    24 Cr. 676.............................................................................................. 37

*United States v. Blakstad*,
    No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) ........................................ 35

*United States v. Ceglia*,
    No. 12 Cr.876 (VSB), 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015)..................................... 35

*United States v.DeFonte*,
    441 F.3d 92 (2d Cir. 2006)............................................................................. 20

*United States v. Gonzalez*,
    144 F.4th 396 (2d Cir. 2025) ...................................................................... 20, 38

*United States v. Int'l Bhd. of Teamsters*,
    119 F.3d 210 (2d Cir. 1997)............................................................................. 8

*United States v. Kovel*,
    296 F.2d at 922 ................................................................................... passim

*United States v. Landji,*
   No. (S1) 18 CR. 601 (PGG), 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) .......................... 38

*United States v. Lumiere,*
   No. 16 Cr. 483 (JSR), 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016) ..................................... 38

*United States v. Lusterino,*
   450 F.2d 572 (2d Cir. 1971) .................................................................................................. 34

*United States v. Mejia,*
   655 F.3d 126 (2d Cir. 2011) .................................................................................................... 9

*United States v. Milton,*
   21 Cr. 478 ............................................................................................................................. 38

*United States v. Rispo,*
   460 F.2d 965 (3d Cir. 1972) .................................................................................................. 34

*United States v. Schwimmer,*
   924 F.2d 443 (2d Cir. 1991) .................................................................................................. 33

*United States v. Shvartsman,*
   722 F. Supp. 3d 276 (S.D.N.Y. 2024) .................................................................................. 33

*United States v. Stewart,*
   294 F. Supp. 2d 490 (S.D.N.Y. 2003) .................................................................................. 38

*United States v. Tournant,*
   No. 22 Cr. 276 (LTS), 2023 WL 5276776 (S.D.N.Y. Aug. 15, 2023) ............................. passim

*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003) .............................................................................................. 35, 37

## PRELIMINARY STATEMENT

The defendant continues to assert that his rights have been violated by a deficient privilege screening process. But the Government's screening procedure was professional, fair, and discharged in good faith, and even the defense's claimed imperfections in the Government's process have caused the defendant no prejudice, constitutional or otherwise. Moreover, the defendant's disclosures following the November 7, 2025 conference reveal that many of the assertions that formed the basis of the defendant's original request for relief were unfounded: the defendant now concedes many supposedly privileged messages the Government purportedly failed to screen are, in fact, not privileged at all. What is left in dispute are overwhelmingly messages that are neither to nor from attorneys. These include electronic messages that the defendant had with his son (and no attorney), his long-time friend (and no attorney), and with himself. None of these messages enjoy the confidential treatment of attorney-client communications, let alone form a basis to conclude that the defendant's "rights [have] been violated." (Def. Br. 1).

The defendant's motion fails from the start because his updated privilege logs do not carry his burden to establish the existence of an applicable privilege. For example, he fails to show that the defendant's son and longtime friend were communicating with the defendant solely in their capacity as retained experts, rather than as personal confidants, as he must. Nor do the defendant's logs establish that in each one of these communications the defendant's son and friend were serving the role of "translator" for the attorneys. The reason the defendant has not made this showing is because he cannot. His correspondence with his close personal associates was not privileged and aggressive invocations of *Kovel* does not it make it otherwise.

The defendant's assertions of privilege over his personal notes are even less credible because the defendant has unambiguously waived any privilege that could attach. The defense

incorporated the notes into reports and expressly authorized their disclosure to the Government. Further still, the defendant's privilege log does not claim that all of these notes were subsequently discussed with or sent to counsel. The defendant has also failed to sustain his other privilege claims, which include contending, without authority, that his own search history is privileged. Having failed to sustain any of his privilege claims, the defendant's motion fails.

The circumstances surrounding the Government's privilege screen also compel the denial of the defendant's motion because they preclude any finding that the Government acted in bad faith. The Filter Team and the Case Team took reasonable steps, often out of an abundance of caution, to screen the Case Team from potentially privileged material and modified those steps when it discovered possible lapses and to improve effectiveness. Indeed, the Case Team proactively requested the assistance of the Filter Team before reviewing a single document and halted its review when it encountered potentially privileged documents. At no point did the Government actively endeavor to deprive Leech of his attorney-client confidences. As set forth in the accompanying declarations, the circumstances here are the opposite of governmental conduct that is, "standing alone . . . so offensive that it 'shocks the conscience.'"[1] Without such a showing there is no Fifth Amendment violation and, even if the Court were to sustain his privilege claims as to particular communications, the defendant is not entitled to any relief.

## BACKGROUND

The Government outlined the factual background to the defendant's motion in its initial opposition. (ECF No. 37 at 46-52.) On November 7, 2025, this Court set forth a framework to develop the record:

There are three aspects of the record that I believe must be developed. First, I need

---

[1] *United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776, at *13 (S.D.N.Y. Aug. 15, 2023).

to know what communications over which the defendant asserts privilege have been reviewed by the prosecution team, and whether they are, indeed, privileged. Second, I need to understand the process that was used by the Government to filter potentially privileged documents from review by the prosecution team, and the reasons why any privileged materials may have moved through that net. And third, if the Government's conduct was a violation of the defendant's rights, I will need to understand the extent to which the documents "tainted" the Government's prosecution to evaluate what if any remedy is appropriate.

(11/7/25 Tr. 99-100.) At the Court's direction, the parties met and conferred on November 12, 2025 to discuss the Court's proposed framework for addressing the privilege issues and filter team issues raised by the defendant's motion. At that meet and confer, the Government provided an attorney proffer outlining certain steps in the warrant review process and made a proposal of how to proceed.

As to the Apple Data, the Government proposed having the Filter Team attempt to regenerate, to the best of its ability, the reports that were released to the Case Team on or about August 23, 2024 and the USAfx documents that were released to the Case Team on or about August 16, 2024. This was because, as set forth below, on August 9, 2024, the Case Team stopped its review upon seeing that chats involving Dexter Senft were present, and on August 15, 2024, the Case Team stopped its review after seeing a file path suggesting that there was additional privileged material. Given that the Case Team had these reports for mere hours, the creation of a privilege log as to all of the items released in those time frames would not represent what the Case Team reviewed. The defense proposed edits to the Government's proposal, and the parties "jointly propose[d]" a schedule to the Court. (ECF No. 50.)

The defendant submitted updated privilege logs on December 12, 2025. Thereafter, defense counsel requested that the Filter Team produce prior versions of the Apple Data that had been released prior to August 16 and 23, 2024. Notwithstanding that the Government made the proposal in writing to defense counsel and the parties jointly proposed it to the Court, the Government takes

in good faith that defense counsel and the Government had a misunderstanding about the Filter Team production. Accordingly, the Filter Team has regenerated two additional versions of reports that were released at two earlier points in time, and produced them to the defense on or about January 20, 2026.

On January 7, 2026, the defendant filed further updated privilege logs and withdrew multiple privilege claims that they had previously asserted prior to filing their motion and again on December 12, 2025. By doing so, the defendant has revealed that he has incorrectly withheld as privileged a series of communications involving his son and Mr. Senft. These improper privilege claims concern communications between the defendant and his son exchanging passwords; a calendar invite between the defendant and his attorneys that had the word "privileged" in the subject line; a January 24, 2024 email chain between the defendant and Mr. Senft where Mr. Senft tells Mr. Leech, "It was never my intent to charge you"; and an email from the defendant to Mr. Senft stating: "Ralph asked you send him David's email and home address so he can send him the 'privilege' letter."[2]

---

[2] On January 16, 2026 and January 20, 2026, the defendant provided to the Government further updated privilege logs fixing apparent errors.

