

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

April 29, 2026

**BY ECF**

Hon. Gregory H. Woods
Southern District of New York
500 Pearl Street
New York, NY 10007

>      Re:     United States v. S. Kenneth Leech II, 24 Cr. 658 (GHW)

Dear Judge Woods:

The Government writes in further support of its April 22 letter regarding Mr. Dolgoff's belated expert notice. The testimony disclosed in that notice should be excluded. Nothing in the opposition provides a justification for failing to make a timely disclosure, and the defense's claim that it "was arguably not obligated to disclose" Mr. Dolgoff's new analyses underscores the need for mandating adherence to Federal Rule of Criminal Procedure 16(b)(1)(C). The defense's opposition also exposes that there is no legal basis for objecting to the Government's proposed jury instructions. Those instructions are necessary to ensure the jury understands the settled principle that intent to defraud need not be the defendant's "sole, or even primary, purpose." *United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2015).

### A.  The April 15 Notice Should Be Excluded As Untimely

The new testimony disclosed in the April 15 Notice is untimely and should be excluded. Glaringly, the defense offers no justification for its failure to timely notice the analyses in the April 15 Notice. That is because there is no plausible justification other than delay. Every fact that Mr. Dolgoff relied on in the April 15 Notice was available months ago. Instead, the defense claims that it may not have been "obligated to disclose" the additional analyses at all. Dkt. 137 at 4. That is plainly wrong. Mr. Dolgoff originally disclosed that he created the Convexity Effect Offset variable as a limited rebuttal to "illustrat[e] the incompleteness" of Professor Cohen's regression analyses. *Id.* at 2-3. He never disclosed that he intended to use that variable to challenge every other data and statistical analysis that Professors Cohen and Kolm performed.

This is not simply a "logical, limited, and obvious extension" of Mr. Dolgoff's earlier work. Dkt. 137 at 1. Instead, Mr. Dolgoff took a narrow critique of a regression and mutated it into full-scale alternate theory of how the defendant may have been trading. An important purpose of Rule 16(b)(1)(C) is avoiding surprise expert analyses and enabling the Court to exercise its gatekeeping function. That purpose would be frustrated if the defense could delay, or withhold entirely, such extensive new data analyses on the belief that the Government should have seen it coming as a natural extension of what was previously disclosed.

After claiming that the April 15 analyses are not meaningfully different than Mr. Dolgoff's original disclosures, the defense pivots to arguing that the new analyses are "critical to the defense case," arguing that the new analyses "illustrat[e] the incompleteness of the government experts' statistical analyses[,] which omit consideration of any post-trade variables beside post-allocation returns (and first-day returns)." Dkt. 137 at 5. The idea that the new analyses are critical to the defense is in tension with the claim that they are not a meaningful expansion on the original disclosure. In any event, the argument about "illustrating the incompleteness" of the statistical analyses is off base. The statistical analyses that the April 15 Notice addresses do not "consider[] . . . variables." *Id.* They are not regression analyses. Instead, they compare various data sets and examine the statistical likelihood that differences in performance between those sets would be the result of chance. Mr. Dolgoff's new work does not show that anything is incomplete about them. Instead, it attempts to insert the idea that the defendant could have achieved such differences in performance by following a Convexity Effect Offset strategy.

Finally, the Government is prejudiced by the April 15 Notice. This case has involved extensive expert work. That work takes time. Had the Government known about the analyses in the April 15 Notice, its experts could have done additional work to address the Convexity Effect Offset variable and explain why using the output of that variable to re-create other analyses is unreasonable. The defense should not be permitted to cut short that time without any stated justification. And the defense's claim that they may not even have needed to disclose these new analyses raises the troubling possibility that there may be more that has not been disclosed. Accordingly, the Government respectfully submits that the Court should exclude the April 15 Notice or, at a minimum, grant the Government additional time to respond.

### B. The April 15 Notice Should Be Excluded As Insufficient

Separately, the April 15 Notice should be excluded because it does not provide a "complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief," as well as "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). Nothing in the opposition justifies that failure. The defense notes that it provided demonstratives in connection with the April 15 Notice. Dkt. 137 at 6. But that is beside the point: The rule requires disclosure of the opinions the expert plans to offer, and the April 15 Notice is silent about what conclusions Mr. Dolgoff intends to draw from the demonstratives.

