

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

May 22, 2026

**BY ECF**

Hon. Gregory H. Woods
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 2260
New York, NY 10007

> Re:   **United States** v. **S. Kenneth Leech II, 24 Cr. 658 (GHW)**

Dear Judge Woods:

The Government writes in further support of its supplemental motion *in limine* (the "May 12 Motion") to (i) admit portions of the defendant's September 9, 2024, Wells submission (the "Wells Submission"); and (ii) preclude cross-examination of anticipated government witnesses about an irrelevant human resources complaint and investigation.

### A. Excerpts from the Wells Submission are Admissible

With respect to the Wells submission, the Government seeks to introduce the trading descriptions excerpted in its May 12 Motion (the "Excerpts"). The defendant does not dispute that the Excerpts are admissible as agent statements under Rule 801(d)(2)(D), or authorized statements pursuant to Rule 801(d)(2)(C). Nor does the defendant dispute that the considerations set forth in *United States v. McKeon*, 738 F.2d 26 (1984), militate toward admitting the Excerpts. Instead, the defendant quibbles over the Government's interpretation of the Excerpts, the completeness of the Excerpts, and whether the Excerpts are cumulative of the defendant's descriptions of his trading in the Trade Memos.

First, the defendant's competing interpretation of the Excerpts does not impact their admissibility, the interpretation of the facts is a question for the jury. Even still, the Government is not offering an interpretation, it is offering the plain text of the Wells Submission, which states: "Mr. Leech frequently had to acquire additional duration in Macro Opps in response to market rallies to offset its decreasing duration (*i.e.*, 'chase up'), and decrease duration in response to market declines to counteract its increasing duration (*i.e.*, 'chase down')." Wells Submission at 13-14. The Wells Submission accordingly argued that the defendant was obliged to make certain trades, *i.e.,* "had to acquire," "in response to market declines" or "in response to market rallies." (*Id.*). The second Excerpt explicitly states that the defendant made trades in response to market signals: he "bought in response to a rising market or sold in response a declining market." Wells Submission at 23. According to the Wells Submission, these trades had an intended allocation *at the time* the defendant traded: "Because Macro Opps' negative convexity caused its duration to fall at an accelerated rate during market rallies, it was necessary to add duration to maintain the portfolio's duration exposure" and "because the Core Strategies typically lacked negative

convexity, Mr. Leech had room to add undervalued securities that would have been inappropriate for Macro Opps." *Id.*

Now, the defendant is attempting to present to the jury a different explanation for his trading. Instead of trading with intended allocations in response to market signals, the defendant will now argue that he traded throughout the day and then decided his allocations at the end of the day to rebalance duration. That the defendant's agents made the opposite argument two years ago is a classic example of shifting rationales and consciousness of guilt evidence. Just as with the Trade Memos, the probative value of the Excerpts is "substantial because they shed light on the defendant's explanation for his trading strategy — a core issue in this case." (4/27/26 Tr. 13.) The Excerpts are admissible for the same reasons the Court found the Trade Memos are admissible. *See id.* ("These are not informal, spur-of-the-moment remarks, but carefully crafted analyses that were formally submitted to . . . the SEC by Mr. Leech's counsel to exonerate him.").

The defendant asserts the Excerpts do "not say anything specific about what [he] may have had in mind at different times during the trading and allocation process, nor do they preclude, as the Government suggests, other factors that could have impacted those decisions." (Def. Opp. at 3-4.) The defendant is free to argue to the jury that these excerpts, although they state that he "had to" "chase up" or "chase down" in response to "market rallies" or "market declines," say nothing about his trading. But those arguments go to the weight of the Excerpts, not their admissibility.

Next, the defendant's argument under Rule 106 is meritless. That Rule provides: "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—*that in fairness ought to be considered at the same time.*" Fed. R. Evid. 106 (emphasis added). "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Johnson,* 507 F.3d 793, 796 (2d Cir. 2007) (internal quotation marks omitted), *cert. denied,* 552 U.S. 1301 (2008).

