

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

May 25, 2026

**BY ECF**

Hon. Gregory H. Woods
Southern District of New York
500 Pearl Street
New York, NY 10007

> **Re:** **United States** v. **S. Kenneth Leech II**, 24 Cr. 658 (GHW)

Dear Judge Woods:

The Government respectfully requests a pretrial evidentiary hearing outside of the presence of the jury under Federal Rules of Evidence 104(a) and 104(c)(3) to establish the existence of an agency relationship between the defendant and his trading assistants, and that certain communications the Government intends to offer were within the scope of that agency relationship. The existence of an agency relationship is a matter for the Court to decide, not the jury, and such a hearing will preserve time at trial and eliminate the need to introduce evidence that is unrelated to the defendant's commission of the charged crimes.

At the hearing, the Government will establish the existence of the agency relationship by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987). At trial, the Government will then offer communications involving the defendant's long-time trading assistant ("Trading Assistant-1"). Trading Assistant-1's "prime responsibility" was a specialized role created exclusively for the defendant:  Trading Assistant-1's "main role" was "support[ing] [Leech's] trade allocating and posting of the same" by "doing whatever is necessary to ensure [the defendant's] orders are carried out and reflected correctly in systems." (GX 1111.) In connection with this responsibility, Trading Assistant-1 spoke to the defendant about his trades almost every trading day, and sometimes multiple times per trading day. To this end, the defendant provided Trading Assistant-1 with his allocation instructions and authorized her to allocate his trades when he did not provide her a specific instruction. Trading Assistant-1 was "[a]lways subject to [the defendant's] needs" and her "work day end[ed] at 2pm or when she [was] done with [the defendant's] trades." (WAMCO_DOJ_2067564.) The Government also intends to offer at trial communications involving the portfolio operations manager, "Operations Manager-1," who took over Trading Assistant-1's role when Trading Assistant-1 was unavailable.

The communications the Government will offer are admissible as agency statements under Rule 801(d)(2)(D). This letter will preview, among other things, performance reviews, human resources documents, and the defendant's statements, which all support admissibility under that Rule. A pretrial hearing on this issue is appropriate under Federal Rule of Evidence 104(c) because much of the evidence that supports the existence of an agency relationship is not otherwise critical for the jury to hear, so a pretrial hearing will streamline the presentation of the evidence.

Separately, many of the communications the Government intends to offer are also admissible as present-sense impressions under Rule 803(1), as statements of the declarants' intent or then-existing mental state under Rule 803(3), and for reasons unrelated to the truth of the matter asserted. This letter identifies the communications that are admissible for those additional reasons and separately seeks an *in limine* ruling on their admissibility.

## I.      Federal Rule of Evidence 104(a)

Pursuant to Federal Rule of Evidence 104(a), the court "must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." (*See also* 4/27/26 Tr. at 8-9.) "When preliminary facts related to the admissibility of evidence are disputed, the party offering the evidence must prove its admissibility by a preponderance of the evidence." (4/27/26 Tr. at 9 (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).) The Court may hold a hearing outside the presence of the jury if "justice so requires." Fed. R. Evid. 104(c)(3).

## II.      Agent Statements

The Government intends to offer communications from Trading Assistant-1 and Operations Manager-1 that were made within the scope of their role in allocating and posting trades for the defendant.[1] These communications are admissible because they were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Rule 801(d)(2)(D). Specifically, the communications were within their responsibility to "support [Leech's] trade allocating and posting of the same" by "doing whatever is necessary to ensure [the defendant's] orders are carried out and reflected correctly in systems." (GX 1111.)

### A.  Applicable Law

Rule 801(d)(2)(D) provides in relevant part that a statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." The offering party must establish these preliminary facts by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration.").

As this Court recognized, in *Zaken v. Borer*, 964 F.3d 1319, 1322-23 (2d Cir. 1992), and *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996), the Second Circuit has held that the Government must lay the following foundation: "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Rioux*, 97 F.3d at 660. "[A] direct reporting relationship is sufficient, but not necessary." (4/27/26 Tr. at 14 (quoting *United States v. Goldstein*, 2023 WL 3662971, at *7 (E.D.N.Y. May 25, 2023)).) Instead, "the Second Circuit has applied a functional

---

[1] The Government is attaching as Exhibit A a table that lists each Government exhibit and its basis for admissibility. The Government will also provide Chambers two courtesy copy binders of these exhibits and this letter.

test to determine whether the declarant was an 'agent' or employee' under Rule 801(d)(2)(D)." (4/27/26 Tr. at 13-14 (quoting *Goldstein*, 2023 WL 3662971, at *6.).) This functional test asks whether the declarants are "directly responsible" to the defendant, which can be satisfied by demonstrating that "the declarant depended on the defendant for her position and job instructions." (*Id.* (quoting *Goldstein*, 2023 WL 3662971, at *7.).)

