# Morvillo Abramowitz Grand Iason & Anello P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com
_____

WRITER'S CONTACT INFORMATION

jsack@maglaw.com
(212) 880-9410

June 5, 2026

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN
____

RETIRED/PARTNER EMERITUS
PAUL R. GRAND
____

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

**VIA ECF**

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:    *United States v. Leech*, No. 24 Cr. 658 (GHW) (S.D.N.Y.)

Dear Judge Woods:

At the hearing on June 1, 2026, the Court and parties discussed the parties' respective proposals regarding the description of the case to be read at the beginning of trial. (*See* Tr. at 182.) As discussed, the parties disagree about whether the venire and the empaneled jury should be instructed that the allegedly fraudulent conduct consisted of allocating trades based on post-execution "price" change (the defense's position) or post-execution "performance" (the government's position). The Court correctly noted that "[t]he parties' initial proposal regarding the text of that initial description of the case used the word performance" and asked the defense, "whether that term, which I understood previously to have been agreed upon, is no longer agreed upon, and, assuming that it is not agreed upon, to ask, what's changed?"

We write to provide a further response to the Court's question. As explained below, the indictment charges Mr. Leech with having defrauded certain clients by allocating trades based on the change in *price* between the time those trades were executed and when they were allocated. The indictment refers to this post-execution price change as "performance," and the parties and Court have referred to "price change" and "performance" interchangeably throughout the case. Recently, however, the government has suggested that it will argue that "performance" is not limited to post-execution price change and that "performance" could refer to other factors, such as duration management.

This is not a simple dispute over nomenclature. This issue goes to the heart of the case. Accordingly, as explained below, we request that the Court adopt the defense's proposed description of the case to be read to the venire. Additionally, due to the importance for the

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Gregory H. Woods
June 5, 2026
Page 2 of 8

defense's strategy at trial and the significant risks the government's recent position presents, we further request that the Court reject the government's proposed jury instructions and instruct the jury that it may find Mr. Leech guilty only if it determines that, with the specific intent to defraud, he used first-day *price* performance to allocate trades with positive first day returns to some clients and trades with negative first-day *price* performance to others.  We respectfully request that the Court decide this issue before trial begins.

## I.      Background

### A.      The Government Alleges that Mr. Leech Improperly Considered *Price* Change When Allocating Trades

From the beginning of this case, the government pursued the theory that Mr. Leech engaged in fraud by allocating trades based on the change in *price* between the time those trades were executed and allocated.

The indictment alleges repeatedly that Mr. Leech allocated trades based on "first-day performance" and exclusively refers to "performance" in terms of price.  (*See, e.g.*, Ind. ¶ 19(g) ("Those trades often had different first-day performance because LEECH executed the trades at different *prices* throughout the day." (emphasis added)).  Throughout, the indictment refers to the early performance of trades in terms of "gains," "losses," and dollar amounts.  (*See id., e.g.*, ¶ 1 (alleging Mr. Leech allocated "trades that performed well during their first day . . . with net first-day gains of over $600 million" and "trades that performed poorly . . . with net first-day losses of over $600 million"); *id.* ¶ 16 (quoting compliance policies against "allocat[ing] lucrative or profitable trades to particular accounts to make up for past account performance"); *id.* ¶ 19 (referring to allocations based on performance in the "market" and "market movements" which generated "gains" and "losses" in dollar amounts).  The indictment is clear that first-day "performance" refers to its first-day profitability based on "price" movements and not some other factor (whether in whole or in part).

Following the filing of the indictment, the government has repeatedly referred to "price" as "performance" for the purposes of its allegations in this case.  For example, in its opposition to Mr. Leech's pretrial motions, the government argued that Mr. Leech's "trades often had different first-day performance because Leech executed the trades *at different prices* throughout the day."  (Gov't Opp'n, Dkt. No. 37 at 24 (emphasis added).)

In accordance with this theory, the government's experts analyzed intraday price movements as the basis for their opinions.  (*See* Cohen Expert Discl., Dkt. No. 64-1 ¶ 50 ("Professor Cohen will testify that he conducted analyses to compare *the price change* of Mr. Leech's Treasury F&O trades (1) in the 24-hour period before Mr. Leech traded; (2) in the period between when his trade filled and he allocated that trade; and (3) in the 24-hour period after Mr. Leech allocated." (emphasis added)); Gov't Opp'n, Dkt. No. 75 at 4 ("Professor Cohen used data on both first-day returns ('FDRs'), which reflect the return on a trade between the time

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Gregory H. Woods
June 5, 2026
Page 3 of 8

of trade and the end of the day, and pre-allocation returns ('Pre-Allocation Returns'), which reflect the return on a trade between the time of a trade and the time an allocation was entered.").)

