**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

November 4, 2026

**VIA ECF**

The Honorable Gregory H. Woods
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**Re: *United States v. S. Kenneth Leech II*, 24 Cr. 658 (GHW)**

Dear Judge Woods:

The defendant in the above-captioned case, S. Kenneth Leech II, is scheduled to be sentenced on November 23, 2026. For the reasons set forth below, the Government respectfully submits that a sentence above the United States Sentencing Guidelines (the "U.S.S.G" or the "Guidelines") range as stipulated by the parties (the "Stipulated Guidelines Range"), is sufficient but not greater than necessary to achieve the purposes of sentencing.

## I. Offense Conduct

Between 2021 and 2023, S. Kenneth Leech II, the defendant, served as the chief investment officer of the investment management company, Western Asset Management ("WAMCO"). WAMCO was one of the largest fixed income managers in the United States, and Leech was responsible for managing billions of dollars of his clients' money. The defendant knowingly obstructed an investigation by the Securities and Exchange Commission ("SEC")—WAMCO's primary regulator—into whether the defendant had perpetrated a multi-year cherry-picking scheme, in which he committed fraud by favoring clients in his Macro Opportunities Strategy ("Macro Opps"), at the expense of others in the Core and Core Plus Strategies (the "Core Strategies"). This obstruction was designed to impede the SEC's investigation into the defendant's serious misconduct, which if the SEC discovered was true, would constitute securities fraud and a breach of the defendant's fiduciary duties.

### A. Leech Obstructed the SEC Proceeding

In March 2024, the defendant was aware of an SEC investigation into his trade allocations. Specifically, the defendant was aware that the SEC was investigating whether he made trades and then delayed his allocation decisions, so that he could observe how his trades performed before determining how to allocate those trades among his clients. The SEC investigation focused on whether the defendant engaged in a scheme to defraud investors and breach his fiduciary obligations by was using this ability to delay trade allocations to observe the trade's performance, and to allocate better performing trades to certain clients and worse performing trades to others.

As part of that investigation, the defendant sat for sworn testimony before the SEC pursuant to an SEC subpoena. During that testimony, the defendant gave false and misleading testimony about the timing of his decision to allocate trades to particular clients or strategies. The defendant's answers were intended to hide the truth, which was that he waited for hours to make allocation decisions for many trades, and to impede the SEC from discovering his cherry-picking scheme. These false and misleading answers included the following:

SEC ATTORNEY: Okay. So, would you say, from your personal perspective, you're doing about 20 trades per day?

LEECH: That look like 100 or more than 100.

SEC ATTORNEY: Okay. At the time that you pick up the phone and place a trade order with a broker, do you document any place that you have placed that trade order?

LEECH: I place the trade orally. The broker knows what the trade order is.

SEC ATTORNEY: At the time you place the trade order, do you typically have an allocation in mind.

LEECH: Yes.

SEC ATTORNEY: Do you document that allocation anywhere?

LEECH: No. I know—I know where I want to put the trade. I do it orally.

SEC ATTORNEY: You do it orally?

LEECH: I give my -- my instructions orally. I don't document the trade. I don't document the trade, no.

SEC ATTORNEY: So, you place the trade orally, and you give the allocation instruction orally?

LEECH: I don't usually give the allocation instruction to the broker, no.

SEC ATTORNEY: Okay. You have an allocation instruction in mind at the time you place the trade order with the broker?

LEECH: Yes.

SEC ATTORNEY: Do you document that allocation instruction, if not to the broker, to anyone else?

LEECH: Yeah. Occasionally, if I -- you know, if I have the ability to communicate with my trading assistant, I'll let her know what my allocation would be if the trade happens to get executed and reported.

***

SEC ATTORNEY: Most of the time when Ms. Marquez was obtaining allocation instructions from you, was it she called you and ticked through a number of executed trades and received an allocation instruction?

LEECH: Often that was the case.

SEC ATTORNEY: And that happened a handful of times each day, and then you said a big sweep at the end of the day?

LEECH: Yes.

SEC ATTORNEY: What time would the end-of-the-day sweep typically occur?

LEECH: I think, you know, the firm has a very strong same-day program. It's always been our – all trades have to be on the same day. And roughly -- roughly -- roughly around one o'clock, 12:30 to one o'clock, would be the time she would usually – you know, we need to get all the trades in. Now, in the fixed income market, unlike the equity market, closing prices end of day, it's a confusing topic only because the market's open 23 hours a day for five straight days. There's not a bell that goes off on the equity market. These are the prices. These are the closing prices. The market keeps trading all the way. So, yeah, I'd say between 12:30 and 1:00, that was when she would call. If brokers didn't report trades till later, if they didn't report them, 1 she might have to call me much later. And if you had gone for the day, Rosemarie might have to call if the trades aren't reported even later and find me and make sure that they got in on the same day. That happened as well.