## ARGUMENT

**I.    The Defendant Has Failed to Establish Attorney Client Privilege Over Any of His Claims**

### A.  The Defendant Has Not Met His Burden to Prove Each Individual Communication With His Son and Friend Are Privileged

The defendant asserts privilege over electronic communications he had with his son and friend about a pending investigation, without including any lawyers.[3] The defendant's privilege assertions—that these communications are protected because his son and friend are non-attorney agents of the lawyers—fail at every level. First, the defendant has not met his burden to prove that each of the communications in his privilege log were with his son and friend in their purported role of attorney-retained experts, rather than in their capacity as son and friend. Second, the defendant has not met his burden to prove that each individual communication was "more than just useful or convenient, but rather . . . nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications."[4]

### 1.  Applicable Law

The attorney-client privilege applies where legal advice is sought "from a professional legal advisor in his capacity as such."[5] Advice sought from non-lawyers does not "fall within the strict parameters of the attorney-client privilege."[6]  The attorney-client privilege can extend to communications between a client and a non-lawyer when the purpose of the communication is "to

---

[3] These items are designated as categories 1, 2, and 3 in the defendant's updated January 7, 2026 privilege log.

[4] *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, No. M8-85 (WHP), 1999 WL 378337, at *2 (S.D.N.Y. June 10, 1999).

[5] *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997).

[6] *In re Grand Jury Subpoenas Dated January 20, 1998*, 995 F. Supp. 332, 337 (E.D.N.Y. 1998).

clarify communications between attorney and client."[7] The Second Circuit, in *United States v. Kovel*, applied the privilege to a communication between a client and an accountant, for example, reasoning that "[a]ccounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases" and therefore concluded that "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit."[8]

"Nevertheless, the extension has always been a cabined one, and to that end, the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client."[9] Accordingly, the principle of *Kovel* "has no application" where the attorney "was not relying on [the third-party] to translate or interpret information given to [the attorney] by his client," even where the information provided to the third party was "important to the attorney's ability to represent the client" or helped provide information that the attorney and client "did not have."[10] In other words, where the third-party's "role was not as a translator or interpreter of client communications, the principle of *Kovel* does not shield his discussions with" the attorney.[11] The application of these principles "requires courts to exercise a

---

[7] *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).

[8] 296 F.2d 918, 922 (2d Cir. 1961).

[9] *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (quotation marks and alterations omitted).

[10] *Ackert*, 169 F.3d at 139-40.

[11] *Id.* at 140; *see also Skillsoft Corp.*, 1999 WL 378337, at *2 (S.D.N.Y. June 10, 1999).

more exacting level of examination than may be common."[12]

### 2. The Defendant Has Not Met His Burden to Prove That He Was Seeking Guidance From His Attorney Rather Than From His Son and Friend

The defendant has the burden to prove that *Kovel* applies to each individual communication in his privilege log: "[t]he *Kovel* doctrine is narrowly applied and requires an individual review and assessment of each potentially relevant document."[13] Accordingly, a categorial assertion based on "retention" and "general" descriptions of the purported agents' assistance is insufficient.[14] Instead, the party asserting privilege must "provide specific document descriptions and explanations of why the *Kovel* Documents [fall] within the doctrine."[15]

Courts have recognized that *Kovel* has no application where the defendant has not established that the particular communications at issue "were at the lawyer's express request" or that "the sole purpose of the conversations with the [non-attorney agent] was to assist the attorney in his representation of the client."[16] This is because courts are "simply not prepared to extend the attorney client privilege to those conversations a person may have with a third party—whether a union representative, a parent, a trusted teacher, or a close friend—in seeking that party's guidance about a potential legal problem or assistance in procuring a lawyer."[17]

The defendant's privilege log descriptions do not demonstrate that any of the documents

---

[12] *Dunn as Tr. for Zohar Litig. Tr.-A v. Patriarch Partners, LLC*, 672 B.R. 587, 591 (Bankr. D. Del. 2025).

[13] *Dunn*, 672 B.R. at 592.

[14] *Id.*

[15] *Id.*

[16] *Grand Jury Subpoenas Dated Jan. 20, 1998*, 995 F. Supp. at 338.

[17] *Id.*

over which he asserts privilege fall within the *Kovel* doctrine. In his privilege log, the defendant asserts privilege over approximately sixteen documents involving his son, Stephen Leech.[18] Two of these entries claim that they are "[c]ommunication[s] relating to expert statistical analysis," one of them claims it is "[f]orwarding memorandum describing expert projects," and the remainder are "[c]ommunication[s] relating to technical analysis that was subsequently shared with counsel" or "[d]raft communication[s] regarding expert analysis that was subsequently shared with counsel." The defendant also asserts privilege over approximately eighteen communications between himself and Dexter Senft.[19] The majority of these entries state that they are "[c]ommunications relating to expert statistical analysis," some others state that they are "[d]iscussion relating to technical analysis prepared by attorneys and experts," and two of the entries state that the "expert statistical analysis" communication had an "explicit reference to counsel." These entries do not claim that these communications were shared with counsel.

The defendant's general descriptions do not allow this Court to determine that the material is protected under *Kovel*. *First*, the defendant acknowledges that, of course, he had a prior personal relationship with both his son and Mr. Senft. Indeed, during the period when the defendant was engaged in his cherry-picking scheme, the defendant confided both with Mr. Senft and his son about the key events charged in the indictment. For example, on February 25, 2022, after the Russian invasion of Ukraine, the defendant wrote Mr. Senft, "[u]nfortunately we do have e[sic] a boatload of Russian bonds on hand."[20] On March 4, 2022, the defendant wrote to Mr. Senft, with

---

[18] These are labeled as category one in the defendant's January 7, 2026 privilege log, which the defense updated on January 16, 2026 and January 20, 2026.

[19] These are labeled as categories two and three in the defendant's privilege log.

[20] Ex. 1; SDNY_LEECH_R01_00313876.

whom he regularly plays cards, "I hope to play decently but I haven't had full focus. I mean I made a poor decision/ but I got a catastrophic outcome."[21]  On September 19, 2022, the defendant wrote Mr. Senft, "I've been in a bit of a discouraged/ depressed mood as I melt my firm and I've become even more antisocial than normal ( if you believe that is possible)."[22]  Finally, in March 2023, after certain Credit Suisse bonds lost their value, the defendant forwarded a news article to his son and confided, "I think you may need a name change—save yourself from guilt by association."[23]

This pre-existing personal relationship presents an obvious non-privileged purpose for these communications—that defendant was confiding in his son and friend about his case and seeking their input on the evidence.[24] Courts have recognized that a prior relationship between the defendant and the non-attorney agent creates a risk that an attorney may abuse the *Kovel* exception: "when the client has previously employed the agent independent of the attorney-client relationship, to perform the same services that he will perform for the attorney . . . [t]his creates a risk that the agent's retention by the attorney is simply a subterfuge."[25] And here, the privilege log entries do not present any way of distinguishing when the defendant was speaking to his son or friend about his case in their capacity as trusted confidants, which is not privileged, versus in their capacity as attorney-retained agents. Because of this potential for abuse, "the court in *Kovel* cautioned against an overzealous use; it cannot be established by attorneys 'simply ... placing accountants ... on their

---

[21] Ex. 5; SDNY_LEECH_R01_00552888.