The defense's claim that "[t]he significance of these analyses is obvious," Dkt. 137 at 6, is also not an alternative to complying with Rule 16. If Mr. Dolgoff only intends to testify that his variable "generates similar results" to the results in the governments' analyses, *id.*, then Mr. Dolgoff should disclose that in a signed notice, so the Government can be sure of his anticipated testimony. Failing to put that in a notice leaves it ambiguous whether Mr. Dolgoff plans to say only that, or intends to offer additional opinions. The absence of a signed notice also makes it more difficult to cross-examine Mr. Dolgoff if his testimony changes. Indeed, these issues are all the more pressing due to the defense's apparent belief that the analyses in the April 15 Notice were so "obvious" that it might not have needed to disclose them at all.

The Government respectfully requests that, if the Court does not exclude the new analyses, the defense be required to promptly supplement the April 15 Notice to comply with Rule 16(b)(1)(C)(iii), and that the Government be given a week to respond.

**C. The April 15 Notice Supports Granting the Government's Request for Certain Jury Charges**

Finally, the April 15 Notice reinforces the need to grant the Government's request for jury instructions on intent and the definition of cherry picking. The defense provides no legal basis for opposing those requests, and its arguments against them misconstrue both the Indictment and the Government's theory of the case.

The opposition does not dispute that the Government's proposed instructions rest on sound legal principles. With respect to intent, the Second Circuit has unambiguously held that specific intent to defraud does not need to be the defendant's "sole, or even primary, purpose." *Technodyne*, 753 F.3d at 385. That is true even in cases, such as the one here, where the defense argues that the defendant's trading could have been motivated, in part, by a risk-management purpose. *See United States v. Phillips*, 155 F.4th 102, 125-26 (2d Cir. 2025) ("The intent element for specific intent crimes, such as commodities fraud, can usually be satisfied even if the defendant has multiple reasons for taking an action, so long as one reason is the intent to deceive."). As for the definition of fraud, while the defense objects to the use of the term cherry picking, it does not appear to contest that a fiduciary's undisclosed scheme to assign "better-performing trades to favored accounts" and "worse-performing trades to other accounts" is "a type of fraudulent scheme." Dkt. 95 at 13 (citing *SEC v. World Tree Fin. LLC*, 43 F.4th 448, 462-64 (5th Cir. 2022)).

Unable to identify a legal objection to the Government's proposed instruction, the defense instead relies on contorting the Indictment and the Government's theory of the case. To be clear, the Government does not contend (as the defense suggest) that the jury can convict if it finds that the defendant "intentionally allocated trades based on duration changes in a portfolio" and that merely "ha[d] an *effect* on the price of the allocated trades." Dkt. 137 at 9, 11. Instead, it is the Government's position that the jury can convict if it finds that the defendant intentionally allocated trades based on their first day performance, and that it is not a defense if the defendant *also* had other reasons for allocation decisions, such as duration management.

The Government's proposed instructions are consistent with that theory. The Government's proposed instructions make clear that, to convict, the jury must find the defendant engaged in an undisclosed, intentional scheme to allocate "better-performing trades to favored accounts" and worse-performing trades to other accounts," with a specific intent to defraud. Dkt. 95 at 7-13. The Government's proposed intent instruction clarifies that, if the defendant engaged in such a scheme with the intent to defraud, it is not a defense that he may also have been "motivated by other lawful, proper, or neutral purposes or reasons." *Id.* at 13. There is nothing in the Government's proposed instructions that would allow the jury to convict upon finding that the defendant's trading simply had the unintended effect of better-performing trades going to Macro Opps and worse-performing trades going to the Core Strategies.

There is no merit to the defense's claim that a constructive amendment arises from applying the principle that intent to defraud does not need to be the defendant's sole intent. A constructive amendment occurs only when "the presentation of evidence and jury instructions . . . so modif[ied] essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013); *accord Unted States v. D'Amelio*, 683 F.3d 412, 416 (2d

Cir. 2012); *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997).  An indictment is not constructively amended "where a generally framed indictment encompasses the specific legal theory or evidence used at trial."  *United States v. Salmonese*, 352 F.3d 608, 620-22 (2d Cir. 2003).  In light of that standard, courts "consistently permit[] significant flexibility in proof, provided the defendant was given *notice* of the *core of criminality* to be proven at trial."  *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007).  The "core of criminality" is "the essence of the crime, not the particulars of how a defendant effected the crime."  *Vilar*, 729 F.3d at 91.

Nothing about the arguments that the Government presented in its April 22 letter would constitute a constructive amendment of the Indictment.  The Indictment alleges that the defendant "engaged in a fraudulent scheme to favor certain portfolios over others by using first-day performance to decide how to allocate Treasury futures and options trades."  Indictment ¶¶ 26-32.  The Government's anticipated proof at trial, and its proposed jury instructions, are consistent with that central allegation.  The Government's proposed instructions simply make clear that, if the defendant intentionally engaged in a scheme to favor certain portfolios over others by using first-day performance to make allocation decisions, it is not a defense that he may have *also* motivated by duration-management concerns.