Here, the defendant is vague about the specific text he believes is necessary to make the Excerpts appropriately complete. A close read of the Wells Submission shows that no supplementation is necessary. For one, the text immediately surrounding the Excerpts is neither explanatory nor relevant and is fundamentally different from the Excerpts. The Excerpts purport to describe actions the defendant *actually* took when executing and allocating trades to the Macro Opportunities strategy. *See* Wells Submission at 13 ("Mr. Leech frequently had to acquire"); Wells Submission at 23 ("Mr. Leech frequently 'chased the market'"). By contrast, the text preceding the first Excerpt describes general market conditions, and the text following the first Excerpt describes trading in the Core Strategies generally, not trading by the defendant specifically. Similarly, the text preceding the second Excerpt is a general description of how Macro Opportunities and the Core Strategies were marketed, rather than a specific account of the defendant's trading for those strategies. The text following the second Excerpt carefully keeps the defendant out of the description, stating what trades may have been appropriate or necessary in general terms, without actually attributing the reasoning to the defendant. Thus, there is nothing unfair about the selection of the Excerpts – they are the sections of the Wells Submission that describe the defendant's reasons for allocating trades to Macro Opportunities and the Core Strategies.

The defendant gestures at "other parts of the Wells submission explain[ing] why trades were not equally suitable for [the] Core Strategies and Macro Opps" (Def. Opp. at 4), but those explanations are not appropriately included under Rule 106 because they describe faulty expert analysis, not the defendant's own purported trading rationale. While it might be misleading to select a single "illustration" from a laundry list of explanations about the defendant's trading rationale, the other explanations offered in the Wells Submission are written in general terms. Those explanations describe trades that might be "appropriate" or "necessary" (*see*, *e.g.*, Wells Submission at 23) rather than a trading strategy the defendant actually employed. In these circumstances, excluding introductory phrases like "a good illustration" or "for example" is not misleading. Those phrases emphasize that the Excerpts describe trading strategies the defendant actually executed and omitting them renders the Excerpts comprehensible as standalone descriptions.

The defendant's concerns about whether introducing the Excerpts would necessitate descriptions of the Wells process and confuse the jury about the differences between civil enforcement and criminal prosecution are unfounded. While the defense has been precluded from introducing evidence or argument about the availability of civil remedies for the defendant's conduct, the fact that the defendant is charged with making false and misleading statements to the SEC will necessitate introducing other proof about the SEC's investigation (including, for example, the defendant's testimony to the SEC during the SEC investigation). The Excerpts can be introduced without confusion as the defendant's additional statements to the SEC.

Further, the Excerpts are not cumulative. "Evidence is cumulative when it replicates other admitted evidence." *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983). The Trade Memo citation offered by the defendant (Def. Opp. at 5 (Sobel Decl. Ex. D-2)) supports admitting the Excerpts. Like the other sections of the Wells Submission, the cited Trade Memo quotation is written in general terms describing what the Macro Opportunities portfolios "would have to" do in certain market environments – not what the defendant actually did when he traded. As a result of this distinction, the Excerpts are not cumulative.

Lastly, in an effort to gin up a reason to exclude the Excepts where no proper legal basis exists, the defendant challenges the novelty of the Government's request to admit the Excerpts. There is nothing novel about the Government offering agency statements against a defendant under Rule 801(d)(2)(D). Instead, the novelty in this case is the volume of false materials the defendant has voluntarily submitted to multiple Government agencies in an effort to avoid charges.[1] That the defendant has decided to present a different set of facts to the jury than the facts he previously presented to the SEC is what makes this evidence especially probative of defendant's guilt.[2]

---

[1] For example, in addition to the Excerpts, the Wells Submissions contains factual assertions about trades the defendant executed using a particular broker. Those factual assertions were withdrawn after the Wells Submission was filed because they were inaccurate.

[2] The defendant's argument about the timeliness of the Government's motion is baseless. The point of motions *in limine* is to make trial more efficient and raise issues for the Court's consideration in advance of trial. The Government is making this supplemental motion now to avoid a dispute when evidence is offered during trial, and it will make additional motions if it appears that doing so will streamline the presentation of proof and conserve the time of the Court and the jury. In any

### B. Cross Examination about the Complaint and Investigation Should be Precluded

Defense counsel's effort to turn a trial about the defendant's securities fraud into a mini-trial about whistleblowers' interactions with each other should not be permitted. It is unsupported by the facts and the law.

As an initial matter, and contrary to the defendant's assertion (Def. Opp. at 7 n.9), the SEC can and does issue joint awards to multiple whistleblowers even when those whistleblowers provide information about the same conduct. *See* SEC Enforcement and Litigation, Whistleblower Program, Whistleblower News at www.sec.gov/ enforcement-litigation/whistleblower-program (linking to three recent press releases describing "joint awards" and awards to "two whistleblowers"). As described on the SEC's website, the "whistleblower program was established by Congress to incentivize whistleblowers to report specific, timely, and credible information about possible violations of federal securities laws." The program is designed to incentivize timely reporting, not create a zero-sum gladiatorial "race" to the tipline. Any attempt to imply otherwise at trial would be misleading and should be precluded.