"The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate." *Pappas v. Middle Earth Condo. Assn*, 963 F.2d 534, 538 (2d Cir. 1992). Thus, the Second Circuit has explained that a nurse's statement to a patient about purging files in a doctor's office was admissible against the doctor both because helping to maintain files was within the scope of the nurse's work and because discussing such matters with patients was within scope of her work, even if "file purging" was not. *United States v. Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003). The Second Circuit has emphasized that because:

> Admissions against a party's interest are received into evidence without many of the technical prerequisites of other evidentiary rules—such as, for example, trustworthiness and personal knowledge—admissibility under this rule should be granted freely.

*Pappas*, 963 F.2d at 537. "If an employee/agent was 'an advisor or other significant participant in the decision making process that is the subject matter of the statement,' the statements are considered within the scope of employment." *Penguin Books U.S.A. v. New Christian Church of Full Endeavor*, 262 F. Supp. 2d 251, 261 (S.D.N.Y. 2003) (citing *Rioux*, 97 F.3d at 661). Thus, even statements that could be characterized as an employee's "private musings" have been admitted when the employee is "speaking as to a matter that matches the subject matter of her job description." *In re Reserve Fund Secs. & Derivs. Litig.*, 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7 (S.D.N.Y. Oct. 3, 2012).

### B. Trading Assistant-1 and Operations Manager-1 Acted as the Defendant's Agents for the Allocation of the Defendant's Trades.

The Government seeks to admit statements that Trading Assistant-1 and Operations Manager-1 made while they acted as the defendant's agent for allocating the defendant's trades. As the defendant's trading assistants, their job was to allocate the defendant's trades according to the defendant's instructions, which they received directly from the defendant, typically by phone or in person. In addition to providing his trading assistants with specific trade allocation instructions, the defendant authorized them to seek out and speak to other investment professionals on his behalf when he did not provide an allocation instruction; and, if the process of seeking input failed, the defendant instructed these employees to allocate trades for him using the "50/50" allocation group as a default, standard allocation. In this respect, Trading Assistant-1 and Operations Manager-1 therefore "depended on the defendant for [their] position and job instructions." (4/27/26 Tr. at 13-14 (quoting *Goldstein*, 2023 WL 3662971, at *7).)

*Trading Assistant-1*. Trading Assistant-1 was directly responsible to the defendant for her role in allocating and posting the defendant's trades. For over a decade, Trading Assistant-1's, "main priority" was her "specific support of Ken Leech." (GX 1112 at 6.)  Trading Assistant-1's

role—serving as a dedicated trading assistant for the defendant's trade allocations—was created specifically for the defendant.  No other portfolio manager at Western Asset Management had a dedicated trading assistant to support their trading allocations.

Trading Assistant-1's performance reviews describe her "prime responsibility" as "support[ing] of [Leech's] trade allocating and posting of the same." (GX 1111 at SDNY_LEECH_R01_00225431-2.) Trading Assistant-1 sat on the trading floor, and her role required extensive daily interaction with the defendant and the executing brokers for his trades. Trading Assistant-1 wrote in 2015, for example, "As I continue to primarily assist [Leech] with his trades, I've gotten to know him better and understand what he expects from me, and thereby making me better at my job." (*Id.*) In 2016, Trading Assistant-1 wrote, "I have a good rapport with [Leech] with whom I spend most of my day assisting with trade allocation and input. I've become efficient and capable at understanding him and what he needs from me." (*Id.* at SDNY_LEECH_R01_00225386.)

Operations Manager-1, described Trading Assistant-1's role as follows: "[Trading Assistant-1] is the daily trade support for Ken Leech and all that his trading entails which wraps up most of her day and is her priority. She is diligent in doing whatever is necessary to ensure his orders are carried out and reflected correctly in systems." (*Id.* at SDNY_LEECH_R01_00225429.) Operations Manager-1 wrote, "Support of Ken's trading means you have to think a bit like him whether you want to or not.  . . . She is well acquainted with Ken's dealer coverage and never afraid to reach out to them for clarification or assistance."  (*Id.* at SDNY_LEECH_R01_00225386.) Consistent with this description, Trading Assistant-1 was fluent in the Treasury Futures and Options the defendant traded.