In reliance on the indictment and the government's representations, both the defense and the Court have understood the alleged fraudulent conduct at issue to be based on price movements. (*See, e.g.*, Nov. 7, 2025 Hrg. Tr. at 69 ("For purposes of this opinion, I will use the word 'misallocated' to refer to this practice. In that way, the government charges, Mr. Leech was able to distribute trades *with early gains* to favored accounts and trades with weaker first-day performance to disfavored accounts." (emphasis added)).

> **B.    The Government Tries to Broaden Its Theory Beyond Price Change in Response to Mr. Leech's Pretrial Submissions**

Despite the allegations in the indictment, and the government's post-indictment confirmations that its prosecution is premised on Mr. Leech's allocations allegedly based on first-day performance—defined as *price changes* on the first day—the government now appears to be arguing that that the term "performance" includes something more than just price change.

In its letter motion to exclude the supplemental expert notice for defense Expert Aaron Dolgoff, the government broadened the definition of "performance" to include things other than price change. (*See* Gov't Ltr., Dkt. 131 at 7.) In Mr. Dolgoff's April 15, 2026 Notice, he disclosed the results of applying the government experts' non-regression analyses to the results of Professor Cohen's modified regression analysis (using Mr. Dolgoff's Passive Duration Change variable). This further illustrated that the results of "Mr. Dolgoff's modification to Professor Cohen's regression analysis are similar to the results of the analyses performed by the government's experts." (Dkt. 137 at 6.)

In its motion to exclude Mr. Dolgoff's supplemental notice, the government argued that, even if Mr. Leech were allocating his trades for the purpose of managing duration (and not price), it would still amount to fraud because Mr. Leech would still have been allocating trades *based on* "*first-day performance*." (*See id.* at 7 ("The Convexity Effect Offset theory is not a defense to the charged fraud because it concedes that the defendant allocated trades *based on first-day performance*, favoring Macro Opps over the Core Strategies." (emphasis added)).)

The government collapses the distinction between allocations based on on first-day "performance" and allocations based on managing duration risk, stating: "*Even if* the defendant was motivated, in part, by the desire to manage the risk of Macro Opps, he was *also* assigning trades on the basis of *first-day performance*." (*Id.*) (emphasis added). The government appears to attribute this to the "inverse" relationship between a strategy's duration and price, and explains that if Mr. Leech "reach[ed] back to a Treasury future he bought at 5 a.m." to manage duration risk, he would have been using "a more profitable way to offset duration loss than placing a new trade at 1 p.m." which is *"a version of cherry picking*." (*Id.*) In the government's

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Gregory H. Woods
June 5, 2026
Page 4 of 8

view, this amounts to fraud *even if* Mr. Leech lacked a specific intent to allocate trades based on first-day price change.  Finally, the government explains that the jury should not be presented a "false choice" between finding that "the defendant was *either* cherry picking *or* managing the duration of Macro Opps." (*Id.* at 8.)

In response, the defense noted that this was a "newfound" theory by the government. (Def. Ltr., Dkt. 137 at 9.)  The defense also demonstrated how the government's proposed jury instructions "would invite the jury to convict Mr. Leech *even if* it were to find that he did not intend to allocate trades based on their price."  (*Id.* ("[T]he government would ask the jury to convict Mr. Leech if it finds he *either* (1) intentionally allocated trades based on their first-day price performance; (2) intentionally allocated trades based on duration changes in a portfolio; or (3) allocated trades with both of these intents, so long as Mr. Leech even partly allocated trades with the intent of doing so based on their first-day price performance.").)  Accordingly, the defense asked the Court to reject the government's proposed jury instructions because "*first*, the proposed jury instructions deviate from the indictment, which clearly and unequivocally alleges that Mr. Leech improperly allocated trades based on price; and *second*, the proposed jury instructions would confuse the jury and impermissibly alter the government's burden of proof at trial by collapsing the intent to allocate based on price with the intent to allocate based on duration changes in a portfolio." (*Id.*)

In reply, the government made contradictory arguments.  On the one hand, it appears to concede that even if Mr. Leech used post-trade-execution information to allocate his trades, the jury could not convict if it found that his purpose for using that information was to manage the duration of the strategies rather than to capture intraday price changes.  (*See* Gov't Reply, Dkt. No. 138 at 3 ("To be clear, the Government does not contend (as the defense suggest) that the jury can convict if it finds that the defendant 'intentionally allocated trades based on duration changes in a portfolio' and that merely 'ha[d] an *effect* on the price of the allocated trades.'" (quoting Dkt. 137 at 9, 11)).  But on the other hand, the government stated that "managing duration with old trades, instead of new ones, is evidence of him intentionally favoring certain portfolios over others by using first-day performance in his allocation decisions," and repeats its theory that managing duration through old trades "is intentionally favoring Macro Opps over the Core Strategy by using first-day performance, even if it is *also* considering duration."  (*Id.* at 4–5.)