SEC ATTORNEY: Between the time that you called the broker to issue the trade order and, in the typical instance, the time when Ms. Marquez contacted you to tick through trade confirms, did you document anywhere your allocation instruction?

LEECH: I didn't -- no, I didn't. It's not my practice to write down notes, no.

SEC ATTORNEY: So the only allocation instruction would be the oral instruction that Ms. Marquez received from you?

LEECH: Yes.

SEC ATTORNEY: What did you consider when deciding how to allocate a particular trade?

LEECH: I decided -- I thought about what was going to be the strategic investment need for usually -- sometimes one account but usually the group of accounts for which I was placing the trade.

SEC ATTORNEY: Did you confer with other members of your team before you made an allocation determination?

LEECH: Yes. I mean, I -- we had -- I mean, there are a lot of trades. So it's not -- I don't want to get myself in trouble for over-generalizing, but we had discussions in the Macro Opps group. We had discussions in the Core and Core Plus group. We had discussions in the insurance group, the Global group about what trades we'd want to do and what strategies we wanted to effect. and so sometimes I would make those decisions on my own without discussion, but often they were in conjunction with strategies and discussions we'd had as a group.

***

SEC ATTORNEY: So for each trade, Ms. Marquez would tick through the trade confirm, and you would convey an allocation; right?

LEECH: Yes.

SEC ATTORNEY: Before that phone call happened, did you discuss with anyone else on your team, "I did these 10, 8, 12, 30 trades. Here's how I plan to allocate them"?

LEECH: I would say that the answer to that question is yes sometimes but not -- not – the majority, I wouldn't. once I've done the trade and know where I'm going to allocate it, I don't need to re-review it. I was saying that the idea of whether or not to do a trade was often done as -- in response to the strategy of the firm or in conjunction with conversations I'd had with other people.

(PSR ¶¶ 4-16).

As part of his guilty plea, Leech admitted that these statements were false and misleading and that he intended to obstruct the SEC investigation into his trading:

> Your Honor, on March 6th, 2024, I gave testimony to the enforcement division of the United States Securities and Exchange Commission. During that testimony, I stated that at the time I placed my trades, I knew the client accounts which I intended to allocate those trades. In fact, when I later alloc[a]ted my trades, certain of my actual allocations were different from what I had intended when I placed the trades. I knew that I was giving false and misleading testimony about my trade allocation process in the 2021 to 2023 period and that giving that testimony was wrong.
>
> ***
>
> Your Honor, in addition to what I said, and it follows straightforwardly, I knew that by giving that testimony I would impede the SEC's proceeding.

(6/12/26 Tr. at 27-28.)

### B. The Defendant Repeated His Lies to the SEC

The defendant's lies served as the foundation for his defense to the cherry-picking investigation, and through counsel he repeated these same lies about his allocation practices later in the SEC's investigation. Upon learning that the SEC staff intended to recommend fraud charges against the defendant in connection with its investigation, defense counsel prepared and submitted

a Wells Submission to the SEC. Importantly, the Wells Submission contained detailed descriptions of the defendant's rationale for executing trades in client portfolios in the Macro Opps and Core Strategies. Those descriptions gave the appearance that the defendant placed trades for specific strategies, in response to market movements—which would mean that the defendant knew where he wanted to allocate trades when he made them, rather than trading, waiting, and making a decision later. For instance the Wells Submission asserted:

> Macro Opps had a "long [duration] bias on . . . the Treasury side," reflecting Western's well publicized view that inflation was transitory. To maintain that long duration position together with Macro Opps' negative convexity, Mr. Leech frequently had to acquire additional duration in Macro Opps *in response to market* rallies to offset its decreasing duration (*i.e.*, "chase up"), and decrease duration *in response to market declines* to counteract its increasing duration (*i.e.*, "chase down").

(Wells Submission at 13-14 (emphasis added)).

The Wells Submission went on to provide greater detail about the defendant's purported "chase up / chase down" strategy, again couching its description in a way that gave the impression the defendant knew where he wanted to allocate trades at the time he placed them:

> [B]ecause of Macro Opps' negative convexity and consistent with its mandate, Mr. Leech frequently "chased the market" (*i.e.*, bought in response to a rising market or sold in response to a declining market) to manage duration. Because Macro Opps' negative convexity caused its duration to fall at an accelerated rate during market rallies, it was necessary to add duration to maintain the portfolio's duration exposure. Likewise, because Macro Opps' negative convexity caused its duration to increase at an accelerated rate during market declines, it was necessary to reduce duration to maintain the portfolio's duration exposure. These trades would have been inappropriate for the Core Strategies, which typically had far less negative convexity and therefore—in most instances—did not need to take such drastic steps to manage duration. And because the Core Strategies typically lacked negative convexity, Mr. Leech had room to add undervalued securities that would have been inappropriate for Macro Opps.