[22] Ex. 9; SDNY_LEECH_R01_00552171.

[23] Ex. 6; SDNY_LEECH_R01_00395859.

[24] *See Lively v. Wayfarer Studios LLC*, 24 Civ. 10049 (LJL), 2025 WL 2606904, at *3-4 (S.D.N.Y. Sept. 9, 2025) (rejecting privilege claim where the documents were inconsistent with notion that "Case was communicating with James Case in his capacity as her lawyer rather than as her father").

[25] *Cavallaro v. United States*, 284 F.3d 236, 249 (1st Cir. 2002) (citations omitted).

payrolls[.]'"[26] Nor can it be established by simply providing a retainer agreement to the defendant's family and friends.

Given their preexisting relationship, the defendant's arguments that "Mr. Leech's communications with counsel-retained experts were made *after* counsel retained the experts" is inapplicable. (Br. 13-14.) The defendant had communications with his son and Mr. Senft before their retention. Indeed, that Mr. Hirschmann purported to retain the defendant's son on October 30, 2023, but issued a formal retention letter only weeks later suggests that there were communications between the son and defendant prior to the retention agreement's execution.

Further still, although the Government has requested information about the dates (and amounts) of any payments made to Mr. Senft or the defendant's son by the attorneys, the defendant has not produced that information. Indeed, the only information that the defendant has provided on payments is a document that the defendant had claimed as privileged until January 7, 2026—is a January 24, 2024 email from Mr. Senft to Mr. Leech, in which Mr. Senft writes, "It was never my intent to charge you," and discusses receiving payment with Mr. Leech.[27]

If anything, the submissions by the defendant suggest that these communications are communications between personal confidants and not between an attorney's agent and his client. For one, none of these messages involve attorneys. If these communications were at the direction of defense counsel and solely made to assist the attorney (rather than the defendant seeking comfort, friendly advice, or a sounding board from a friend or family member), then it would be paramount to copy defense counsel on these messages. *Kovel* was decided in 1961, before email

---

[26] *Dunn*, 672 B.R. at 591 (quoting *Kovel*, 296, F.2d at 921.)

[27] Ex. 7; USAO_GOOGLE_02_00000955.

was invented. At the time *Kovel* was decided there were practical reasons that requiring counsel's presence at each client communication may have been burdensome.[28] Copying an attorney on an email is a costless, protective choice that the defendant and his son and friend did not make. Indeed, the defendant does not attempt to explain why the defendant, son, or friend, did not copy any attorneys on these communications. The Court should credit that this choice reflects the true personal nature of these communications.

*Second*, even if the defendant's son and friend were acting in their capacity as non-attorney agents, and even if the defendant had established that the "sole purpose" of these particular communications was to assist the lawyer or at the lawyer's request, the *Kovel* protection still fails because the defendant has not proven that *in these communications* the defendant's son and friend were acting as a "translator" or "interpreter" for the benefit of the defendant's attorneys.[29]

The defense advances two ways in which his son assisted the defense. Defendant first asserts that his son assisted counsel "in understanding various fixed income concepts, including but not limited to explaining concepts he had discussed with Mr. Leech and analyzing the complex trading at issue in the investigation." The question is not whether Mr. Leech's son was useful to the defense lawyers or *ever* acted in a role akin to an interpreter; it is whether the specific communications at issue were examples of the defendant communicating with his son, so his son could act in an interpreter role with the attorneys.[30] They have not even attempted to make that

---

[28] *Kovel*, 296 F.2d at 922 ("[T]here can be no more virtue in requiring the lawyer to sit by while the client pursues these possibly tedious preliminary conversations with the accountant than in insisting on the lawyer's physical presence while the client dictates a statement to the lawyer's secretary or in interviewed by a clerk not yet admitted to practice.").

[29] *Ackert*, 169 F.3d at 139-40.

[30] *Id.*

showing, and it makes little sense given that counsel has argued to this Court that "Mr. Leech is a distinguished fixed income professional with over 40 years of experience,"[31] and there is no language barrier between the defendant and his attorneys.

Defendant next asserts that his son: "enabl[ed] Mr. Leech to access and analyze certain data files . . . in light of Mr. Leech's lack of facility with Microsoft Excel." This sounds much like a son occasionally helping his father with a computerized task, and not much like an essential "interpreter" linking counsel to his client. The defendant does not explain how this falls under *Kovel*'s protection or which of the communications relate to this function. Indeed, the defendant has withdrawn privilege claims over such technical matters as where the defendant and his son exchanged document passwords. Accordingly, this function cannot sustain any privilege claims.

As to Mr. Senft, the defense claims that his communications are privileged because Mr. Senft "performed a range of expert analyses in connection with and at the direction of counsel." (Br. 11.) The defendant claims only that the communications at issue "relate to these functions." (*Id.*) That again is insufficient. That Mr. Senft was communicating with the defendant about a "range of expert analyses" does not make those communications "necessary" to the client's representation or establish that Mr. Senft was acting as a "translator" or "interpreter" in those communications. Further, defendant does not claim in his privilege log that any of his communications with Mr. Senft were subsequently shared with counsel.  The defendant therefore has not established that each individual communication was "more than just useful or convenient, but rather . . . nearly indispensable or serve some specialized purpose in facilitating the attorney-

---

[31] ECF. No. 35 at 1.

client communications."[32]

The defendant's failure to meet his burden as to these communications is also underscored by his updated privilege logs, which withdrew claims of privilege over communications between the defendant and his son and Mr. Senft. These improper privilege claims concerned communications between the defendant and his son exchanging passwords; a calendar invite between the defendant and his attorneys that had the word "privileged" in the subject line; a January 24, 2024 email chain between the defendant and Mr. Senft where Mr. Senft tells Mr. Leech, "It was never my intent to charge you"; an email from the defendant to Mr. Senft stating: "Ralph asked you send him David's email and home address so he can send him the 'privilege' letter."[33] That the defendant had previously claimed that these documents were privileged speaks to defendant's fundamental misuse of *Kovel*.

\*\*\*

At bottom, it is entirely understandable why the defendant would want to speak with his son and his friend about the investigation. And, in every other case, such communications would be discoverable because there is no "son" privilege and there is no "friend" privilege. The defendant cannot now try to expand *Kovel* beyond recognition to protect these communications. To do so, would be a "derogation of the public's 'right to every man's evidence' and as an obstacle to the investigation of the truth."[34]

### B. The Defendant Has Not Met His Burden to Establish that His Notes Are Privileged

Defendant next asserts privilege over notes to himself that did not involve any attorneys.

---

[32] *Skillsoft Corp.*, 1999 WL 378337, at \*2.

[33] Ex. 8; USAO_GOOGLE_02_00001170.

[34] *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (citations omitted).