The defense protests that the Indictment does not "mention the word 'duration'" or discuss factors other than "first-day performance" that the defendant used in making allocation decisions.  Dkt. 137 at 10.  But that is beside the point.  The question is whether the Indictment gave "*notice* of the *core of criminality* to be proven at trial."  *Rigas*, 490 F.3d at 228.  Here, the core of criminality is the intentional, undisclosed use of first-day performance in making allocation decisions, and the Government intends to prove the defendant did just that.  The Indictment did not need to address all the other factors the defense might argue the defendant was considering, and refraining from providing such a list does not force the Government to prove that the defendant's *sole* intent was to allocate based on first-day performance.  Rather, as long as that was one of his intentions, he committed the same fraud disclosed in the Indictment.  *Salmonese*, 352 F.3d at 620-22 ("[W]here a generally framed indictment encompasses the specific legal theory or evidence used at trial.").

The defense is also wrong to claim that the Government's proposed jury instructions would "improperly dilute the Government's burden of proof at trial."  Dkt. 137 at 10-11.  Legally, there is no change to the burden of proof.  The Government must establish the defendant's guilt beyond a reasonable doubt.  That requires proving that, with the intent to defraud, he engaged in an undisclosed scheme to favor certain portfolios over others by using first-day performance to decide how to allocate Treasury futures and options trades.  Instructing the jury that it can still convict if the defendant *also* had other motives for assigning trades, is not shifting the burden of proof—it is accurately reciting the law.

The defense's argument also factually misses the mark.  The Government's argument is not that managing duration merely has the inadvertent "effect on the price of allocated trades."  Dkt. 137 at 11.  Rather, it is that the defendant managing duration with old trades, instead of new ones, is evidence of him intentionally favoring certain portfolios over others by using first-day performance in his allocation decisions.  Recall the example from the Government's April 22 letter: Suppose the defendant bought a future (a duration-adding trade) at 5 a.m. and prices rose between 5 a.m. and 1 p.m.  Such a price increase would typically cause the duration of Macro

Opps to fall. The defendant could place a duration-adding trade for Macro Opps at 1 p.m. to (partially) correct that change, but he would have to make the trade at the higher, 1 p.m. price. The reason to forego a new trade, and instead allocate the trade from 5 a.m. to Macro Opps, is to give Macro Opps a trade *that trade has performed well* over the day. And the defendant was able to wait because he knew that he could put trades that ended up performing poorly into the Core Strategies. That is intentionally favoring Macro Opps over the Core Strategies by using first-day performance in allocation decisions, even if it is *also* considering duration.

Finally, the defense's efforts to justify the defendant's conduct under 17 C.F.R. § 1.35 ("Rule 1.35") fall flat. The defense characterizes Rule 1.35 as a blanket authorization to allocate trades at the end of the day to manage duration. That is not the case. The Rule requires allocation to be "made *as soon as practicable* after the entire transaction is executed, but in any event no later than the end of the day." 17 C.F.R. § 1.35(a)(5)(iv) (emphasis added). It also requires that allocations "must be fair and equitable," with "[n]o account or group of accounts" receiving "consistently favorable or unfavorable treatment"; that "the allocation methodology must be sufficiently objective and specific to permit independent verification of the fairness of the allocations using that methodology"; and that traders follow a host of record-keeping requirements.[1] The defendant did not follow any of these requirements. And more importantly here, Rule 1.35 plainly does not authorize a trader to intentionally allocate trades based on first-day performance, even if there is also a duration management reason for the allocation. *See Id.* § 1.35(a)(5)(iv)(B) (stating that allocations must be fair and equitable). There is, then, no merit to the defense's position that the Government's proposed instructions would allow the jury to convict the defendant for "engaging in lawful conduct." Dkt. 137 at 12.

For the foregoing reasons, the Government respectfully requests that the Court: (i) exclude the new analyses in the April 15 Notice under Rule 16 or grant the Government's request for a supplemental notice and time to respond, and (ii) grant the Government's request for an instruction on the sole-intent issue and defining cherry picking.

Respectfully submitted,

SEAN BUCKLEY
Attorney for the Government

by: __/s/ _____
Thomas Burnett/Peter Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
(212) 637-2468/1064/6523

cc: Counsel of Record (by ECF)

---

[1] The Rule also does not mention duration and appears to refer to how to allocate a particular order across accounts within a strategy, rather than how to choose between strategies.