Significantly, as set forth in the Government's motion, the Government has no objection to cross-examination about the Analyst and Portfolio Manager's motivation for reporting the defendant's cherry picking (including potential financial incentive).[3] Further, with the exception of "biases against Western," which seem irrelevant in view of the fact that Western Asset is not on trial, the Government has no objection to permissible cross examination in the four categories enumerated by the defendant: "(1) the Portfolio Manager's and Analyst's biases and self-interest as whistleblowers with financial and reputational interests in the outcome of the case; (2) their biases against Mr. Leech []; (3) their incentives to try to out-perform each other as whistleblowers providing information to the government; and (4) their interests in currying favor with the government." (Def. Opp at at 10.) Indeed, the Government also has no objection to cross-examination concerning whether the Analyst felt the Portfolio Manager retaliated against him in the wake of their joint reporting to Western Asset's leadership (although those feelings have marginal if any relevance to the issues on trial). Therefore, the Government's motion is not to preclude cross examination about these witnesses "status as whistleblowers, and their interest in the outcome of this case." (Def. Opp. at 6).

Instead, the Government's motion to preclude cross examination is narrowly targeted to the Analyst's Complaint and the subsequent human resources Investigation. The defendant has not offered a plausible theory as to how the Complaint and Investigation demonstrate "bias" against the defendant on the part of either witness. Nor could he, as the defendant was entirely uninvolved in the Complaint and the Investigation. Instead, the defendant describes the Portfolio Manager's resignation following the Investigation as creating merely a "potential bias against Western." (Def. Opp. at 11). However, even under the defendant's recounting of the timeline, the Portfolio Manager and the Analyst each reported their concerns about the defendant's cherry-picking to Western Asset and the SEC in advance of the human resources Complaint (which occurred in

---

event, the defendant has not even attempted to provide an explanation as to how he is prejudiced by the filing of a brief motion *in limine* more than a month in advance of trial.

[3] Such cross examination will open the door to the actual reasons the Analyst and Portfolio Manager reported the defendant's conduct to Western Asset and the SEC.

February 2024), and Investigation (which commenced in March 2024). Further still, even under the defendant's recounting of the timeline, the Portfolio Manager and the Analyst each had either met with, or made submissions to, the SEC in advance of the human resources Complaint and Investigation. In straining to create an appearance of bias where none conceivably exists, the defendant's reporting of the timeline omits that the Portfolio Manager's decision "to raise by email questions within Western about the timing of the Company's investigation of the defendant" (Def. Opp. at 8) pre-dated *every interview* Western Asset's human resources conducted during the Investigation except for its initial interview of the Analyst. In other words, there is no evidence to suggest the Portfolio Manager knew of the Complaint or the Investigation at the time he sent the aforementioned email. To the extent "anti-Western bias" has any marginal relevance to this trial, it is unclear how a human resources Complaint and Investigation which post-dated reporting the defendant's conduct to Western Asset and the SEC is demonstrative of "anti-Western bias" on the part of either witness.

Moreover, the only "prior inconsistency" the defendant has identified in the Portfolio Manager's description of events preceding the Complaint is whether the Portfolio Manager "discussed" the SEC with the Analyst during the November 15 phone call or "asked" the Analyst whether he contacted the SEC during the November 15 phone call. (Def. Opp. at 11). This "inconsistency" is irrelevant to the Portfolio Manager's anticipated testimony about the defendant's cherry picking and not properly a subject of cross examination. *See United States v. Blackwood*, 456 F.2d 526, 531 (2d Cir. 1972) ("a witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral").

The Complaint and Investigation are not demonstrative of the witnesses' potential bias against the defendant, unrelated to the witnesses' character for truthfulness, and irrelevant to the issues on trial. Thus, the probative value of the Complaint and Investigation is limited. On the other hand, introducing these issues will take substantial time, and necessitate a detailed recounting of interactions in which the defendant was not involved, all of which post-date the Analyst and Portfolio Manager's reporting to Western Asset and the SEC. Introducing these issues will waste time, and may confuse the jury and cause unfair prejudice against these witnesses for reasons that have limited, if any, impeachment value in a trial against the defendant. For these reasons and the reasons set forth in the Government's May 12 Motion, cross examination of the Analyst and Portfolio Manager about the Complaint and Investigation is properly precluded under Rule 403.

<div style="margin-left:45%">

Respectfully submitted,

SEAN BUCKLEY
Attorney for the Government

by: __/s/ _____
Thomas Burnett/Peter Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
(212) 637-2468/1064/6523

</div>

cc: Counsel (by ECF)

<div style="text-align:center">5</div>