In a document listing "[p]ossible ways to free up" time, Operations Manager-1 wrote that Trading Assistant-1 could "lend a hand" early in the morning to other teams, but noted, that Trading Assistant-1's time was "[a]lways subject to [the defendant's] needs. Her normal 8hr work day ends at 2pm or when she is done with [the defendant's] trades." (WAMCO_DOJ_2067564.) Trading Assistant-1 communicated with the defendant on a near-daily basis, and would even ask the defendant if he needed Trading Assistant-1 to work on a holiday. (GX 1105-27.)

Trading Assistant-1's performance reviews reflect the defendant's evaluation of her performance: "[Trading Assistant-1] continues to strive for excellence in support of Ken Leech. His volume of trading has peaks and valleys but [Trading Assistant-1] can quickly adapt. [Leech] is pleased with her support and interaction." (GX 1113 at 6.) In 2014, Operations Manager-1 wrote, "Ken Leech is comfortable in [Trading Assistant-1's] primary support of him and relies upon her to get things done for him." (GX 1111 at SDNY_LEECH_R01_00225430.)  In addition, the defendant was able to, and did on at least one occasion, directly change Trading Assistant-1's compensation in light of her excellent performance as his trading assistant.  (*See, e.g.*, WAMCO_DOJ_4470831 (in email entitled "comp," *i.e.*, "compensation," a human resources employee emailed the defendant, "You and I had also discussed reviewing . . . [Trading Assistant-1].")

The defendant's testimony confirms this agency relationship. Leech testified that he provided "instructions" to Trading Assistant-1 for how Trading Assistant-1 should allocate his trades. (GX 802 159:5-8.) The defendant testified that he gave his allocation "instructions" orally, and that the "only allocation instruction would be the oral instruction that [Trading Assistant-1]

received from [Leech]." (*Id.* at 159:5-8, 163 6-16.) The defendant also testified that if he was unavailable and had not allocated a trade, he authorized Trading Assistant-1 to ask the senior leadership of the portfolios to "provide their insight into what they though the right practice was." (*Id.* 170:11-173 (explaining that "[Trading Assistant-1] could go to any of the senior leaders" of the Core and Core Plus teams)).

This process by which Trading Assistant-1 sought input from the other senior professionals on how to allocate the defendant's trades when the defendant did not provide an allocation is captured in many emails. For example, on March 12, 2019, Trading Assistant-1 emailed two members of the Macro Opportunities team with the subject "Question about a trade for [Leech]." (GX 1104-3.) Trading Assistant-1 wrote that Leech had "been radio silence [sic] last two days" and that she saw "Leech did a similar trade on 3/8 and we allocated to [Macro Opportunities.] I'm thinking I should allocate this one today the same. Agree?" (*Id.*)

On December 8, 2021, Trading Assistant-1 wrote to other investment professionals at Western Asset, "Unfortunately, [Leech] left the office in a rush to board a flight today without calling in his allocations to me. I feel confident enough that I can figure out most of his trades but if you know of anything that he needed to do specifically today—then let me know." (GX 1106-117.) Trading Assistant-1 then wrote Operations Manager-1 that Leech "had been allocating some option trades recently to SKL1+F only but I did not do any like that because I could not see any pattern of which trades he allocates this way." Operations Manager-1 responded, "Run with it." (*Id.*)

The defendant also testified that if he had not provided an allocation, and the senior investment professionals were not available to provide insight, the defendant authorized Trading Assistant-1 to allocate the unallocated trade 50/50 as a "default." (*Id.* at 173:17-174:3.) The defendant referred to this practice as his "standard" allocation. There are a number of emails that reflect Trading Assistant-1 applying the defendant's 50/50 default allocation instruction when she could not obtain an allocation directly from the defendant. For example, on November 10, 2021, the defendant wrote Trading Assistant-1, "[Trading Assistant-1] I'm on a plane-can't talk. If there are any late trades—standard allocations 50/50 Plus or minus Ford depending on five year." (GX 1106-105.) Trading Assistant-1 responded, "Ok there was only one and I did the standard – thank you." On November 29, 2022, after Trading Assistant-1 could not get in touch with Mr. Leech regarding two trades, she emailed, "I allocated 50/50 on both of these below, fyi." (GX 1107-171.) Mr. Leech responded, "Sorry-missed this-but as usual-your use of our standard allocation is correct!" (*Id.*)