This argument carried over into the parties' submission on the proposed description of the case.  In the proposed description, the defense requested that the Court state that the "[t]he indictment alleges that he would execute a trade, wait to see how the *price moved* in the hours after he executed the trade, and then, based on that early *price* performance, allocate trades to the accounts he managed in a manner that favored certain clients and disfavored others." (Dkt. No. 156-1 at 1.)  The government, however, asks the court to strike the emphasized language regarding price movement. (*Id.* at 1 n.1 ("The defendant's proposed injection of the word 'price'

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Gregory H. Woods
June 5, 2026
Page 5 of 8

is a transparent attempt to narrow the charges in the indictment to match defense counsel's newly manufactured defense and should be rejected.").

## II.     Argument

### A.     The Court Should Reject the Government's Proposed Instructions

The Court should reject the government's attempt to broaden "performance" beyond what was alleged in the indictment.  To this end, the Court should reject the government's requested jury instructions, namely:  (i) "[a] defendant may have the requisite intent to defraud even if the defendant was motivated by other lawful, proper, or neutral purposes or reasons for his actions"; and (ii) that "cherry picking—which is when a fiduciary engages in a scheme to allocate better-performing trades to favored accounts after observing market-movements, while assigning worse-performing trades to other accounts or clients—is a type of fraudulent scheme or practice if it is not disclosed to clients." (Dkt. No. 131 at 6 (quoting Request to Charge, Dkt. No. 95 at 13, 9).).

The defense requests that, instead, the Court instruct the jury that it may find Mr. Leech guilty only if it determines that, with the specific intent to defraud, he used first-day *price* performance to allocate profitable trades to some clients and unprofitable trades to others.[1]  The jury may not find Mr. Leech guilty if it were to conclude that he had the specific intent to allocate based on post-execution duration changes in the portfolio and not post-execution price changes.  Although the term "first-day performance" in this case has always referred to allocations based on price, it has now become necessary to clarify this matter in advance of trial. Otherwise, there is a risk that the jury may confuse intent and effect and find Mr. Leech guilty of the charged offenses without finding the specific-intent element met beyond a reasonable doubt.[2]

Allowing the government to broaden the definition of "performance" to encompass trades allocated with the specific intent of managing duration would also constitute a constructive amendment of the indictment.  (*See* Dkt. 137 at 9–10; *see also, e.g.*, *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (finding constructive amendment where indictment alleged misbranding by "re-packaging drugs" but government pursued alternative theory at trial).)  Here, the government's proposed jury instructions would impermissibly expand the bases for conviction beyond the four corners of the indictment.  By seeking to instruct the jury that it may convict if it finds Mr. Leech allocated trades based on "first-day performance" without limiting

---

[1] For the same reasons set forth in this letter, the defense requests that the Court summarize for the venire and empaneled jury that "[t]he indictment alleges that [Mr. Leech] would execute a trade, wait to see how the price moved in the hours after the executed the trade, and then, based on that early price performance, allocate trades to the accounts he managed in a manner that favored certain clients and disfavored others."  (Dkt. No. 156-1 at 1.)

[2] For example, without the requested clarity in instructions, the jury could convict Mr. Leech based on a finding of conduct—taking intraday market movements into account for purposes of managing duration—that is expressly permitted under CFTC Rule 1.35.  (Dkt. 58 at 11-13).

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Gregory H. Woods
June 5, 2026
Page 6 of 8

that term to price—and by arguing that "performance" may encompass non-price factors such as duration management—the government attempts to broaden the charged offense beyond what was included in the indictment.

The government now appears to argue that allocating trades to manage post-trade-execution duration changes would be sufficient for the jury to convict. (*See* Dkt. 131 at 7 ("Even if the defendant was motivated, in part, by the desire to manage the risk of Macro Opps, he was also assigning trades on the basis of first-day performance.").) But an intent to allocate based on post-execution duration needs is not charged in the indictment. If pursued at trial, the government will have constructively amended the indictment by "broaden[ing] the possible bases for conviction from that which appeared in the indictment." *Milstein*, 401 F.3d at 65 (quotation marks omitted). The indictment charged allocation based on *price*, and the government may not at trial expand that charge to encompass allocation based on other factors (such as duration) simply because there is a relationship between the two variables. Permitting the jury to convict on this expanded theory would violate Mr. Leech's Fifth Amendment right to be tried only on charges returned by the grand jury, which plainly alleged that Mr. Leech used price change to decide how to allocate trades.