(Wells Submission at 23.)

These descriptions of the defendant's trading contemplated that the defendant had an allocation decision for Macro Opps in mind at the time of trade execution (the defendant "bought in response to a rising market or sold in response to a declining market"). These representations were materially false and misleading, as the defendant ultimately admitted in his guilty plea. Instead, as the defendant admitted in his plea: "when I later alloc[a]ted my trades, certain of my actual allocations were different from what I had intended when I placed the trades." (6/12/26 Tr. at 27-28.)

### C. The Cherry-Picking Scheme

The defendant's materially false and misleading statements to the SEC were not made in a vacuum. Instead, they were made to impede the SEC's ability to discover his cherry-picking scheme. Specifically, the defendant knew that trading and waiting to allocate his trades was a red flag for cherry picking and that he had used this gap in time between trade execution and trade allocation to secretly favor one set of funds over another.

#### 1. WAMCO and the Relevant Strategies

The defendant's cherry-picking scheme revolved around Macro Opps and the Core Strategies. The Core Strategies were benchmarked strategies that WAMCO advertised to pension funds, large institutions, and retail investors as a prudent, long-term investment strategy designed to outperform the benchmark over a market cycle. Investors could participate in either of the Core Strategies by having a separately managed account or investing in one of the WAMCO mutual funds that followed the Core Strategies. From 2021 to 2023, WAMCO had between approximately $100 and $165 billion in assets under management across the Core Strategies. The defendant shared portfolio management responsibilities for Core and Core Plus with many other portfolio managers. Macro Opps was an unconstrained strategy, which meant that, unlike the Core Strategies, it did not have a benchmark. Instead, the stated objective of Macro Opps was to maximize total return, with a relatively wide range of risk compared to the Core Strategies. WAMCO advertised that "the firm's overall value opportunities can be assessed through [Macro Opps]," and that the strategy typically expressed the best ideas drawn from other strategies across WAMCO—including the Core Strategies—but did so in a more concentrated, aggressive manner. From 2021 to 2023, WAMCO had between approximately $3 and $16 billion in assets under management in mutual funds and separately managed accounts following Macro Opps. The defendant shared portfolio management responsibilities for Macro Opps with one other portfolio manager.

Macro Opps strategy had an outsized effect on WAMCO's net revenue, despite its relatively small size compared to the Core Strategies. Investors following the Macro Opps strategy paid fees that were approximately four times higher than fees paid by investors in the Core Strategies. That fee structure meant that each dollar in Macro Opps was more valuable to WAMCO than a dollar in the Core Strategies. Macro Opps also had a significant effect on the net revenue that WAMCO attributed to Leech's performance.

Between 2021 and October 2023, the defendant made a series of poor investment decisions that disproportionately affected Macro Opps. These decisions included obtaining and keeping a large position in Russian debt that was nearly wiped out soon after Russia invaded Ukraine in early 2022 and a significant investment in Credit Suisse debt that also lost all value when Credit Suisse collapsed in early 2023. Although those losses affected many of WAMCO's strategies, including the Core Strategies, they caused acute problems for Macro Opps, in large part because Macro Opps had more exposure to some of the losing investments. Over the period described above, the assets under management for Macro Opps fell by approximately 80%, dropping to a low of under $3 billion.

This severe drop in the value of Macro Opps caused the defendant and the Macro Opps team to pay particularly close attention to improving the daily performance of that strategy. For example, On March 4, 2022, Leech emailed his co-portfolio manager in response to the daily report on Macro Opportunities' performance, "you were so right this morning, we just need a positive number desperately!"

### 2. The Defendant Knew that Cherry Picking Was Illegal

The defendant knew that he was not allowed to make up for the poor performance in Macro Opps by favoring it over other strategies in his allocation decisions. WAMCO maintained policies, and conducted annual trainings, that detailed Leech's obligations as an investment adviser. Those trainings reinforced that the defendant was managing client money, and he had a fiduciary duty to make trading decisions that were in the best interests of each and every client.

For example, WAMCO's ethics and compliance manuals stated that Leech was required to act as a fiduciary to all of the clients for which he managed money, and the policies explained that this fiduciary duty prohibited Leech from "inappropriately favor[ing] the interests of one client over another." The policies specified that "[i]nvestment decisions must never be based upon an objective to allocate lucrative or profitable trades to particular accounts to make up for past account performance or to benefit the Firm through a higher fee structure in such accounts."