Defendant has represented that "[m]any of these documents are substantively duplicates of one another."[35] Defendant's declaration states that he used his iPhone to draft notes relating "to my trading on specific days," discussed those notes with his son, and then "conveyed the information from these notes to my lawyers orally, in emails, and in text messages" (the "Category 4" documents).[36] The defendant also drafted notes that "reflected matters that [he] discussed with counsel and/or matters that [he] intended to research based on requests that my counsel had made during our conversations" (the "Category 5" documents").[37]

### 1. The Defendant Has Waived Any Privilege Over These Communications

It is "fundamental that voluntary disclosure by or on behalf of a party during judicial proceedings may waive the privilege as to the disclosed information as well as all the otherwise privileged information relating to the same subject-matter of the disclosed information.[38] A defendant also "cannot use attorney-client privilege as both 'a sword and a shield' by partially disclosing only the privileged documents it so chooses while shielding other unfavorable privileged documents on the same subject matter.'"[39] Therefore, "[b]oth the attorney-client and work-product privileges may be waived if a party puts the privileged communication at issue by relying on it to support a claim or defense."[40] "Just as the party asserting privilege has the burden

---

[35] ECF No. 39 at 2.

[36] ECF No. 69.

[37] *Id.*

[38] *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63 (W.D.N.Y. 2011).

[39] *Regeneron Pharms., Inc. v. Merus B.V.*, No. 14 Civ. 1650 (KBF), 2014 WL 11344040, at *4 (S.D.N.Y. Dec. 5, 2014).

[40] *Cicel (Beijing) Sci. & Tech. Co. v. Misonix, Inc.*, 331 F.R.D. 218, 228 (E.D.N.Y. 2019)

of establishing it, that party "also bears the burden of demonstrating that it has not been waived."[41]

Here, the defendant has waived any privilege over his notes to self because he affirmatively disclosed their contents to the Government. Counsel states that the defendant's notes to self-identified in his privilege log, "were incorporated into documents that counsel ultimately submitted as part of the Outside Counsel Investigation." (Br. 16 n.9).[42] In other words, defense counsel incorporated the defendant's notes into reports and disclosed those reports to the law firm Munger Tolles & Olson, LLP (the "MTO Reports"), and to the Securities and Exchange Commission. Additionally, defendant noticed Andrew Newman as an expert witness in this case. In his expert disclosure, Mr. Newman claimed to have done a "blind allocation exercise," and the defense claimed that Mr. Newman will testify that "he also reviewed reports describing Mr. Leech's trades" but "did not rely upon these reports in making his own allocation decisions." In other words, Mr. Newman reviewed the MTO Reports,[43] which incorporated the defendant's notes to self.

Recognizing that the defendant had placed the MTO Reports and their subject matter at issue, on November 3, 2025, counsel for WAMCo's produced four of the MTO Reports to the Government, and noted that "Mr. Leech's counsel has confirmed that they do not object to WAM's

---

[41] *Id.* at 229.

[42] *See also* Br. at 14 (notes to self drafted "during the course of the Outside Counsel Investigation and the SEC investigation . . . in response to requests from counsel related to [] trading on specific days."); Dkt. 68, Leech Decl. ¶ 10 ("In connection with responding to requests that my lawyers made during the course of the [Outside Counsel and Securities and Exchange Commission] investigations, I occasionally used the mail application on my iPhone to draft notes relating to my trading on specific days . . .  I would then discuss and convey the information in these notes to my lawyers orally, in emails, and in text messages.").

[43] The Government understands that Mr. Newman reviewed four of the MTO Reports.

production of these documents to the Government."[44] The defendant voluntarily disclosed the substance of his notes to self to the Government, and placed the subject matter relating to them at issue by noticing an expert witness who reviewed them. The defendant has therefore waived any protection over these notes.[45]

Defendant's cited authority only supports a finding of waiver. In *A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, the Court found a document was "not protected by the attorney-client privilege because it contemplates disclosure of its contents to a third party."[46] The same is true here. The Court further found that it was the defendant's burden to establish that any purported drafts "contain sufficient information to make a determination whether confidential communications were eliminated from the final document."[47] Defendant has not attempted to satisfy that burden here by comparing the draft documents in the privilege log against what was included in the MTO Reports. Accordingly, the defendant has failed to carry his burden to establish he has not waived any protection over his notes to self.

## 2. The Defendant Has Not Established That His Notes to Self Are Privileged

The defendant asserts privilege over his notes to self because they were "created at counsel's request or in connection with conversations with counsel and ultimately, in sum or substance, communicated with counsel." (Br. 16.)  In support, the defendant relies primarily on

---

[44] *See* Ex. 4 November 3, 2025 Production Letter on Behalf of Western Asset Management.  In the lead up to the *Daubert* motion deadline, WAMCo's counsel informed the Government that, far from being "blind," Mr. Newman was provided *all* of Mr. Leech's trade allocations. Unsurprisingly, after that revelation, counsel for Mr. Leech informed the Government that he was and not calling Mr. Newman as a witness.

[45] *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987).

[46] No. 07 Civ. 929 (WWE), 2014 WL 657688, at *2 (D. Conn. Feb. 20, 2014)

[47] *Id.*

*United States v. DeFonte*,[48] But that case found the defendant's journal entries were privileged precisely because "[t]here is no evidence that she shared or intended to share those entries with any third party."[49] Here, as set forth above, these entries were incorporated into the MTO reports, provided to a witness, and disclosed to the Government, so *DeFonte*'s protection doesn't apply.

Further still, *Defonte* found critical that "the notes were communicated by the client to the attorney."[50] To be sure, the defendant's privilege log supports his claim the Category 4 notes were ultimately discussed counsel, but the defendant's privilege log does not make the same representations as to the Category 5 documents. Instead, the representations as to the Category 5 documents fall outside of any privilege protection. As to these documents, the privilege log asserts only: "[l]ist of years based on discussion with counsel," "[n]ote based on discussion with counsel," or "link to analysis prepared by client and attorney." These descriptions fall outside of *DeFonte*'s central holding that to be privileged, the notes must be "communicated by the client to the attorney" because "[s]uch a requirement comports with the language of the rule—*i.e.*, that there be a communication by the client—and makes sense from a policy perspective."[51] Even if he had not waived any potential privilege, the defendant has therefore not met his burden as to the Category 5 documents.

### C.  The Defendant's Search History Is Not Privileged

The defendant also claims that his own search history is protected by the attorney client privilege and attorney work product doctrine. There is simply no attorney-client communication

---

[48] 441 F.3d 92 (2d Cir. 2006).

[49] *Id.* at 95.

[50] *Id.* at 96.

[51] *Id.* at 95-96; *United States v. Gonzalez*, 144 F.4th 396, 403 (2d Cir. 2025).

in the defendant's google search history and the defendant does not claim otherwise. Instead, the defendant claims that these searches reflect counsel's thought process. This argument fails on its own terms as the defendant does not claim that his attorneys directed him to conduct these searches, only that his lawyer "suggest[ed] that I review the market conditions and various economic events that would have impacted trading decisions several years earlier."[52] Mr. Hirschmann similarly does not say that he directed Mr. Leech to conduct these Google searches, but only that the searches "reflect topics that I discussed with Mr. Leech."[53] Mr. Leech cannot retroactively describe his searches as his attorney's work product when he decided when, what, and how to search. On January 20, 2024, for instance, the defendant searched "how to search for stories on a particular date in Bloomberg news," followed by a series of privilege redactions.[54] Accordingly, there is no basis to conclude that these searches reflect *counsel*'s thought process.