As part of her support for allocating and posting the defendant's trades, Trading Assistant-1's job included tracking the defendant's trade executions as trade confirmations were issued throughout the day and report the executed trades and prices (the "fills") to the defendant. Trading Assistant-1 explained to one broker, "you do know i give [the defendant] all of his fills . . . was on with him going over all of his trades when you called." (GX 1107-146.) Trading Assistant-1 asked the broker to not give the defendant's fills to the administrative staff because "they do not report them back to him, thats [sic] what i do." (*Id.*)

*Operations Manager-1.* When Trading Assistant-1 was out of the office, Operations Manager-1 supported the defendant's trade allocations. Operations Manager-1 wrote in her self-

review, "As for our support of Mr. Leech in allocating all of his trades, I have a main point person who has supported him for many years. Mr. Leech likes continuity so we provide that for him. If the usual support is out, a second person is also trained in allocation but occasionally I have to jump in and help." (GX 1115 at 4.) For example, on August 8, 2023, Trading Assistant-1 emailed Operations Manager-1 that she wanted to leave the office by 2:00 p.m. PT, that she had "done everything possible to get SKL trades posted but right now he is in a meeting and I have just a few left," and asked, "[w]ould that be okay to pass off to you if I don't have them by 2:00 p.m.?" (GX 1108-73.) Operations Managaer-1 responded, "yep." (*Id.*)

Just as with Trading Assistant-1, when Operations Manager-1 supported the defendant's trade allocations, she depended on the defendant for his allocation instructions and was authorized to apply the default standard allocation if the defendant did not allocate a trade and was unavailable. For example, on November 28, 2011, Leech did not provide allocations for a particular trade, Operations Manager-1 emailed the defendant, "I made a few 'executive decisions' on your behalf" and explained that she allocated certain trades "50/50 + Ford" and left one trade unallocated for the defendant to discuss with Trading Assistant-1. (GX 1106-113.)

On August 17, 2022, Operations Manager-1 emailed, "Called Ken a few times. Looking for an allocation on a buy of 250 WNU2. No response. Looking at previous days purchases of WNU2 with Wells, I ended up allocating the same. Fairly sure he would have said the same." (GX 1107-139.) A member of the Macro Opportunities team responded, "Cannot be helped." (*Id.*) On August 19, 2022, Operations Manager-1 emailed the defendant regarding three trades and stated, "If I don't hear from you, I will allocate all 50/50." (GX 1107-140.) On October 31, 2022, Operations Manager-1 wrote to Western employees that Mr. Leech was in meetings and she was "waiting for allocations from him." (GX 1107-160.) Operations Manager-1 wrote, "Sorry for the lateness but the boss is the boss." (*Id.*)

Each aspect of the defendant's trade allocation process demonstrates that these two employees were his agents when they allocated and posted his trades. The Government's request, therefore, does not implicate the concern that "the testimony of a bank manager in Ohio" could be a statement by an agent of "Jamie Dimon simply because Jamie Dimon is at the top of the corporate pyramid." (4/27/26 Tr. at 15-16.) Here, the agency relationship is not solely based on the defendant's higher rank in the corporate pyramid. Instead, the agency relationship is based on facts demonstrating that the declarants' depended on the defendant for their position and instructions.

The defendant, "like[d] continuity," so Western Asset established "a main point person who has supported him for many years," *i.e.*, Trading Assistant-1. (GX 1115 at 4.) This position was created just for the defendant, and no other portfolio manager had a designated trading assistant like Trading Assistant-1. Trading Assistant-1's job was "doing whatever is necessary to ensure [the defendant's] orders are carried out." (GX 1111.) Trading Assistant-1 was "always subject to Ken's needs" and her workday was done when she finished allocating the defendant's trades. (WAMCO_DOJ_2067564.) The defendant instructed these employees how to allocate his trades and told them what to do and who to talk to on his behalf when he did not provide an allocation. Further, the defendant could and did increase Trading Assistant-1's compensation for good performance. These facts demonstrate an agency relationship because the employees "depended on the defendant for [their] position and job instructions." (4/27/26 Tr. at 13-14 (quoting *Goldstein*, 2023 WL 3662971, at *7).)