The government's approach is not only procedurally improper but also factually wrong. Allocating trades based on price and allocating trades based on the passive duration change of a portfolio reflect entirely different mental states—one to allocate based on price, one to allocate in order to manage duration, a critical and legitimate aspect of portfolio management—and the government should not be allowed to collapse the two by labeling them effectively the same. To the extent the government argues that this would be a "*version of cherry picking*" (Dkt. No. 131 at 7 (emphasis in original)), this is not only different from what was alleged in the indictment but also a new definition of "cherry picking," *see SEC v. World Tree Fin., LLC*, 43 F.4th 448, 460 n.4. (5th Cir. 2022) ("[T]he SEC has described cherry-picking as: 'a practice in which securities professionals allocate profitable trades to a preferred account (like their own) and less profitable or unprofitable trades to a non-preferred account (like a customer's).'"). Prior cherry-picking cases require the specific intent to allocate trades based on price. *See id.* at 463 ("[C]herry picking can satisfy the scienter element because it involves the knowing conduct of picking certain accounts over others . . . [T]he scheme require[s] specific preparation and the deliberate allocation of a disproportionate number of profitable trades." (internal quotation marks omitted)); *SEC v. Paris*, No. 21-cv-3450, 2024 WL 4433614, at *1 (N.D. Ill. Oct. 7, 2024) ("[C]herry-picking occurs 'when an investment advisor defrauds his clients by purchasing stock and then waiting to see whether the price of the stock goes up, or down, before allocating the trade.'"); *The Dratel Grp.*, Exchange Act Release No. 77396, 2016 WL 1071560, at *1 (Mar. 17, 2016) ("To cherry pick a trade, a securities professional . . . allocates the trade to an account after observing how that transaction performed" and "effectively steal[s] from one customer to enrich himself" "[b]y directing the more profitable trades to preferred accounts.").

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Gregory H. Woods
June 5, 2026
Page 7 of 8

The government's new definitions of "performance" and "cherry picking" would cause significant juror confusion and prevent the jury from distinguishing between what are lawful and unlawful purposes. While the government contends that its requested instructions avoids presenting the jury with a "false choice" between finding that "the defendant was *either* cherry picking *or* managing the duration of Macro Opps" (Dkt. No. 131 at 8), the government's newfound theory of the case permits the jury to collapse specific intent and unintended effect, and removes the jury's ability to find that Mr. Leech was allocating based on a legitimate factor other than price.

**B.      The Court Should Rule on this Issue Pretrial**

The Court should rule on this issue now.  In the parties' prior briefing on this issue, the defense requested that the Court defer the issue of jury instructions until the trial.  (*See* Dkt. 137 at 8.)  The government has since made clear, however, that it may distort the definition of "performance" and to argue that allocating trades to manage post-trade-execution duration changes is the functional equivalent of allocating based on first-day price performance.  That conflation is legally erroneous and unfair for the reasons stated above.

Resolution of this issue is critical to the defense's trial strategy.  If the Court gives the government's proposed jury instructions—that is, that the jury may convict Mr. Leech for allocating trades based on post-execution duration changes rather than price—the defense cannot meaningfully pursue a theory that Mr. Leech's allocations were made in good faith and driven by legitimate, non-price factors, including managing duration.  Put simply, the defense needs to know whether the evidence it may present at trial regarding duration management will provide a defense that the jury may accept to find Mr. Leech not guilty.  Without a pretrial ruling, the defense will be forced to enter the trial without knowing the legal framework in which the jury will evaluate its evidence.

Accordingly, the Court should reject the government's proposed jury instructions and instruct the jury that it may find Mr. Leech guilty only if it determines that he, with the specific intent to defraud, used first-day *price* performance to allocate profitable trades to some clients

Morvillo Abramowitz Grand Iason & Anello P. C.

Hon. Gregory H. Woods
June 5, 2026
Page 8 of 8

and unprofitable trades to others.  The Court should also reject the government's summary of the case and adopt the version submitted by the defense.

Respectfully submitted,

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.

By:    /s/ *Jonathan S. Sack*
Jonathan S. Sack
Jeremy H. Temkin
565 Fifth Avenue
New York, NY 10017
(212) 880-9410
jsack@maglaw.com

CLEARY GOTTLIEB
STEEN & HAMILTON, LLP

/s/ *Joon H. Kim*
Joon H. Kim
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Defendant S. Kenneth Leech II*

Cc:    AUSA Peter J. Davis (via ECF)
       AUSA Thomas S. Burnett (via ECF)
       SAUSA Lindsey Keenan (via ECF)