WAMCO also emphasized to Leech and others that allocation practices were an important risk area for potential misconduct. Those WAMCO's compliance training and materials repeatedly emphasized that traders should not wait hours to allocate their trades, but instead should allocate each trade promptly after the trade had been executed, and in no event later than the end of the trading day. WAMCO's compliance training for all portfolio managers, including Leech, stated that traders should complete the allocation process promptly after each trade they made was executed. The training presentation emphasized that it was not prompt to wait hours before allocating, giving a "[b]ad facts scenario" of a trader who executed a trade at 8 a.m., but waited until noon to complete the allocation for that trade, after the market had moved. WAMCO also trained Leech and others to document their "allocation rationale" because the electronic trade allocator creates an "audit trail that can be accessed later—memory can be unreliable."

WAMCO's compliance department reinforced this training through emails to all portfolio managers, including the defendant. For example, in or about August 2021, an operations employee told the chief compliance officer that WAMCO needed "our occasional refresh on timely allocations" after having to remind another employee that, "the optics of not allocating soon after execution may raise questions about deciding who to allocate once the market is closed...i.e. cherry-picking portfolios dependent on the movement in px, etc." WAMCO's compliance department sent an email to all portfolio managers, including Leech, emphasizing that they "should be allocating reasonably promptly after [trade] execution." The email explained that WAMCO did "not want a market movement after execution to influence the allocation," and that "[t]he [Securities and Exchange Commission] is concerned that an adviser might use knowledge of market movement to allocate winning trades to certain accounts."

### 3. The Defendant Secretly Favored Macro Opportunities and Secretly Hurt the Core Strategies

Notwithstanding the trainings and WAMCO's representations to investors, the defendant secretly favored Macro Opps over the Core Strategies by routinely waiting for hours after trading—often until late in the day—before allocating those trades. This practice provided Leech the opportunity to observe how the market had moved between the time of his trades and the time of his allocation decisions.

The defendant took advantage of his ability to see trade performance before allocation to favor Macro Opps in his allocation of many Treasury futures and options trades, at the expense of the Core Strategies. This process of favoring Macro Opps based on first-day performance cumulatively had a significant, positive impact on their performance. Over the course of the scheme, the first-day performance of trades allocated specifically to the Macro Opps strategy had profits of over $600 million of profits, bolstering performance by approximately 8%. By contrast, the first-day performance of trades he allocated exclusively to the Core Strategies amounted to over $600 million of losses, lowering performance by approximately 0.8% due to the larger size of the Core Strategies.

This stark difference in first-day performance was remarkable. The odds of it occurring by chance were less than one in a trillion. The difference in performance was also remarkably consistent: The first-day performance of trades allocated to Macro Opps was almost always better than the first-day performance of trades allocated to the Core Strategies, notwithstanding differences in the market from day to day. The difference in performance persisted regardless of the type of instrument the defendant was trading—indeed, it existed even when he allocated the same type of treasury future or option to both Macro Opps and the Core Strategies on the same day. The difference in performance persisted regardless of whether the market moved up, or down, before the defendant made his trade (which is inconsistent with the "chase up/chase down" theory he presented in his Wells Submission). And the consistency with which Leech allocated winners to Macro Opps and losers to the Core Strategies grew as the size of the gain or loss grew. For example, for trades with first-day gains of over $1 million, over 90% went to Macro Opps, whereas for trades with first-day losses of over $1 million, over 90% went to the Core Strategies.

The bias in favor of Macro Opps was not caused by Leech pursuing a particular trading strategy for Macro Opps. Notably, when Leech did not exercise discretion to allocate trades between Macro Opps and the Core Strategies, the trades that went to Macro Opps were not characterized by disproportionate first-day gains. For example, Leech generally did not exercise discretion to allocate trades through a particular broker ("Broker-1") at the end of the day because his trading assistant automatically allocated them to Macro Opps. When Treasury futures and options trades were allocated to Macro Opps without Leech first observing performance in the market, the bias in favor of Macro Opps disappeared. Over the relevant time period, approximately 55% of the trades Leech placed through Broker-1 trades had first-day gains, while approximately 45% had first-day losses. These trades produced modest first-day losses, generating an average first-day return of a loss of over $5,000. This is dramatically different from the first-day performance of trades Leech allocated to Macro Opps when he had the opportunity to first observe market movements, which had an average first-day return of a gain of over $225,000.

Similarly, after October 2023, WAMCO removed Leech from the Core Strategies, so he no longer had the authority to allocate trades to those strategies. As with the Broker-1 trades, when Leech no longer had discretion to allocate trades to the Core Strategies, the trades Leech allocated to Macro Opps stopped having a consistent, pronounced bias toward first-day gain. Between in or about November 2023 and July 2024, approximately 60% of the Treasury futures and options trades Leech allocated to Macro Opps had first-day gains, while approximately 40% had first-day losses. Unlike when Leech could choose to allocate between Macro Opps and the Core Strategies, the average first-day return on the trades allocated to Macro Opps after October 2023 was a first day loss of approximately $1,500.