The search history that defendant has not asserted privilege over confirms that the at-issue searches do not reflect his attorneys' thought process, but instead are examples of the defendant, using his own judgment, attempting to generate a defense. For example, in December 2023, after WAMCo prohibited the defendant from trading in the Core Strategies, the defendant searched for "Justice Department," and "importance of daily results in portfolio management."[55] These searches are also related to the investigation, but they are not privileged. Defendant articulates no basis to

---

[52] ECF No. 68.

[53] ECF No. 67.

[54] Ex. 3; USAO_GOOGLE_01_40852.

[55] Ex. 2; USAO_GOOGLE_01_00040953.

assert privilege over his remaining searches.

The defendant also admits he has no direct authority to support his privilege assertion. Given that the burden is his, that should end the matter. Instead, he relies on an out-of-circuit case from 1992 to attempt to analogize a defendant's own google searches to a "compilation" of "printed results" from a legal database.[56] Even accepting this analogy, the attorney in *Burroughs* directed the search of the databases and the results reflected the "legal strategy of counsel." Here, the defendant is missing both steps. Mr. Hirschmann did not direct Mr. Leech to search Google. And Mr. Leech's searches, which purport to be relating to historical market events, do not purport to reflect any legal strategy *of counsel*. These assertions fail.

### D. The Defendant's Miscellaneous Privilege Assertions Fail

The defendant also asserts privilege over a handful of messages between the defendant and Ralph Hirschmann.[57] Mr. Hirschmann's declaration states only that these messages are duplicates and "relate[] to this investigation."[58] That is insufficient to establish that these messages are for the purpose of seeking legal advice. Indeed, the privilege log description of these messages is "[c]ommunication with counsel." Not all communications with counsel are privileged, and the defendant has not met his burden to prove that these messages were "for the purpose of obtaining or providing legal advice."[59] Instead, according to the Filter Team, this document appears to

---

[56] *Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*, 143 F.R.D. 611 (E.D.N.C. 1992).

[57] Specifically, FTPROD02-REL-00002231, FTPROD02-REL-00002233, FTPROD02-REL-00004651, FTPROD02-REL-00004653.

[58] ECF No. 67

[59] *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) ("Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct.).

discuss only logistics and not legal advice.  (Canick Decl. ¶ 19).

The defendant also asserts privilege over an electronic document, noted on the defendant's privilege log as USAO_GOOGLE_01_00000009, on the basis that it is "[c]ode containing contents of emails between client and attorneys." This entry is insufficient for the Court to assess any privilege or even what this document is or whether defendant is claiming it is privileged in its entirety or in part. Finally, the defendant asserts privilege over USAO_APPLE_01_00000450, which Mr. Hirschmann describes as an "excerpt from the Western Trade Blotter identifying certain Treasury Futures and Options trades and includes my notes about them."[60] The defendant has not claimed that this document has any indication of privilege on the face of the document, but only that metadata shows that Mr. Hirschmann created it and it is saved on *Mr. Hirschmann's* computer in a folder path called "Work Product." Mr. Hirschmann's description is too vague to sustain defendant's privilege over this document given that WAMCo's trade blotter is not privileged, and Mr. Hirschmann does not describe the type or location of any of his comments.

***

The defendant has not sustained his burden through his privilege logs to establish privilege over any of these documents over which he asserts attorney client privilege or attorney work product. Accordingly, the defendant's motion fails. If the Court is inclined to sustain any of these privilege assertions, however, then the Court should conduct a document-by-document review of these communications *in camera* to rule on each individual assertion (and so that the Government can receive and review any non-privileged material for responsiveness to the warrant).

## II.    The Filter Team Process Reasonably Respected the Defendant's Privilege

The Government's filter review process demonstrates that the Case Team and the Filter

---

[60] ECF No. 67.

Team acted in good faith and with appropriate respect for the defendant's privilege. As set forth in the Davis and Canick Declarations, the Filter Team and Case Team actively worked to avoid encountering even potentially privileged information and pursued a screening process that reasonably protected the defendant's privileged communications. Just as importantly, the record before the Court lacks any facts that would support a finding of shocking misconduct or manifest corruption. When the Case Team identified potential lapses in the privilege screen it updated the Filter Team, which, in turn, conducted further screening. The circumstances reflect an investigative team diligently working through large amounts of data in good faith.

### A. The Filter Process

On or about February 28, 2024, the Honorable Stewart D. Aaron signed covert, sealed search warrants related to the defendant's accounts at Google and Apple (the "Google Data" and the "iCloud Data"). (Davis Decl.¶ 3.)

<u>The Google Returns</u>

In or around March 2024, the Case Team requested that a team of lawyers working under the supervision of the Office's Privilege Review Coordinator, AUSA Molly Canick,[61] (collectively, the "Filter Team") screen the Google Data for potentially privileged material prior to the Case Team's responsiveness review. (Canick Decl. ¶ 4; Davis Decl. ¶ 4.) The Case Team did not conduct any review prior to the Filter Team's initial screen. (Canick Decl. ¶ 4; Davis Decl. ¶ 4.) The Case Team's use of a filter review process conducted within the U.S. Attorney's Office comported with long-established practice, repeatedly affirmed by judges in this District, as means to protect the defendant's privilege while simultaneously enabling the Government to pursue legitimate, often

---

[61] AUSA Canick is not a member of any investigative or prosecutive team.

covert, investigative steps.

To facilitate the filter review, the Case Team compiled a list of law firms and lawyers who the Case Team understood represented the defendant, Western Asset Management Company, or were involved in the internal investigation conducted by Western Asset Management. (Davis Decl. ¶ 4.) The Case Team provided this list to AUSA Molly Canick on or about March 12, 2024. (Davis Decl. ¶ 4.)

In or around March 2024, the Filter Team conducted a review of the Google Data. (Canick Decl. ¶ 5.) The purpose of the review was to identify records potentially subject to a valid assertion of attorney-client privilege or work product protection. (*Id.*) The Filter Team directed the Relativity vendor to index the data and run searches for law firm domains known to represent the defendant. (*Id.*) These searches returned hits on approximately two thousand files, which were segregated into a folder labeled as potentially privileged. (*Id.*) The Filter Team then continued their review with an iterative process including searching for legal generics and reviewing those hits for potentially privileged material. (*Id.*) The Filter Team also searched for privilege designations such as "Attorney-Client Privileged" and "Attorney Work Product" within the content of the Google Data.  (*Id.*) After each search, the Filter Team reviewed all of the search returns for false positives, including inapplicable boilerplate language such as that in some email footers. (*Id.*) After performing these targeted searches and individually reviewing each hit, the Filter Team identified approximately sixty additional potentially privileged files, and placed a request with the Relativity Vendor to move the sixty files into the folder labeled as potentially privileged. (*Id.*)

On or around April 5, 2024, the Filter Team released the Google Data to the Case Team, except for the material that the Filter Team had identified as potentially privileged, which was segregated into a locked folder inaccessible to the Case Team. (Canick Decl. ¶ 6; Davis Decl. ¶ 5.)

As is the Government's usual practice, the Filter Team and the prosecution team agreed that, if members of the case team identified any material during the responsiveness review that appeared to be potentially privileged, the Case Team would pause its review and notify the Filter Team, so the Filter Team could conduct a supplemental privilege review, if necessary.  (Canick Decl. ¶ 6; Davis Decl. ¶ 18.)