**C. The Defendant's Trading Assistants' Statements Related to the Defendant's Trade Allocations Are Admissible.**

Agent statements are admissible so long as the agent has "the authority to take action about which the statements relate." *Pappas v. Middle Earth Condo. Assn*, 963 F.2d 534, 537 (2d Cir. 1992). Here, the defendant's trade allocations were a "a matter within the scope" of the trading assistants' agency relationship with the defendant.[2] All of the exhibits the Government proposes to offer under this Rule are within the scope of the employees' role as the defendant's agents for allocating his trades. They include communications where the employees are seeking guidance about and allocating the defendant's unallocated trades,[3] communications about the defendant's failure to provide timely trade allocations (and sudden, but brief, episodes of timely allocations following a compliance warning about the dangers of late allocations and cherry picking),[4] and communications with Western Asset's back office, compliance, and trade brokers about the status of the defendant's trade allocations.[5] These communications fall squarely within the scope of the employees' authorization to allocate and post the defendant's trades. For example:

- On November 5, 2021, Operations Manager-1 reported to the back office that there will be delays due to the defendant's failure to provide allocations: "Ken is out of control today. Markets are crazy. Not one allocation yet for the 70+ trades he has executed . . . Just a friendly heads-up." (GX 1106-99.)

- On June 30, 2021, Operations Manager-1 updated the back office about one of the defendant's unallocated trades. (GX 1106-38.) Operations Manager-1 stated, I have not heard from [the defendant]. I'm going to hold out until tomorrow. I have no idea where [the defendant] wants to allocate it." (*Id.*)

- On July 1, 2022, Operations Manager-1 wrote the back office, "Ken is on a tear with [futures and options] trading and I have no allocations as of yet. Lots of trades. Just wanted to give you a heads up." (GX 1107-97.)

- On July 21, 2022, Trading Assistant-1 and Operations Manager-1 discussed how Trading Assistant-1 should allocate one of the defendant's unallocated trades. (GX 1107-119.) Trading Assistant-1 wrote, "tried ken but no answer . . . no allocation from ken." (*Id.* at

---

[2] This letter does not address communications involving the defendant himself, which are not hearsay or will be offered for non-hearsay purposes.

[3] GX 1104-3, 1106-38; 1106-117; GX 1107-80; 1107-119; 1107-139.

[4] GX 1106-13; GX 1106-45; GX 1106-49; GX 1106-51; GX1106-68; GX 1106-69; GX 1106-82; GX 1106-99; GX 1106-100; GX 1106-102; GX 1106-112; GX 1107-23; GX 1107-43; GX 1107-97; GX 1107-98; GX 1107-120; GX 1107-123; GX 1107-125; GX 1107-126; GX 1107-127; GX 1107-152; GX 1107-160; GX 1107-161; GX 1107-163; GX 1107-164; GX 1107-165; GX 1107-180; GX 1107-181; GX 1107-182; GX 1108-26; GX 1108-56.

[5] GX 1105-08; GX 1105-22, GX 1106-14; GX 1106-15; GX 1106-21; GX 1106-50; GX 1106-86; GX 1106-96; GX 1106-98; GX 1107-21; GX 1107-98; GX 1107-118; GX 1107-149; GX 1108-20; GX 1108-31; GX 1108-32; GX 1108-55; GX 1108-60.

SDNY_LEECH_R01_01154390.) These employees then have the following exchange about how to allocate the defendant's trade:

> Trading Assistant-1:  "although its [sic] a great price."
>
> Operations Manager-1:  "We know how he thinks. He would be happy to have a winning trade. What is the trade."
>
> Trading Assistant-1:  "so i feel like its [sic] such a great price he would want to dictate specifically where to allocate. sell 1000 tyu2 119-00. . . . he was doing 50/50 on other ty's today. . . I could just do that."
>
> Operations Manager-1:   I'd [sic] that . . . yes. Least invasive."

(*Id.* at 1154390-91.) The employees then decide to "leave it until tomorrow," but then, after Trading Assistant-1 receives a confirm from the broker writes, "i will do 50/50." (*Id.* at 1165391-92.) All of these exchanges are directly on a matter for which the employees had authority—the allocation of the defendant's trades.