The documentary evidence demonstrated how Leech engaged in this scheme on a day-to-day basis. Defendant's trading assistants, Rosemarie Snoke and Julie Marquez were constantly communicating about the defendant's late allocations and detected the defendant's scheme to specifically allocate winning trades to his favored funds. On July 21, 2022, Marquez and Snoke discussed how Marquez should allocate one of the defendant's unallocated trades. (GX 1107-119.) Marquez wrote, "tried ken but no answer . . . no allocation from ken." (*Id.* at SDNY_LEECH_R01_01154390.) Marquez and Snoke then had the following exchange:

> Marquez: although its [sic] a great price.
>
> Snoke: We know how he thinks. *He would be happy to have a winning trade.* What is the trade.
>
> Marquez: so i feel like its [sic] such a *great price he would want to dictate specifically where to allocate*. sell 1000 tyu2 119-00. . . . he was doing 50/50 on other ty's today. . . I could just do that.
>
> Snoke: I'd [sic] that . . . yes. Least invasive.

(*Id.* at 1154390-91 (emphasis added).) The employees decided to "leave it until tomorrow," but then, after Marquez received a confirm from the broker, wrote, "i will do 50/50." (*Id.* at 1165391-92.)

It was this scheme—that the defendant was using his ability to observe how his trades performed throughout the day—that tried to cover up and obstruct when he gave false and misleading information to the SEC.

## II. The Defendant's Plea and Guidelines Range

On June 12, 2026, the defendant appeared before this Court and pleaded guilty to a one-count Superseding Information, pursuant to a plea agreement with the Government. The Superseding Information charged that on March 6, 2024, during testimony before representatives of the Enforcement Division of the SEC, Leech gave false and misleading testimony about when he knew the clients or strategies to which he intended to allocate trades when, in truth, he waited until later in the day to make certain of those allocation decisions, in violation of 18 U.S.C. § 1505. As agreed to by the parties, and as calculated by the Probation Office, the Stipulated Guidelines Range is 6 to 12 months of imprisonment. (PSR 30.)

## III. Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## IV. Discussion

### A. Leech's False Statements to the SEC Warrant an Above-Guidelines Sentence.

Standing alone, Leech's false statements to the SEC warrant a meaningful term of imprisonment above the Guidelines Range to appropriately reflect the severity of the offense and to deter others from similar misconduct. Intentionally lying to the Government is blameworthy and corrodes the Government's ability to effectively protect the public interest. Leech's lies were particularly reprehensible because he made them while running a regulated entity entrusted with managing billions of dollars of other people's money, and he lied with the intent to obstruct his principal regulator from investigating his own trading activity.

Leech was entrusted with managing billions of dollars, and he was required to do so pursuant to regulations established by the SEC. Western Asset was an investment adviser registered under the Investment Company Act of 1940. That statute, and its implement regulations, permit people like Leech to manage money for others, on the understanding that they will meet high standards of integrity set by federal law and the SEC. The guiding rule is that investment advisers, such as Leech, must act as fiduciaries for all of their clients, treating each client fairly and placing client interests above their own.

That rule is reinforced by a host of detailed regulations governing trading conduct, recordkeeping, and reporting, among other aspects of investment advisory businesses. The SEC is the principal agency tasked with enforcing many of those regulations, and its enforcement regime relies heavily on the understanding that regulated entities and their leadership will cooperate in good faith. The SEC, for example, conducts regular examinations of investments advisers, but the effectiveness of that examination process relies, in part, on regulated entities acting transparently with the regulators and providing truthful information. Because of the significant number of investment advisers across the country, the SEC's regulatory system also relies, in part, on regulated parties policing themselves and their employees. For example, as required by regulation, Western Asset maintained a detailed compliance manual and code of conduct. The compliance manual acknowledged that Western Asset had a "duty to supervise the activities of persons who act on its behalf," that "the SEC expects supervisors to respond vigorously when wrongdoing or possible indications of wrongdoing are brought to their attention," and that "supervisors should take appropriate actions decisively to detect and prevent violations of the federal securities laws."

Leech understood his obligations as a leader of a regulated entity. He had decades of experience working for Western Asset, including through periods when the firm went through regulatory reviews that should have impressed upon him the importance of honesty with regulators. He spent years as Western Asset's Chief Investment Officer—a supervisory role that, practically speaking, placed him at the top of the organizational hierarchy alongside the Chief Executive Officer. And if any reminder were necessary, he was required to annually certify that he understood Western Asset's compliance and ethics policies, and to take part in annual compliance trainings that reinforced his responsibilities at a regulated entity.