AUSA Davis started his review of the Google Data on or about April 18, 2024.[62]  (Davis Decl. ¶ 5.)  That same day (the first day of AUSA Davis's review), AUSA Davis came across materials that he thought could be potentially privileged, stopped his review, and spoke to his supervisor about how to address the issue. (*Id.*) AUSA Davis wrote the following email to file recounting these steps:

> Our privilege team released non-privileged documents from this warrant review to the prosecution team. I started my review of the non-privileged material today, April 18, 2024. I saw correspondence that suggested that Leech was consulting with an expert on the subject matter of this investigation. No attorneys were on the correspondence as far as I could tell. I stopped my review and I instructed the agents to stop their review. I spoke with my supervisor and we decided we will raise with Molly Canick (from the privilege team) and decide next steps.

(Davis Decl. ¶ 5.)

The Filter Team then conducted a supplemental review, in which the Filter Team attempted to recreate case-specific searches that the Case Team had run to see if there was any indication of attorney involvement or other potentially privileged material. (Canick Decl. ¶ 7.)  After reviewing several hundred files, the Filter Team identified approximately ninety-five additional files as potentially privileged. These files consisted mostly of emails the defendant sent to himself and his son. Approximately eight of these emails included the subject "privilege" but the remainder had either no subject or a subject line with no indication of a legal content, and no attorney participant.

---

[62] AUSA Davis was on trial from on or about April 8, 2024 through on or about April 18, 2024.

(Canick Decl. ¶ 7; Davis Decl. ¶ 6.)[63] On April 19, 2024, AUSA Canick emailed AUSA Davis

regarding this screening process:

> I ran the OPPS and Core Plus searches. I didn't find any emails that included an
> individual who could have been an expert. Almost all of these hits are emails from
> Ken Leech to himself (he has several email accounts). These are notes about
> trading. They could be notes that he is taking to record his recollections or actions
> in light of the SEC investigation. 8 of them have a subject "privilege". But there
> are 95 total that are very similar (and often duplicative). The others have either no
> subject or a dated subject like "July note". I've tagged all 95 as potentially
> privileged for now and made the request to segregate them. That will probably be
> done on Monday morning.

(Canick Decl. ¶ 7; Davis Decl. ¶ 6.)

On or around April 22, 2024, these files were removed from the folder accessible to the

Case Team, who were advised that they could resume their review. (Canick Decl. ¶ 7; Davis Decl.

¶ 7.)  To assist AUSA Canick in identifying potentially privileged material, on or about April 23,

2024, AUSA Davis marked documents for AUSA Canick's review "without reviewing the

substance." (Canick Decl. ¶ 8; Davis Decl. ¶ 7.)  The Filter Team then located and reviewed

hundreds of communications with Mr. Senft.  During this process, the Filter Team identified at

least one other potential expert.  On or about April 25, 2024, AUSA Canick wrote, in substance

and in part, that she had made the request to segregate 84 files as potentially privileged because

they might include a potential expert retained by counsel, approximately 24 of which included the

subject "privileged." (Canick Decl. ¶ 7; Davis Decl. ¶ 8.) These files consisted mostly of emails

that the defendant sent to individuals appearing possibly to act as experts, including Dexter Senft

---

[63] AUSA Canick explains that these items were likely missed in the initial screen because (besides
lack of attorney participation) the single word "privilege" was not used to mechanically screen out
hits given that the use of that term results in a number of false positives (such as news articles).
The Filter Team has now (in an effort to broadly identify documents appropriate for further review
by the Filter Team) amended that standard protocol to include a search for "privilege" in the subject
line of emails. (Canick Decl. ¶ 7.)

and Autumn Soukup. Because Mr. Senft also appeared to have a personal relationship with the defendant, the Filter Team did not tag or otherwise identify as potentially privileged any communications which appeared to be personal in nature. (Canick Decl. ¶ 7.) The Filter Team conducted a file-by-file review to separate these personal communications from those which might be protected by attorney-client privilege or attorney work product. (*Id.*)

On or around April 26, 2024, these files were removed from the folder accessible to the Case Team, who were advised that they could resume their review.  (Canick Decl. ¶ 8; Davis Decl. ¶¶ 8, 9.) AUSA Canick emailed, "All of the communications with these three individuals will be segregated, except for clearly non-privileged communications with Dexter Senft with whom Ken Leech plays bridge. Please note that all of the communications with Soukup also include Senft." (Canick Decl. ¶ 8; Davis Decl. ¶ 8.)

On or around May 14, 2024, the Case Team notified the Filter Team that they had come across material that might be privileged, paused their review, and requested a supplemental filter review.  (Canick Decl. ¶ 9; Davis Decl. ¶ 9.) AUSA Davis emailed AUSA Canick, "On the gmail return, I am marking PP [potentially privileged] the following document, which looks like there is an attachment from Dexter Senft (I have not reviewed it of course)." (Canick Decl. ¶ 9; Davis Decl. ¶ 9.) The Filter Team subsequently identified approximately four additional files as potentially privileged. These files were comprised of two duplicate emails between the defendant and his wife with an attached note to Dexter Senft, neither of which contained a clear indication of privilege. (Canick Decl. ¶ 9.)  The Filter Team also flagged another email that the defendant sent to himself, which the Filter Team reviewed and did not segregate as potentially privileged. That email contained a non-working link to a Google Drive file named "RFH Work Product."

(Canick Decl. ¶ 9.)

On or around July 24, 2025, the Filter Team identified two large search history files and one calendar file, which had been segregated as potentially privileged. (Canick Decl. ¶ 10.) The Filter Team confirmed that these files were records of search history and calendar entries, but did not conduct a page-by-page review of each file due to their length. (*Id.*) Because search history records and calendar entries do not usually contain attorney-client privileged communications or attorney work product, on or about July 25, 2024, the Filter Team released these three files to the Case Team. (*Id.*)

The iCloud Data

On or around April 29, 2024, the Case Team requested that the Filter Team review Apple iCloud data associated with the defendant (the "iCloud Data") for any potentially privileged material. (Canick Decl. ¶ 11; Davis Decl. ¶ 10.) The iCloud Data was processed for review by the Computer Analysis Response Team ("CART") of the Federal Bureau of Investigation ("FBI") using Cellebrite digital forensic software. (Canick Decl. ¶ 11; Davis Decl. ¶ 11.) Cellebrite is used primarily to process mobile phone and tablet data, extracted from either a cloud account or physical device. (Canick Decl. ¶ 11.) Cellebrite organizes various media into dozens of categories such as chats, images, audio, notes, search history, and calendar entries. (*Id.*) The iCloud Data was returned from two separate accounts associated with the defendant and processed into eleven Cellebrite reports. (*Id.*)

To facilitate the review, AUSA Davis informed AUSA Canick, in substance and in part, that the iCloud data was for the same case as the Google Data and attached April 25, 2024 version of the Filter Team's privilege screening list. (Davis Decl. ¶ 10.) AUSA Davis noted that the list

"includes segregating any potential expert materials as discussed." (Davis Decl. ¶ 10.)

The Filter Team loaded and reviewed the eleven Cellebrite reports generated from the iCloud Data and tagged any files identified as potentially privileged. (Canick Decl. ¶ 12.) For each of the eleven reports, the Filter Team implemented a methodical, manual review process, which involved opening all the data categories and implemented review techniques specifically designed to identify potentially privileged material within that particular category.  (*Id.*) Searches in Cellebrite are run one at a time, so if hits were returned on any of the search terms, those hits would be reviewed before progressing to the next term. (*Id.*) Depending on the size of the Cellebrite report, each search may take a few minutes to process. (*Id.*) This same or similar process was repeated for each of the searchable data categories with terms appropriate to the category, including unsearchable data such as images and documents. (*Id.*) After the Filter Team reviewed the iCloud Data and tagged any files identified as potentially privileged, a forensic examiner from CART then removed the files that had been tagged as potentially privileged and generated a version of the iCloud Data that would be released to the Case Team. (Canick Decl. ¶ 13; Davis Decl. ¶ 11.)