Trading Assistant-1 and Operations Manager-1 also discussed the defendant's late allocations and how the defendants' late allocations created problems for the defendant's portfolio management. (GX 1107-125 at SDNY_LEECH_R01_01154396.) Trading Assistant-1 noted it was "interesting that ken called ME about noon yesterday and gave me allocations, instead of his usual 2:00." (*Id.* at 01154395.) Operations Manager-1 responded, "That's interesting as well. I wonder who scolded HIM?" *Id.* at 01154396.) Trading Assistant-1 responded, "wondering if that big snafu was the reason . . hard for people to help him adequately if he gives up info so late" and stated how a Macro Opportunities performance report runs late if "I can't get his trades in." (GX 1107-125 at SDNY_LEECH_R01_01154396.)

In sum, the proposed communications are within the scope of the agency relationship between the declarants and the defendant for allocating and posting the defendants' trades. Accordingly, the foundation for their admission will be established at the hearing.

### D.  A Preliminary Hearing Under Rule 104(c)(3)

The Court should exercise its discretion to hold a preliminary evidentiary hearing under Rule 104(c)(3) because "justice so requires." *First*, much of the foundational evidentiary matters to establish the agency relationship between the defendant and the employees would not otherwise require full development before the jury. *Second*, as to the preliminary question of admissibility of these documents, the Court is "not bound by evidence rules," Rule 104(a); accordingly, the Court would be permitted to review this foundational evidence (including the proposed exhibits themselves), notwithstanding any evidentiary objections that defense counsel could potentially raise before the jury. *Third*, a pretrial ruling on these foundational questions will impact the length and scope of the Government's proof at trial, so will significantly streamline the trial.

**III.    Communications Involving Trading Asssistant-1 and Operations Manager-1 Are Also Admissible under Rule 803.**

In addition to Rule 801(d)(2)(D), many of these communications are admissible under Rule 803(1) because they are the declarants' present sense impressions and 803(3) because they are the declarants' contemporaneous statements of intent, plan, or mental feeling.

**A. Rule 803(1) Present Sense Impression**

Trading Assistant-1 and Operations Manager-1 also made a series of communications contemporaneously describing the defendant's allocations and other events. These communications are therefore admissible under Rule 803(1). [6] The present-sense impression exception to the rule against hearsay permits the admission of an out-of-court "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). Because "in many, if not most, instances, precise contemporaneity is not possible . . . a slight lapse is allowable" between when the declarant perceived the event and when the declarant made the statement. Fed. R. Evid. 803(1) advisory committee's note (1972).

For example, on October 31, 2022, Operations Manager-1 wrote, "Ken is in meetings . . . waiting for allocations from him." (GX 1107-160.) On November 26, 2021, a Western employee asked Operations Manager-1 if she was allocating the defendant's trades, she responded, "I am . . . he just called me. Like 100 trades maybe. Killing me." (GX 1106-112.) These communications are examples of the declarants contemporaneously "describing or explaining an event or condition" and are therefore admissible under Rule 803(1).

**B. Rule 803(3) " Intent," "Plan," and "Mental Feeling."**

Rule 803 also provides a hearsay exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).

Many of the communications involving Trading Assistant-1 and Operations Manager-1 include their stated intentions and plans for allocating Mr. Leech's trades.[7] For example, on June

---

[6] GX 1105-8; GX 1106-13; GX 1106-15; GX 1106-45; GX 1106-47; GX 1106-49; GX 1106-50; GX 1106-51; GX 1106-68; GX 1106-69; GX 1106-82; GX 1106-99; GX 1106-100; GX 1106-112; GX 1106-117; GX 1107-23; GX 1107-80; GX 1107-97; GX 1107-98; GX 1107-119; GX 1107-120; GX 1107-123; GX 1107-125; GX 1107-127; GX 1107-139; GX 1107-149; GX 1107-152; GX 1107-160; GX 1107-161; GX 1107-180; GX 1107-181; GX 1108-32; GX 1108-55; GX 1108-56.

[7] GX 1106-38; GX 1106-50; GX 1106-117; GX 1107-119; GX 1107-163; GX 1107-164; GX 1107-165; GX 1108-31.

30, 2021, Operations Manager-1 stated, "I have not heard from [the defendant]. I'm going to hold out until tomorrow. I have no idea where he wants to allocate it." (GX 1106-38.)

On August 19, 2021, Operations Manager-1 wrote, "Ken has not called back..the allocation he gave me for each trade is short. Unless I hear from [him] in the next few min[utes] I'm going to leave them unallocated until tomorrow." (GX 1106-50.)