But when push came to shove—when Leech's own trading was under regulatory scrutiny—Leech egregiously violated his obligation to deal honestly with his principal regulator and lied repeatedly under oath to protect himself. In late February 2024, the SEC sent Leech a subpoena to give testimony to representatives of the agency's Division of Enforcement, which is responsible for investigating potential violations of the federal securities laws. Leech understood that the investigation was about him. Specifically, he knew that the SEC was investigating whether he made trades, and then delayed his decisions about how to allocate those trades, so he could observe how they performed before making a decision. The SEC was concerned that this delayed-allocation process allowed Leech to commit cherry picking—allocating better-performing trades to Macro Opps and worse-performing trades to the Core Strategies.

Leech understood that his answers to questions about his trade-allocation process would be central to the SEC's investigation because of his unique trading process. Other traders at Western Asset typically followed a pre-clearance process, which involved entering information into Western Asset's systems about where a trade should be allocated *before* actually placing the trading. When traders did not preclear trades, they typically logged their allocation decisions in Western Asset's systems shortly after making the trade.

Leech followed a different practice. He traded throughout the day and used a designated assistant to handle the process of inputting his allocations. From the perspective of regulators, this left a murkier picture of when Leech decided where to allocate trades: Western Asset's systems often showed a long lag time between when Leech traded and when his allocations were logged in Western Asset's system, but it was unclear whether that delay was a meaningless byproduct of

Leech's unique trading process or was evidence of a fraudulent scheme to wait before making allocation decisions—this is what the SEC was investigating when it questioned Leech.

Rather than come clean about his allocation practice of cherry-picking, Leech lied. Before testifying, the SEC sent Leech a letter reminding him of his obligation to deal honestly with the agency. That letter warned Leech that making false statements to the SEC could lead to criminal charges under 18 U.S.C. §§ 1621 or 1001, and it apprised him of his Fifth Amendment right to refuse to answer questions if answering honestly may tend to incriminate him. Leech was reminded of his obligations again at the outset of his testimony. He was placed under oath and, in response to questioning from the SEC attorney he acknowledged his obligation to give honest and complete answers.

Leech then gave false testimony to hide from the SEC that he routinely waited hours, or even days, between placing trade orders and making allocation decisions. In an extensive back and forth with the SEC Attorney, Leech repeatedly made statements calculated to give the misimpression that he knew where he was going to allocate a trade at the time he placed each order. When asked whether, "[a]t the time you place the trader order, do you typically have an allocation in mind," he responded "yes." The SEC Attorney then followed up, asking, "you have an allocation instruction in mind at the time you place the trade order with the broker?" Leech again responded, "yes."

The SEC Attorney then probed Leech's trade process further, and he continued to make false and misleading statements to give the impression that he made allocation decisions when he placed trades. For instance, the SEC Attorney asked Leech wash he considered "when deciding how to allocate a particular trade." Leech responded that he made the decision based on "the strategic investment need[s]" of the "group of accounts *for which I was placing the trade*." (Emphasis added). Similarly, the SEC Attorney asked Leech whether he discussed with anyone where he planned to allocate trades between the time he placed orders and the time he gave allocation instructions to his trading assistant. Leech responded that he typically did not, remarking, "once I've done the trade and know where I'm going to allocate it, I don't need to re-review it." In total, these responses were calculated to give the false impression that Leech made allocation decisions when he placed trades, and any delay was an innocent byproduct of waiting to convey that pre-existing decision. Leech also doubled down on this lie in his Wells Submission, which again tried to convince the SEC that he knew his allocations at trade execution and was not waiting until later in the day to observe market movements before deciding his allocations.

Deliberately lying, under oath, to obstruct an ongoing SEC investigation is egregious misconduct that warrants a meaningful term of imprisonment to appropriately "reflect the seriousness of the offense . . . and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Falsehoods destroy trust, make it impossible for others to make informed choices, and undermine the Government's ability to fairly and efficiently protect the public interest. For this reason, and even setting aside the unique regulatory context surrounding Leech's crime, lying to obstruct a federal investigation is a serious crime that warrants a serious sentence. Accordingly, courts in this Circuit routinely impose meaningful prison sentences for lying to federal officials, perjury, and similar obstruction offenses. *See, e.g.*, *United States v. Sampson*, 898 F.3d 287, 294 (2d Cir. 2018) (60 months for obstruction of justice and false statements); *United States v. House*, 636 F. App'x 50, 52 (2d Cir. 2016) (48 months for obstruction of justice and false statements); *United States v.*

*Smith*, 2022 WL 1053263, at 1 (2d Cir. Apr. 8, 2022) (48 months for perjury); *United States v. Templar*, 486 F. App'x 224, 225 (2d Cir. 2012) (36 months for false statements); *United States v. Perez*, 325 F.3d 115, 118 (2d Cir. 2003) (24 months for false statements and failing to file a currency report); *United States v. Barresi*, 361 F.3d 666, 668 (2d Cir. 2004) (21 months for false statements); *United States v. Vogler*, 763 F. App'x 18, 19 (2d Cir. 2019) (18 months for false statements) *United States v. Gangapersad*, 2023 WL 8540428, at *1 (2d Cir. Dec. 11, 2023) (12 months for false statements).