On or around August 1, 2024, the Filter Team finished review of the iCloud Data and sent tags of the files identified as potentially privileged to CART to generate the Filtered iCloud Reports. (Canick Decl. ¶ 14.) On or around August 5, 2024, three of the eleven Filtered iCloud Reports were released to the Case Team. (Canick Decl. ¶ 14.) On or around August 8, 2024, the remaining eight Filtered iCloud Reports were released to the Case Team. (Canick Decl. ¶ 14.)

The FBI examiner created those non-privileged reports and loaded them onto a drive on or about August 9, 2024. (Davis Decl. ¶ 11.) AUSA Davis received a copy of the drive on August 9, 2024. (Davis Decl. ¶ 11.) AUSA Davis participated in a witness interview that began on or about 10:30 a.m. (*Id.*)  On August 9, 2024, at approximately 3:07 p.m., AUSA Davis wrote AUSA

Canick, "I see there are chats on the icloud report with Dexter Senft. Were those supposed to be screened as potentially privileged given he is listed as a potential expert? I have stopped reviewing and [Special Agent Thomas Kovacs] please hold off until we solve this." (*Id.*)

The Filter Team subsequently identified additional potentially privileged material including text messaging with Dexter Senft, who appeared possibly to be acting as an expert. (Canick Decl. ¶ 15.) On or around August 12, 2024, the Filter Team sent their updated tags to CART to generate new Cellebrite reports with potentially privileged material removed. (Canick Decl. ¶ 16;) On or around August 15, 2024, new reports were released by the Filter Team to the Case Team. (Canick Decl. ¶ 17.)

The FBI examiner made the new Cellebrite reports and copied them to a drive for pick up on or about August 15, 2024 at 3:46 p.m. (Davis Decl. ¶ 12.) On or about August 15, 2024, at approximately 5:47 p.m., AUSA Davis wrote AUSA Canick, "All, I'm stopping review again. In the below folder I saw a file path that said privileged from Ralph [Hirschmann]. I did not review the document, but it appears there is still privileged materials in these reports. Can we please discuss tomorrow?" (Davis Decl. ¶ 13.) While the Filter Team worked on identifying that file path and conducting a further review, the Filter Team released non-privileged messaging reports from the Apple Data via a USAFx platform on or about August 16, 2024. (*Id.*) However, AUSA Davis does not know if he was able to review these materials due to technological issues. (*Id.*)

On or around August 23, 2024, the Filter Team finished a supplemental review of the iCloud Data and released a new set of eleven Cellebrite reports with additional potentially privileged material removed. (Canick Decl. ¶ 19; Davis Decl. ¶ 14.)

On or about August 28, 2024, the Case Team notified the Filter Team that they had come across material that may be privileged.  (Canick Decl. ¶ 20; Davis Decl. ¶ 15.) The Filter Team

subsequently identified an email with an attachment appearing possibly to be expert material. (Canick Decl. ¶ 20.) The attachment was marked "Confidential" but did not include any other indication of attorney-client privilege or work product protection.  On or about August 29, 2024, the Filter Team released a new set of Cellebrite reports with the email and attachment removed from two separate reports. (Davis Decl. ¶ 15.)

On or about August 30, 2024, the AUSA Burnett emailed the Filter Team, asking the Filter Team to review a set of emails in the iCloud Data for potential privilege. (Davis Decl. ¶ 16.) AUSA Burnett emailed the Filter Team, in substance and in part, that the emails did not appear to be to or from lawyers, but nonetheless asked the Filter Team to review them out of an abundance of caution. (*Id.*)  On or about September 6, 2024, the Filter Team finished a supplemental review of the iCloud Data and released a new set of Cellebrite reports with all the potentially privileged material removed, along with all the Email, Exchange files and Documents removed. (Canick Decl. ¶¶  22, 23.)

On September 9, 2024, AUSA Davis emailed defense counsel requesting a list of names of any people with whom they believed the defendant has had privileged communications. (Davis Decl. ¶ 17.) On September 24, 2024 defense counsel provided their initial list of individuals. (*Id.*) The Case Team subsequently had further dialogue with defense counsel about materials defense counsel believed may be privileged. Prior to the indictment, the Filter Team made productions to defense counsel so that they could assert privilege in a privilege log.

### B.  Applicable Law

As the Court recognized, the filter process described above all took place prior to

indictment. Accordingly, the Fifth Amendment applies but the Sixth Amendment does not.[64] Under that standard, "[t]he existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience.'"[65] In the case of "violations of the attorney-client privilege that occur pre-indictment, a defendant must show that 'the conduct of the government has been manifestly and avowedly corrupt.'"[66]

The Second Circuit has invoked the notion of "manifestly and avowedly corrupt" conduct to describe actions that might invoke a "per se rule [that] represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the Government as punishment regardless of the defendant's guilt."[67] Such a rule applies where the government's "conduct has been an offensive interference with the defendant's rights without any justification."[68] As noted previously, the Second Circuit has pointed, as examples of government conduct that might meet this standard, to cases where the government tried multiple defendants, including one who, unbeknownst to his co-defendants or even his attorney, was a government informant,[69] where the government tried an informant along with a codefendant and

---

[64] 11/7/ 25 Tr. 92-95; *see also Tournant*, 2023 WL 5276776, at *13 & n. 10; *In re Grand Jury Subpoena Served Upon Doe*, 781 F. 2d 238, 244 (2d Cir. 1986) ("At the time the district court denied Colombo's motion to quash the subpoena, he had not been indicted. Since Sixth Amendment rights do not attach until 'the time that adversary judicial proceedings have been initiated'"); *United States v. Shvartsman*, 722 F. Supp. 3d 276, 305 (S.D.N.Y. 2024) ("M. Shvartsman's Sixth Amendment right to counsel did not attach until the original grand jury returned the Indictment, and even then it attached only as to the charges in that Indictment.").

[65] *Tournant*, 2023 WL 5276776, at *13.

[66] *Id.* (citing *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991).

[67] *Gartner*, 518 F.2d at 637.

[68] *Id.*

[69] *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972).

the informant professed his own and his codefendant's guilt in front of the jury,[70] and where the government wiretapped a defendant and her counsel before and during trial.[71]

"In contrast, in cases which have concluded that the government's actions were not manifestly corrupt, the government either did not commit any intentional intrusion into the attorney-client relationship, or its actions (even if intentional) did not rise to a level of egregious misconduct that prejudiced the defendant."[72] In *Tournant*, for example, the Court held that the defendant "has not demonstrated any manifest corruption or violation of his constitutional rights by the Government" because, even assuming the communications were privileged, "nothing in the proffered evidence indicates that the Government improperly intruded into the attorney-client relationship, or that the Government otherwise took any corrupt or outrageous actions."[73]

### C. Discussion

Far from conduct that "shocks the conscious," at every stage the Filter Team and Case Team took affirmative steps to protect the defendant's privilege, including as to privilege claims that are, as outlined above, wrong. "In cases which have found manifest corruption, the record showed a clear, intentional, and flagrant intrusion by the government into the realm of attorney-client privilege."[74] Here, the record shows the opposite: The Case Team employed reasonable screening procedures, adjusted those procedures to improve their effectiveness based on materials encountered during the review, and repeatedly took affirmative steps to avoid encountering

---

[70] *United States v. Lusterino*, 450 F.2d 572 (2d Cir. 1971).