On November 11, 2022, Trading Assistant-1 wrote, I put in all the trades that I had allocations for . . . there are a couple that we will have to enter on Monday." (GX 1107-163.) That same day, Operations Manager-1 wrote, "There are other trades that Ken did not want to allocate. I'll put them in on Monday for [trade date] November 11, 2022."  (GX 1107-164.)

These communications state Operations Manager-1's and Trading Assistant-1's plan and intent to allocate the defendant's trades in a particular way. They are also highly probative to key issues in the case including how the defendant routinely provided delayed allocations, how Trading Assistant-1 and Operations Manager-1 were diligent in seeking allocations from the defendant and posting those allocations; and how the defendant's delayed allocations violated Western Asset policy of same-day allocations.

Other communications involving Trading Assistant-1 and Operations Manager-1 are also admissible because they state the declarants' contemporaneous "mental feeling."[8] Fed. R. Evid. 803(3). These communications include Trading Assistant-1 and Operations Manager-1 expressing that they were hopeful and happy when the defendant—after receiving a compliance reminder about the dangers of late allocations and cherry-picking—briefly changed his allocation methodology so that each broker had a particular allocation. (GX 1106-51.) Operations Manager-1 wrote, "10:40 a.m. There is hope. Like you said the other day, each broker has their own allocation. No one-by-one needed. Yippe!" (*Id.*) Trading Assistant-1 responded, "Yes!!! So much easier. Less time spent on phone trying to understand each other." (*Id.*)

On other occasions, these employees expressed their frustration with the defendant's late allocations: "Friday was HELL!! Called me at 12:45 p.m. I had close to 100 trades to be allocated." (GX 1106-102; *see also* GX 1107-120 ("His list of trades though WOW. Might cause me to run right back under the covers"; GX 1107-181("He is killing me!! I know all of the below trades so that will help once I get allocations from him"; GX 1108-26 ("I'm dying")).

These statements—which express the employees' emotional state and mental feeling—are admissible under Rule 803(3) and they are also probative of many of the key issues in the case, including demonstrating that the defendant routinely delayed his allocations; that the trading assistants attempted to encourage him to allocate earlier; and that the trading assistants were diligent in posting the defendant's trade allocations.

---

[8] 1106-13; 1106-45; 1106-49; 1106-51; 1106-69; 1106-102; 1106-112; 1107-98; 1107-119; 1107-120; 1107-125; 1107-127; 1107-149; 1107-181; 1108-26 1108-56.

IV.    **Certain Communications Are Admissible Without Regard to the Truth of Any Matter Asserted**

Some communications are also independently admissible for non-hearsay purposes. For example, in August 2021, the chief compliance officer sent Mr. Leech and others a reminder to "**Finalize allocations promptly after execution**," because "[t]he more you delay finalizing an allocation, the more risk we assume. Even if your actions are benign, we might have to defend and explain if we have a pattern of market movements and allocations made late in the day." (GX 1106-45.) The email also made clear that, "The SEC is concerned that an adviser might use knowledge of market movement to allocate winning trades to certain accounts." (*Id.*) Following this email, Trading Assistant-1 wrote, "Interesting…got an earlier than usual call from ken with his allocations today!" Operations Manger-1 wrote that she told the chief compliance officer to "send this out late last week given IG had unallocated trades on the blotter for close to 7 hours!" Trading Assistant-1 responded, "Nice! Good going." These communications are admissible for the non-hearsay purpose that the Operations Manager and Trading Assistant encouraged the defendant and others to allocate their trades early and to not provide them late in the day.

V.    **Conclusion**

The Court should hold a pretrial evidentiary hearing outside of the presence of the jury under Federal Rules of Evidence 104(a) and 104(c)(3) to establish the admissibility of communications involving the defendant's trading assistants. A preliminary hearing will respect the jury's time by sparing them collateral evidence on a preliminary question, enable the Court to discharge its responsibility to consider even inadmissible evidence when assessing the existence of an agency relationship, and provide the parties with certainty on an evidentiary matter of import to the trial. After such a hearing, the Court should find the existence of an agency relationship and admit the offered communications.

Respectfully submitted,

SEAN BUCKLEY
Attorney for the Government

by: _Peter J. Davis_
Thomas Burnett/Peter Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
(212) 637-2468/1064/6523

cc: Counsel (by ECF)