Leech's conduct is all the worse because of his leadership role at a regulated entity. This is not a case of someone who lied to federal agents who appeared at the door unannounced; or even who lied under oath, but had no prior experience with the legal system, each of which is serious misconduct. Leech was fully aware of the significance of lying to the SEC, both because of his career experience and the narrow events leading up to his testimony. Looking at his career, Leech spent his entire professional life working at regulated entities and rose to a leadership role at one of the largest bond funds in the country. In that role, he not only was expected to set the standard for Western Asset, but was also a public face in the world of bond trading. With respect to the specific testimony at issue, Leech had advanced notice that he was under a serious investigation, he was advised by counsel, and he was explicitly warned about the option to refuse to answer questions if he could not do so truthfully without incriminating himself, and the potential consequences he faced if he lied.

This context is not accounted for in the applicable Guidelines range, but it is a significant aggravating factor that warrants an above-Guidelines sentence. For one, it enhances the "seriousness of the offense" and the need to "provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Leech knew the importance of telling the truth to the SEC. He had time to consider the nature and gravity of the SEC's investigation. He knew how the truth could hurt him in that investigation, and how a lie could protect him. And he selfishly advanced his own interests by lying in the hopes that his lies would frustrate the SEC's investigation.

Because of Leech's leadership role in a regulated entity, an above-Guidelines prison sentence is also necessary to "promote respect for the law" and to "afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(2)(A) & (B). The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white-collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). The Second Circuit and courts in this district have noted the appropriateness of meaningful sentences in the context of financial crimes committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). As the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses

are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").[1]

That is particularly true here. As a leader of Western Asset, Leech was supposed to set an example for others in the business. And as a renowned bond trader at a significant firm, Leech had notable public presence in the industry at large. The fact that someone of his stature would lie to the SEC, in an effort to avoid scrutiny of how he was managing clients' money, presents a meaningful risk to the SEC's ability to effectively and efficiently supervise investment managers. Imposing a sentence with a brief, or no, term of imprisonment would send a poor message to other investment managers, signaling that—even if the lies ultimately fail—the consequences of lying to and obstructing regulators will be light. That would risk increasing the incentive for investment advisers to try to conceal or cover up wrongdoing, or otherwise deal dishonestly with the SEC.

### B. Lying to Hide a Massive Cherry-Picking Scheme Warrants an Above-Guidelines Sentence.

An above-Guidelines sentence is also necessary in this case because Leech lied to the SEC to hide his long-running, cherry-picking scheme to deceptively favor certain funds over others in his allocation decisions. That Leech lied to hide his own, breach of fiduciary duties is a significant aggravating factor that confirms the need for an above-Guidelines sentence.

The Court can, and should, consider at sentencing that Leech lied to the SEC to cover up his cherry-picking scheme. Although Leech did not plead guilty to that offense, the plea agreement provides that either party may "seek a sentence outside the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a)." This language expressly reserved the Government's right to advocate for an upward variance based on the Section 3553(a) factors. *See United States v. Sealed Defendant One*, 49 F.4th 690, 696 (2d Cir. 2022) (where parties to the plea agreement "expressly agreed that either party could seek a sentence outside of the Stipulated Guidelines Range based upon the [Section 3553(a)] factors," there is "no error, much less plain error, in allowing the government to advocate a sentence above the Stipulated Guidelines Range").

Leech's secret cherry-picking scheme is relevant to the Section 3553(a) factors. The Second Circuit has consistently affirmed that sentencing courts may consider criminal conduct beyond the scope of a conviction, so long as that conduct is "proven by a preponderance of the evidence," and the District Court does not use it to "increase either the statutory minimum or maximum available punishment." *United States v. Ulbricht*, 858 F.3d 71, 128 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018). This authority to

[1] As defendant notes, many of his Section 1505 sentencing citations do not provide enough factual information about the sentences and their underlying facts to be helpful to the Court in this fact bound balancing of sentencing factors. *See* Br. at 54 & n. 40, 41. Even the few sentencings with additional factual detail do not come close to the seriousness of the offense in Leech's case given Leech's role at Western Asset.