[71] *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951).

[72] *Tournant*, 2023 WL 5276776, at *14.

[73] *Tournant*, 2023 WL 5276776, at *14.

[74] *Id.* (citing cases).

privileged material.

*First*, the use of the Filter Team itself demonstrates that the Case Team did not intentionally review any privilege material. AUSA Canick has outlined the procedure the Filter Team used to screen any potentially privileged materials including searches, sorting, filtering, and document-by-document reviews. "The use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications."[75] There is no reason to depart from this established precedent here.

*Second*, the Case Team did not simply rely only on the Filter Team review to safeguard the defendant's privilege. Instead, the Case Team diligently, and repeatedly, flagged potentially privileged materials for the Filter Team to ensure that it was not exposed potentially privileged materials. That the Case Team repeatedly stopped its review and alerted the Filter Team to any potentially privileged document so that they could be reviewed by the Filter Team and segregated demonstrates the Case Team's good faith efforts to avoid encountering privileged material. In *Tournant*, the Court cited favorably that the Government "took reasonable steps to segregate the disputed material pending a determination of the privilege claim" after learning that the defendant was asserting privilege.[76] Not only did the Case Team take those steps here, but the Case Team took those steps *prior* to learning of the defendant's privilege claims, including by flagging for the

_____

[75] *In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) (citing *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, *8 (S.D.N.Y. Oct. 9, 2020); *United States v. Ceglia*, No. 12 Cr.876 (VSB), 2015 WL 1499194, *1 (S.D.N.Y. Mar. 30, 2015)); *see also United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) ("[T]he Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys."), overruled on other grounds by *Montejo v. Louisiana*, 556 U.S. 778 (2009).

[76] *Tournant*, 2023 WL 5276776, at *15.

Filter Team communications that did not involve attorneys.

*Third*, the nature of the defendant's privilege claims here also underscore that there was no intentional invasion of the defendant's privilege. As set forth above, the defendant is claiming privilege over swaths of communications that do not involve attorneys. This includes communications with his son, friend, his own search history and his notes to self, none of which include attorneys.[77] It is understandable why these documents—documents that did not include attorneys at all—would be difficult to screen. AUSA Canick has also addressed why defendant's other privilege claims do not present as privileged or were otherwise difficult to identify as such.[78]

Even with these difficulties, the Case Team identified that there could be privileged materials that did not include attorneys, and it alerted the Filter Team so that they could be segregated. Further still, that the defendant is continuing to withdraw claims of privilege over documents in his privilege log (even as recently as two weeks ago) speaks to the difficulty in perfectly predicting each of the defendant's privilege claims.

There has simply been no "manifestly corrupt" conduct by the Government. To hold otherwise, would be to turn this Circuit's caselaw approving the Government's use of filter teams exactly backwards. Far from an intentional invasion of the privilege—or one that shocks the conscious—courts in this District consistently recognize, "[w]here the Government has obtained potentially privileged material, use of a filter team constitutes an action respectful of, rather than

---

[77] These are the Categories 1 through 6 documents.

[78] As to USAO_APPLE_01_00000450, unbeknownst to the Case Team, and notwithstanding the Filter Team's request to the Relativity Vendor to disable this document from being viewable by the Case Team, this document remained viewable until on or about October 21, 2024.

injurious to, the protection of privilege."[79] The use of a filter team has accordingly been deemed adequate protection of potentially privileged material obtained by the Government many times in this District.[80] Indeed, in a recent case, Judge Caproni rejected a defendant's request for an evidentiary hearing based on potentially privileged material passing through the filter team to the case team.[81] The Court held that "the Government employed a litany of safeguards to ensure that privileged information did not pass from the Filter Team to the Case Team" and that "any alleged intrusion of the attorney-client privilege was unintentional, wholly non-prejudicial, and not 'manifestly and avowedly corrupt.'"[82] The same is true here.

At bottom, the Case Team and the Filter Team took extensive efforts to protect the defendant's privilege. Time and again the Case Team evidenced its good faith by independently stopping its review and flagging potentially privileged material for the Filter Team. There is no basis to conclude that "the conduct of the government has been manifestly and avowedly corrupt," the defendant cannot meet his burden to establish a Fifth Amendment violation, and the defendant is not entitled to any relief.[83]

---

[79] *Avenatti*, 559 F. Supp. 3d at 282 (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 522-23 (6th Cir. 2006)).

[80] *See Avenatti*, 559 F. Supp. 3d at 282 (noting that the use of a filter team "is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney client communications" and citing multiple cases); *see also United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) (finding that "the Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys" in case in which government received notes and information from a jailhouse informant about defendants), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778 (2009).

[81] *United States v. Alexander et al.*, No. 24 Cr. 676, ECF No 184 (November 13, 2025).

[82] *Id.*

[83] *Tournant*, 2023 WL 5276776, at * 13.

37

\*\*\*

Given that the defendant cannot establish that any of the documents in his privilege log are privileged, let alone establish a Fifth Amendment violation, and the Sixth Amendment does not apply, the defendant is not entitled to any further relief. Even if this Court were to credit the defendant's privilege assertions, "the proper remedy for any breach of the privilege . . . would be their exclusion at trial."[84] Nor is the defendant entitled to any further discovery regarding any alleged prejudice. The defendant has not articulated any theory of prejudice, identified which documents give rise to that prejudice, or stated what relief he seeks.[85] If the defendant does so for the first time in reply, the Government respectfully requests an opportunity to respond in writing.

---

[84] *See, e.g.*, *United States v. Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) ("Stewart has cited no decision disqualifying an attorney for inadvertently viewing either kind of work product. The proper remedy in disputes over work product is the remedy already granted here: prohibiting the opposing side from using the document at trial."); *United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at \*6 (S.D.N.Y. Nov. 29, 2016) (general remedy for violation of the attorney-client privilege is suppression of the privileged information, not wholesale suppression); *United States v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y.), September 8, 2022 Conf. Tr. at 8.

[85] *See, e.g.*, *United States v. Landji*, No. (S1) 18 CR. 601 (PGG), 2021 WL 5402288, at \*27 (S.D.N.Y. Nov. 18, 2021), *aff'd sub nom. United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025) ("[T]his Circuit has not endorsed the taint theory proffered by Defendants here – that 'the [G]overnment's thought process or questioning of witnesses may have been influenced by [its] access to Defendants' Documents," and citing *Schwimmer* as "rejecting argument that 'even the indirect use of privileged information by the prosecution is prohibited.'").

## CONCLUSION

For the foregoing reasons, the Court should reject the defendant's privilege assertions and

deny the defendant's motion.

Dated:  New York, New York
         January 21, 2026

                              Respectfully submitted,

                              SEAN BUCKLEY
                              Attorney for the United States

                    By:  _____
                              Thomas S. Burnett
                              Peter J. Davis
                              Lindsey Keenan
                              Assistant United States Attorneys
                              Telephone: (212) 637-1064 / 2468