consider the scope of the defendant's misconduct is sufficiently broad that it encompasses even "uncharged conduct." *See United States v. Cacace*, 796 F.3d 176, 190-91 (2d Cir. 2015); *accord United States v. Hadden*, 2024 WL 4456203, at *5 (2d Cir. Oct. 10, 2024). And it applies regardless of whether the misconduct at issue "constitute[s] 'relevant conduct' under the Sentencing Guidelines," as opposed to simply "the broader circumstances surrounding the defendant's criminal activity." *United States v. Yaghmour*, 2023 WL 4504462, at *2 (2d Cir. July 13, 2023); *accord United States v. Wernick*, 691 F.3d 108, 119 (2d Cir. 2012). Indeed, in the context of a false-statements conviction, the Second Circuit has affirmed that District Courts may even consider under Section 3553(a) related acquitted conduct, so long as it is established by a preponderance of the evidence. *United States v. Shahid*, 486 F. App'x 915, 916-17 (2d Cir. 2012).

Here, Leech's cherry-picking scheme is an important factor in the Section 3553(a) analysis. First, the cherry-picking scheme is essential context for evaluating "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Leech did not lie to hide a regulatory misstep with no impact on client funds. Instead, he lied to obstruct an investigation into his own cherry-picking scheme, in which he deceptively advantaged Macro Opps and other select funds, at the expense of the Core Strategies, over a period of years. The fact that he resorted to further deceit to cover up this scheme confirms that his false statements to the SEC were not a momentary lapse of judgment, but were instead the deliberate next step in his long-running pattern of deceitful acts. Indeed, Leech knew that "[c]herry-picking is difficult to detect," *Sec. & Exch. Comm'n v. World Tree Fin.*, 43 F.4th 448, 462 (5th Cir. 2022), so his deception was all the more meaningful. That makes the crime of conviction all the more needing of an above-Guidelines prison sentence to reflect the seriousness of the offense and to deter others from similarly trying to conceal their wrongdoing.

Second, and relatedly, accounting for Leech's cherry-picking scheme is necessary to appropriately "reflect the seriousness of," and "providing just punishment for," the offense. 18 U.S.C. § 3553(a)(2)(A). Again, Leech's lies to the SEC did not occur in a vacuum. He lied because the walls were closing in on his long-running cherry-picking scheme after multiple whistleblowers detected his misconduct. That fraudulent scheme struck at the core principle for every investment adviser: that the adviser should act as a fiduciary for each and every client. Leech was not managing Western Asset's money; he was managing money that belonged to his clients. Because of that, he had a duty to look out for the interests of each client individually, whenever he made a trade. Leech knowingly breached that duty and misled investors when he consistently placed trades, waited to see their performance, and allocated better-performing trades to Macro Opps and worse-performing trades to the Core Strategies. This scheme was not an isolated event. Leech did it for years, routinely sending the best-performing trades to Macro Opps and the worst-performing trades to the Core Strategies. The result was that, between 2021 and October 2023, the first-day performance of trades Leech allocated exclusively to Macro Opps amounted to over $600 million of profits, bolstering performance by approximately 8%. By contrast, the first-day performance of trades he allocated exclusively to the Core Strategies amounted to over $600 million of losses, lowering performance by approximately 0.8% due to the larger size of the Core Strategies. That concealed favoritism is contrary to the proper role of an investment advisor, and warrants serious consideration at sentencing.

Finally, Leech's cherry-picking scheme is relevant for assessing the "characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Leech's sentencing submission relies heavily on letters from co-workers and others, attesting to his integrity and reputation in the industry. His cherry-picking

scheme to disadvantage clients to whose he owed a duty and the lies he told to cover up the scheme are important, countervailing factors to consider when evaluating those letters. Leech occupied a unique position at Western Assets, serving both as the Chief Investment Officer and the lead investment professional on two different sets of strategies: Macro Opps and the Core Strategies. This gave him the freedom to place and allocate trades with little practical oversight. Leech had no boss, and there was no one consistently monitoring how he allocated trades between the two strategies. So while Leech could outwardly present the image of a trustworthy asset manager to co-workers and clients, behind the scenes he had broad discretion to secretly make investment decisions in a way that secretly favored certain strategies over others. When Macro Opps ran into particularly rough waters, he did just that—systematically advantaging the fund in allocation decisions, over the course of years, by sending the best-performing trades to that strategy and the worst-performing trades to the Core Strategies. That extensive scheme (which was concealed from investors and inconsistent with Leech's fiduciary obligations), was punctuated by lying to the SEC. This context is critical context for evaluating an appropriate sentence under Section 3553(a).

**Conclusion**

For the reasons set forth above, the Government respectfully submits that an above-Guidelines sentence is fair and appropriate in this case.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

by: Peter Davis ______________________
Thomas Burnett
Peter Davis
Assistant United States Attorneys
(212) 637-2468

cc: *Counsel for the defendant* (via ECF)